UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA

**FILED**

DEC 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

AMU A. ALLSTON,  Pro-Se )
( Petitioner ) )
2302 DELANO LANE )
DIST. HGTS. MD 20747 )
V. #301-735-2393 )
)
UNITED STATES PAROLE )
COMMISSION, )
( Respondents ) )
)

Case: 1:07-cv-02354
Assigned To : Urbina, Ricardo M.
Assign. Date : 12/10/2007
Description: Habeas Corpus/2255

---

### PETITION FOR WRIT OF HABEAS CORPUS ( 28 U.S.C. § 2254 )

The petitioner submits to this court, this petition for Writ of Habeas Corpus, for relief of the U.S. Parole Commission's ( Commission ) erroneous decision to revoke petitioner's parole based on it's finding arbitrarily that petitioner violated the conditions of his parole by committing an assault ( Simple Assault ).  Ordering him to serve 16 months prior to reparole ( see Final Notice of Action ).  Petitioner exhausted his ' Administrative Remedies ', appealing to the National Appeals Board who affirmed Commission's decision ( see Notice of Action on Appeal ).

The petitioner asserts that the Commission abused it's discretion when : **1) The Commission based their decision on erroneous information, a flawed interpretation of the law of self-defense.  2) The Commission failed to follow their own Rules, Regulations and Proceedures in their fact finding and decision making process.**

Petitioner also asserts that the Commission violated his Constitutional Right to Due Process when : **1) The Commission failed to afford petitioner with Notice of all the charges in the Parole Warrant that his Final Revocation Hearing would be based on, when**

**RECEIVED**

NOV 2 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

-1-

Hearing examiner ' Verbally Supplemented ' the warrant during the recommendation phase [ conclusion ] of the hearing, adding a ' Seperate Charge '. 2) The Commission failed to re-issue subpoena for Officer Russell Heller ( Anne Arundel County Police Department ), who was on ' sick leave ' for the first hearing, to be present for the second hearing, who would have further contradicted statements Asset Protection Associate ( A.P.A ) James Gibson ( alleged victim ), made to him on the scene, to those made at the second hearing, and their failure to subpoena the video survailance tapes [ in-store & parking lot ], from Wal-Mart as requested by petitioner, at the rescheduling phase of initial hearing.  3) The Commissions decision decision was totally lacking in evidentiary support and was so irrational as to be fundamentally unfair.

Finally, the Commission was arbitrary and capricious in revoking petitioners' parole because there was no rational basis in record to support Commissions conclusions.  And, if found necessary, the Commission could have applied other punitive options in concideration of petitioners progress while on parole, and his supervision officers testimony in support of petitioner, and of the circumstances of his arrest being unwarranted.


## STATEMENT OF CASE


On sunday, Febuary 20, 2006, upon returning from a weekend ' ski-Trip ' with family, petitioner ( Amu Allston ) and his wife, Dawana Cooke ( Common-Law ), went to a ' Wal-Mart in Laurel, Md.[1],

---

1 - Mr. Allston was living in Laurel, Md. with his wife & 2 childern at the time.

to purchase some food items for their childrens breakfast, and lunch for school for the week. Prior to going to Wal-Mart, Mr. Allston and his wife had to go to his mother-in-law's house ( Mrs. Cookes' mother ), to reconnect her kitchen stove, and to check on the problem with her heat.[2] Upon conclusion of these minor repairs, Mr. Allston and Mrs. Cooke headed to Wal-Mart. Having to pass their home enroute to the store, Mrs. Cooke suggested that they stop at their house to pick up some items that were previously purchased at a Wal-Mart while on their trip, that were defective and needed to be exchanged. Upon arriving at their home, Mrs. Cooke called inside the house to tell their daughter to bring out the bag containing the items that needed to be exchanged.[3] She complied with this direction and brought the bag to the car.

Upon arrival at the Wal-Mart, due to some crowding, Mr. Allston was forced to park a slight distance away from the front of the store. The bag with the items in it to be exchanged ( 1 large bag ) was placed in a shopping cart, and Mr. Allston and Mrs. Cooke entered the store. They proceeded directly to the ' Service Desk ' to make their exchange. While taking the items out of the bag, Mrs. Cooke noticed that there were other items in the bag that were

---

2 - Mr. Allston is an H.V.A.C.-R Mechanic ( E.P.A. - Cetrified ). Mr. Allston is also a member of the Steamfitters Union ( Local 602 in Capitol Heights, Maryland ). Mr. Allston had disconnected his mother-in-law's stove that previous friday (2/18/06) before going on their trip, in preperation of the men coming [ over the weekend ] to install new hardwood flooring.

3 - Mr. Allston [ and his wife ] had not had the opportunity to unpack any of their bags after returning from their trip. When his daughter brought the bag out the house and to the car, it was still packed as it was when they returned from the trip.

not being exchanged.[4]  Mrs. Cooke made mention of this to the clerk, who responded that she would put the exchanged items in " Wal-Mart bags ", so they would not have any problems.  Each item was placed in an individual Wal-Mart bag ( 3 bags ), and a reciept was given to Mrs. Cooke, concluding the exchange.

With the exchange complete, Mrs. Cooke placed the bags back into the shopping cart.  She then led the way into the food aisles, with Mr. Allston following pushing the cart.  After adding to the cart the desired food items, Mr. Allston, an avid DVD collector, told Mrs. Cooke that he wanted to go see what new DVD's had been released.  They then proceeded to the rear of the store to a DVD display.[5]  Deciding there was nothing he wanted to purchase, they made their way back to the front of the store, and to the check-out counter.  In line at the check-out counter, Mr. Allston took the bags with the exchanged items in them, and the bag they initially brought the items in the store in [ with the remaining items in it ], out of the cart.  Mr. Allston informed her that he would go get the car and meet her in front of the store.  Mrs. Cooke gave him the reciepts, and Mr. Allston proceeded to the stores exit. Mr. Allston exited the store and proceeded to where his vehicle was parked.  Upon approaching his car (appro. 20-25 ft. away), Mr. Allston heard some footsteps seeming to be running in his direction from behind.  As he glanced over his shoulder, he noticed 2 unidentified me quickly approaching him [ one of them wearing a

4 - There were 4 sweatsuits, a sweatshirt and some unopened battaries in the bag. 3 of the sweatsuits were exchanged. The battaries had previously purchased for the trip, at 1 of 3 possible stores (Target, Best Buy or Wal-Mart). The reciept for battaries was not found.

5 - DVD display was located in the rear of the store just outside of Electronics Department. Mr Allston never entered Electronics Department.

hood over his head ( a sweathood ), who demanded, " Give me that bag! " Startled and in fear of his safety [ of being attacked ], Mr. Allston turned, facing the assailants, taking his utility knife off of his belt. Holding it in his hand ' <u>down at his side</u> ',[6] while steadily moving away from his assailants and towards his car. The two men noticed that Mr. Allston had something in his hand and stopped their pursuit. They then started to move back, towards the front of the store, when Mr. Allston heard one of the men say, " Call the Police! " Hearing this confused Mr. Allston because he had reasonably believed that the two unidentified men demanding his property, meant him harm. But at that point Mr. Allston realized that the men must be affiliated with the store. This realization disturbed Mr. Allston, because he did not understand why they would be running behind him.

Mr. Allston [ having already put the knife away ], placed his bags in to his car, then began to return to the front of the store in an attempt to find out what the problem was. As Mr. Allston was driving back to the front of the store, Mrs. cooke called Mr. Allston [ on his cellphone ], to inquire about his whereabouts [ after reaching the area where the car had been parked and not seeing him nor the car ]. He informed her that he was on his way to the front of the store, and described briefly to her what had just happened. Mrs. Cooke informed Mr. Allston that she had heard the man [ as she passed him ], talking on the phone describing a

---

6 - Mr Allston had the Utility Knife on his hip because he had used it just prior to going to Wal-Mart in completing repairs at his mother-in-laws house. Mr. Allston held the knife down in his hand beside his thigh. At no time did he raise it, point it at, threaten, or lunge at [anyone] either of the men.

vehicle as a " Gray Volvo "[7]. Aware of Mr. Allston's parole
status and not wanting the potential for any trouble to come to
him, Mrs. Cooke suggested that he return to pick her up, and that
they just leave.  Mr. Allston rejected her suggestion and told
her to return to the front of the store.  Informing her that he
wanted to wait for the police to arrive, to address the matter.

Parked in front of the store, Mr. Allston asked the man who
had the hood on his head [ later identified as James Gibson -
Asset Protection Associate (A.P.A.), Wal-Mart ], What was the
problem? Mr. Gibson stated that Mr. Allston had shoplifted.
Mr. Allston, offended and clearly aggitated by these accusations,
informed Mr. Gibson that he was wrong in his assumptions.  That
he had just exchanged some Items, and that he had reciepts for the
items in his bag(s).  To which Mr. Gibson replied; " I didn't
know! "

Shortly after, the first of several officers arrived on the
scene[8]. Mr. Gibson informed the officer [ Ofc. Heller ], that
Mr. Allston was the individual " 911 " was called about [ a shop-
lifter with a knife ].  Also informing the officer that Mr. Allston
had " Stolen Electronics ", in his car.  Ofc. Heller approached
Mr. Allston and detained him [ placed him in handcuffs ].  Mr. Allston
questioned Ofc. Hellers' actions, but complied.  The Officer asked
Mr. Allston whether he had a knife and stolen electronics in his
car.  Mr. Allston informed him that there was a ' utility knife '
on the front passanger seat of the car, but that he did not have

---

7 - The Wal-Mart Associate (A.P.A. James Gibson), described to the 911 operator,
    the vehicle Mr. Allston was driving as a Gray Volvo. Mr. Allston was driving
    a light blue BMW.  (see 911 radio report - Exhibit I)

8 - The first officer to arrive on the scene [ and arresting officer ] was,
    Anne Arundel County Police Officer Russell Heller, Badge No. 1323.

any stolen items in his car.  Explaining to to the officer what
had just happened in the parking lot, then instructing the officer
to search his vehicle.

Upon completion of the search of Mr. Allstons' vehicle by
Ofc. Heller [ and another officer ], there were no stolen items
found.  The two officers then proceeded to verify the items in his
bag(s), against what was on the reciept(s).  The officer(s)
determined that the battaries [ that were brought into the store
in the bag with the items to be exchanged ] and the sweatshirt were
not on the reciept(s).  The Officer called Mr. Gibson over and
showed him these items.  Moments later, Ofc. Heller returned to
Mr. Allston and informed him that he was being placed under arrest
and charged with " Assault and Theft of Battaries ".  Mrs Cooke
[ and Mr. Allston ] attempted to explain to the officer(s) that
the battaries were previously purchased, and already in the bag
prior to entering the store.  Mrs. Cooke then attempted to go back
into the store in an attempt to have the 'Service Person' who had
helped them [ during the exchange ], to varify their account.  But
was stopped by other officers and told, " Do not enter the store
or you will be arrested! "

Mr. Allston was taken into custody and charged with: 1) First
degree Assault, 2) Second Degree Assault, and 3) Theft of under
$100.00.  On the morning of Febuary 21, 2006, Mr. Allston was taken
in front of the ' Commissioner ', who set bail at Seventy-Five
hundred dollars ($7500.00) [based on Mr. Allston's parole status].
Bail was immediately posted and Mr. Allston was released from

-7-

detention.  Mr. Allston promptly notified his Community Supervision Officer ( C.S.O. ), Angela Griffin, later that day, of his 'Unwarranted Arrest[9]', and explained in detail the circumstances leading up to his arrest.  Due to Mr. Allston's compliance of his Supervision Officers direction(s) and the ' Modified Conditions[10]' of his parole, coupled with her belief in Mr. Allston's version of the events leading up to his arrest;[11] C.S.O Griffin did not find it necessary to immediately report arrest to the Commission.

On March 15, 2006, Mr. Allston hired attorney Mark A. Lechowicz to represent him in the matter.  A preliminary hearing was scheduled for March 22, 2006.  At the preliminary hearing, Count 1 - First degree Assault ( Felony ) was dismissed.  Under the advise of his attorney, Mr. Allston waived his right to a preliminary hearing. [ Petitioner later entered a plea of ' NOT GUILTY ' to the remaining charge(s): Second degree Assault ( Misdemeanor ) and Theft of under $100.00. ]  Several court dates passed as Mr. Allston's attorney investigated the allegations.  Mr. Lechowicz requested Wal-Mart to release the ' Video Survailance ' (e.g. in store and parking lot), of the night in question.  No survailance tapes were released. Mr. Lechowicz spoke directly to the arresting officer [ Ofc. Heller ] who refered him to the officer who normally patrols and responds to calls in the area of that particular Wal-Mart ( Ft. Meade Rd./ Rt. 198 ), who described the " Wal-Mart Security " ( Asset Protection Associate ) staff as " UNRELIABLE ".[12]  Also, conferring directly

---

9 - See Number 6 of Parole Conditions ( Exhibit II )
10 - See 'Modified Conditions' approved by the Commission ( Exhibit III )
11 - See Hearing Transcript ( Exhibit A Pgs. 12-13 )
12 - See Hearing Transcript ( Exhibit B2 Pg. 5 ), and
     Letter from Atty. Mark Lechiwicz

with the States Attorney about whether Mr. Gibson [ Wal-Mart ], " Could prove for certain that the battaries in fact came from Wal-Mart. " [ They ] Mr. Gibson could not.  All remaining charges were dismissed on August 28, 2006.[13]

On or around June 9, 2006, Mr. Allston contacted C.S.O Griffin, to inform her that the remaining charges were scheduled to be dismissed on August 28, 2006.  On July 18, 2006, C.S.O Griffin submitted a ' Violation Report ' [ semi-annual report ] to the Commission, informing them of Mr. Allston's arrest and tentative dismissal of the charges.  Also requesting that " No action be taken " against Mr. Allston pending resolution of charges.[14] C.S.O Griffin's report was received by Mr. Jaquan Jackson ( Case Analyst Trainee ) with the U.S. Parole Commission.  Mr. Jackson, without further inquiry, and in disregard of C.S.O Griffin's request that " No action be taken ", submitted a ' Warrant Application ' alleging Mr. Allston violated the Conditions of his Parole.  Unbeknown to C.S.O Griffin [ and Mr. Allston ], the Commission issued a ' Parole Violator Warrant ' on August 9, 2006 pursuant to § 24-205, 24-131 and 24-133 of the U.S. Code.[15]  On August 18, 2006, a routine stop was conducted by the D.C. Metropolitian Police.  Upon check of Mr. Allston's name and Social Security Number, he was taken into custody for the Parole Violator Warrant.  He was processed and taken to the D.C Central Detention Facility ( D.C Jail ).

On August 25, 2006, Mr. Allston was given a Preliminary Hearing

---

13 - See Defendant Trial Summary ( Exhibit IV )
14 - See Violation Report ( Exhibit V )
15 - See Parole Violator Warrant ( Exhibit VI )

by the Commission, and was represented by Ms. Anna Rodriques of the D.C. Public Defender Service.  The Warrant Alleged the following violation(s) : **Charge No. 1 - Use of Dangerous and Habit forming Drugs.  Charge No. 2 (a) Assault with a Deadly Weapon, (b) Theft.** The Preliminary Hearing Examiner found ' Probable Cause ' based on the Police Report.[16]  A Local Revocation Hearing was scheduled for October 26, 2006. The Adverse Witnesses approved [ at that time ] to be subpoenaed to attend the ' Final Revocation Hearing ' were : 1. Angela Griffin ( C.S.O ), 2. Ofc. Russell Heller ( Arresting Officer ), 3. James Gibson ( Asset Protection Associate - Wal-Mart ).

On October 26, 2006, Mr. Allston was **granted** a local revocation hearing at the Central Treatment Facility ( C.T.F ).  The hearing was conducted by Examiner Casey Skvorc.  The only Adverse Witness [ Subpoenaed Witness ] to attend was C.S.O Griffin.[17]  Mr. Allston's wife ( Mrs. Cooke ) was also in attendance.  Examiner Skvorc refused to hear the alleged ' Law Violation(s) '.  Stating that he must afford the officer and the accuser another opportunity to be present, and Mr. Allston the opportunity to confront his accusers.  Examiner Skvorc stated however, that he would hear [ review ] the alleged ' Administrative Violation ', based on C.S.O Griffin being present.

C.S.O Griffin spoke highly of Mr. Allston's accomplishments and progress while on parole, dispite his ' Minor Set-back ' in December of 2004 [ Mr.  Allston sought help through his [ then ] supervision officer Michelle Merrett, expressing his desire to

---

16 - See Police Report ( Exhibit VII )
17 - Ofc.  Heller and James Gibson were subpoenaed to attend hearing.
     Ofc.  Heller was on sick leave as a result of recent surgery ( excused ).
     James Gibson was simply a ' NO SHOW '.

enter an in-patient program, admitting that he had recently reverted
to the use of drugs.  Mr. Allston also submitted two urins samples
in January of 2005, that tested positive for drugs.  C.S.O Merrett
reported Mr. Allston's use to the Commission, requesting that he
be ' Sanctioned ' and, the conditions of his parole ' Modified[18] ].
C.S.O. Griffin informed Examiner Skvorc that Mr. Allston had been
in complete compliance with the ' Modified Conditions ', and was in
the process of completing the out-patient portion of his conditions
[ self-pay ].  Upon conclusion of the hearing, Examiner Skvorc
found that the ' Admitted Use ' and ' Positive Urines ' did not
rise to the level of revocation, based on that violation alone.[19]
Examiner Skvorc recommended that Mr. Allston be released on
' Subpoena ', pending rescheduling of the hearing,[20] [ based on
his stable home, stable employment, and testimony in support of
reinstatement of parole from his Community Supervission Officer ].

     The Commission issued a ' Notice of Action ' dated November
7, 2006, against Examiner Skvorc's recommendation.  Ordering
Mr. Allston to remain in custody pending the continued revocation
hearing.[21]  The next hearing was scheduled for December 12, 2006.
The Commission failed to re-subpoena C.S.O. Griffin and Ofc. Heller
[ as requested by petitioner, at conclusion of initial hearing ].
The only subpoena that was issued [ by Commission ] was for Mr. James
Gibson ( A.P.A - Wal-Mart ).  The hearing was conducted by Dr. Price.
With the administrative violation reviewed in the first hearing,
this hearing was only to address the alleged ' Law Violation(s) '
(i.e. Assault with a Deadly Weapon and Theft ).

------------------------------------------------------------

18 - See letter requesting Reprimand/Modification ( Exhibit III )
19 - See Hearing Transcript ( Exhibit A pg. 11 )
20 - See Hearing Transcript ( Exhibit A pg. 17 )
21 - See 'Notice of Action' ( Exhibit VIII )

During cross-examination of Mr. James Gibson at the hering, Mr. Gibson's testimony was riddled with ' Conflicting Statements ' and ' Inconsistancies '. Mr. Allston providedin his defense, the ' 911 Transcript ' of the Emergency call placed on the night in question [ to the Anne Arundel County Police Department[22] ]. Mr. Gibson [ alleged to be the person who placed the 911 call ], described to the Dispatch Person, an alleged ' **Shoplifter with a knife and Stolen Electronics** ' [ He never mentioned anything about batteries in his report to the operator ]. Mr. Gibson's testimony revealed that when Ofc. Heller arrived on the Scene, he again stated that he believed Mr. Allston had ' Stolen Electronics ' in his car [ at hearing Mr. Gibson admitted that there was no mention of batteries, until after batteries were found in his car ]. Mr. Gibson also stated that he did not have the chance to identify himself, as he approached Mr. Allston from behind.[23] Contradicting the statement that he made to Ofc. Heller on the scene ( See Police Report EX. VII ).

Mr. Gibson also made conflicting statements [ at hearing ], in regards to where he initially approached Mr. Allston [ stating that he approached Mr. Allston about " 2 or 3 steps off the sidewalk " in front of the store[24] ]. When asked later whether he could describe or identify the knife Mr. Allston held, Mr. Gibson could not. Only suggesting that it was a " Pocket Knife ". [ Illogically ] testifying that he could not give a detailed description of the knife because, " It was dark and it's just the lights from the

---

22 - See 911 Transcript ( Exhibit I )
23 - See Hearing Transcript ( Exhibit B1 pg. 19 )
24 - Mr. Gibson admitted during testimony that he (nor any other employee) is not
     permitted to follow a suspect more than3 or 4 ft. off the sidewalk, and
     that he could be fired for doing so ( See Ex.B1 pg.32). Which makes it
     highly unlikely that he would admit running into the parking lot after him.

parking lot.[25] " Mr. Gibson also stated that he observed Mr. Allston
enter the ' Electronics Department ' and remove batteries from a
display. Then he stated that he " watched Mr. Allston go into the
Home Fashion Department ", where he saw " Mr. Allston put the
batteries in his bag. " Mr. Gibson then states [ Illogically ],
that Mr. Allston proceeded to the register where " he thought
Mr. Allston was going to pay for the items " [ that he allegedly saw
Mr. Allston put in his bag ].[26] It is not in accordance with
reasoning, to see someone you suspect of stealing [ Shoplifting ]
( e.g. putting items not paid for in his bag ], to then reasonably
believe that person intends to pay for the items. Furthermore,
Mr. Allston contradicted Mr. Gibson's version of this when he
stated ; 1. He never entered the Electronics Department. 2. He was
at no time standing at or near a battery display [ after investigation
of where the batteries are on display at in this particular store,
it was found that the ' main battery display ' is located in the
' Photo Department ' ( See enclosed photo's, Ex 1,2 & 3 ), and
some are on display at the check out counters. Which also contradicts
Mr. Gibson's testimony as to why he only mentioned ' Stolen Electronics '
when he placed the 911 call. Alleging that he considers batteries
electronics, because " that's where they keep them.[27] " ].

There were several ' Major Points ' about the night in
question, that both Mr. Allston and Mr. Gibson share identical views
and recollections. They are : **1. Mr. Allston had no idea who the**

---

25 - See Hearing Transcript ( Exhibit B1 pg. 22 ) This testimony from Mr. Gibson-
     that the front of the Wal-Mart store was dark, lit only by light coming from
     the parking lot- defies logic and good business scense as well.
26 - See Hearing Transcript ( Exhibit B1 pg. 31 )
27 - See Hearing Transcript ( Exhibit B1 pg. 31 )

men pursuing him were ( Mr. Gibson did not identify himself ).
**2. Mr. Allston never pointed the knife he was holding at him, it
was held down at his side** ( i.e. He never lunged at, pointed it
at, threatened nor attempt to harm anyone ), **and continued
moving back and away from his pursuers. 3. Mr. Allston returned
to the front of the store to find out why these men were pursuing
him, and willingly, waited for the police to arrive** [ to address
Mr. Gibson's misperception and misunderstanding ]. **4. Mr. Allston
was upset by the accusations** ( i.e. felt harrassed and offended ),
**but at no time did he make any threats to anyone** [ instead he
attempted only to explain to Mr. Gibson that he had erred with
his accusations ]. **5. Mr. Allston could have simply fled the
scene** [ Unidentified ], **had he actually did something wrong**
[ committed a crime or performed any act with criminal intent ].

After hearing all the testimony, and in review of all the
evidence, Dr. Price made ' No Finding ' [ of guilt ] in relation
to the two alleged ' Law Violations stated in the charging warrant.
Dr. Price then ' Verbally Supplemented ' the warrant, adding a
" Seperate Charge[28]" of ' Simple Assault ', and decided that
Mr. Allston comitted a Simple Assault by his own admission that
he possessed [ displayed ] a knife. Mr. Allston's attorney
objected to Dr. Price's misuse/abuse of his discretion, duties
and authority. Dr. Price then further erred by making his
decision based on ' Future Predictions ' of what would have
happened had the men not stopped and retreated. Stating; " Okay,

28 - See Hearing Transcript ( B3 pg. 1 )

well again, I mean, if you be honest with yourself, had the guy,
the one with the hood on, had continued forward, you would have
used the knife[29]" There was no evidence to support this prediction.
Mr. Gibson testified that Mr. Allston " Never pointed the knife
at him, and never threatened him[30] "

Dr. Price erred in basing his finding on his own personal
belief [ Flawed interpretation of the law and/or conditions of
Mr. Allston's parole ], that Mr. Allston was not entitled to wear
his ' Work Tool ' [ on his belt ], if he was not literally at
work.[31] Mr Allston does not agree with Dr. Price's theory that his
' Conditions of Parole ' allowed him to possess ' Work Tools '
only while working.  Mr. Allston had been working at his mother-
in-laws house just prior to going to Wal-Mart.  No evidence was
presented that Mr. Allston carried his work tool [ utility knife ]
in " anticipation of an attack " or " with the intent to attack
( or intimidate ) anyone ".

Dr. Price also erred through his ' flawed interpretation of
the law, Mr. Allston's right to defend himself and what during
' Self-Defense ' is concidered " Excessive ".  Dr. Price's
interpretation that the " Mere display of a knife " to twart off
the on rush of unarmed attacker(s) is excessive, is legally flawed.[32]
As well as Dr. Price's interpretation of Mr. Allston's right to
defend himself.  Suggesting that Mr. Allston had to ' Meekly
stand by and become a victim ', before he could ' Lawfully '

29 - See Hearing Transcript ( Exhibit B1 pg 16 & B2 pg. 13 )
30 - See Hearing Transcript ( Exhibit B1 pg 20 )
31 - See Hearing Transcript ( Exhibit B2 pg 14 &15 )
32 - See Hearing Transcript ( Exhibit B3 pg 2 & 3 )

defend himself. And that Mr. Allston's level of defense exceeded the threat that he was confronted with.

Mr. Allston is also lead to believe that Dr. Price was confused and/or reviewed the wrong testimony of his initial hearing, when [ Dr. Price ] stated that Mr. Allston's Supervision Officer [ Angela Griffin ] testified that Mr. Allston had told her ' Something different ', than what he testified to at the hearing.[33] Also stating infatically, " This is what he said according to Mr. Howard. " Mr. Allston contends that he does not know a " Mr. Howard ", nor was there a Mr. Howard involved in any of the proceedings regarding Mr. Allston and the alleged violation(s). Therefore, it is evident that Dr. Price confused testimony from someone else hearing, 'Irrelevant ' and ' Erroneous ' information, and used it in determining his finding.

## STATEMENT OF FACTS

I. The Commission based it's finding on erroneous information, a flawed interpretation of the law and petitioners right to self-defense.

(a) The Commission made it's finding [ decision ] based on :

1) Dr. Price's ' Future Predictions ' of what would have happened had the men continued there advance toward Mr. Allston.   2) Dr. Price's personal belief [ not factual ], that Mr. Allston was not entitled to wear [ possess ] a work tool, if he was not literally at work.   3) Dr. Price's

---

33 - See Hearing Transcript ( Exhibit B2 pg 11 )

confusion regarding Mr. Allston's Supervision Officers'
testimony regarding what Mr. Allston's version of events
were when he initially notified her of his arrest, and
what he testified to at the hearing.  Alleging that he
told her ' Something Different ', than what he testified
to at the hearing.

Revocation of parole must be based on verified facts, accurate
knowledge, and supported by the evidence [ which excludes the
examiners ' Crystal Ball ' predictions ].  See **Morrissey v. Brewer,**
**408 U.S. 471 (1972).**

" The parolee whose due process liberty interest is at stake,
and society, have an interest in not having parole revoked
because of erroneous information or because of an erroneous
evaluation of the need to revoke parole, given the breach of
parole conditions. " **U.S.C.A Const. Amend. 14 D.C. Mun. Regs.**
**Title 28 § 219.1(b)**

The Supreme Court recognized in **Morrissey,** that no ones
interest - neither the parolee nor the governments interest is
fostered by the risk of parole revocation based on erroneous
impressions or conclusions grounded on innuendo or exaggeration
as distinguished from " verified facts ".  **408 U.S. @ 484, 92 S Ct.**
**2593.**

(b) The Commission based it's finding [ decision ] on Dr. Price's
flawed interpretation of the law [ of Self-Defense ] as well as
petitioners right to Self-Defense.  Dr. Price stated : 1) His
understanding was that Mr. Allston was " entitled to use the
ammount of force commensurate with the threat. "  2) Mr. Allston's

-17-

" level of defense exceeded the threat that he was confronted
with. " [ That petitioners display of a knife was excessive. ]
3) Mr. Allston was only allowed to use " Equal Force ",
against the two on rushing attackers.  Stating, " Just gearing
up to fight [ the 2 men ] if  you have to ", would have been
' Equal Force. '

In **Gant v. Reilly, 224 F. Supp. 2d. 26, 41 (2002)**, " The
District of Columbia District Court held that revocation based on
' Legally Flawed ' construction of a doctrine of law, violates
due process as it does not provide a rational basis for the
conclusion. "

The **Doctrine of Self-Defense**, permits a person who ' reasonably '
believes that he is in imminent danger of bodily harm, to use a
reasonable ammount of force to repel an attacker, without committing
what would be an Assault.  Mr. Allston's right to Self-Defense was
not defeated even if he used greater force than seemed necessary,
as the Supreme Court put it, " Detached reflection cannot be
demanded in the presence of an uplifted knife. " **Brown v. U.S.,
256 U.S. 335, 343 (1921)** Each situation is independently analyzed
<u>**from the prespective of the defendent**</u>, and the question becomes,
whether his reaction was reasonable under the circumstances as they
appeared to him at the time of the attack [ See **Maryland Criminal
Jury Instruction and Commentary, 2 ed., david E Aaronson, Instruction
5.14, Self-Defense – Where appearances are false.** ]  **Jones v. State,
745 A 2d. 396, 407 (Md. 1999)** ( " In Murder and Assault context,
a person who protects himself or herself from an imminent attack
is excused from the criminal liability that his or her defense may

create. " )

   **Maryland Criminal Jury Instruction, § 5.12, Self-Defense -
Amount of force permissible,** instructs that, " a person may use
non deadly force against another person if he honestly and
reasonably believes that the other person is immediately about
to inflict unlawful bodily harm against him. "  If it appears
that the person used greater force than necessary, here in this
case, whether holding a small pen knife [ utility knife ] by the
side of his leg when confronted from the rear by two men, was
excessive, the instructions provide :

   " In determining whether the defendent used excessive force in
   defending himself, you may concider all the circumstances under
   which he acted.  The claim of Self-Defense is not necessarily
   defeated if greater force than would have seemed necessary to
   a calm mind, was used by the defendent in the heat of passion,
   resulting from an assault upon him.  A belief which may be
   unreasonable to a calm mind, may be actually and reasonably
   held under the circumstances as they appear to the defendent
   at the time of the incident ( **Emphasis Added** ). "

The Evidence showed by the preponderance of the evidence, that
Mr. Allston reasonably believed that he was in immediate and imminent
danger of bodi;y harm.  He had no advance warning of the confrontation.
The men approached from the rear, so he could not see them.  Not only
did he hear pounding footsteps behind him and a voice commanding him
to give up his shopping bag, but his perception of the gravity was
intensified by his memory of the [ recent and high profile ] robbery

-19-

and subsequent murder of a New York TimesJournalist in the District
of Columbia, just a few weeks prior to this incident.  Moreover, he
knew from the sound of the footsteps that more than one perpetrator
was running up behind him [ in a dark parking lot ].  The attack
was immenent and he had no other options available to him, than to
turn and face the men who were pursuing him.

Furthermore, In **Douglas v. U.S., 859 A. 2d. 641,** " A defendants
mere display of a knife in order to allegedly deter on rushing
attackers, did not constitute excessive use of deadly force as a
matter of law, for the purposes of defendants claim that he acted in
Self-Defense, in trial for Simple Assault and Attempted Possession
of a Prohibited Weapon. "

Also,

In **McPhaul v. U.S, 452 A. 2d. 371,** states; " The mere display
of a deadly weapon is not necessarily to be equated to the
actual use of deadly force, for the purpose of evaluating
whether force used was excessive. "
" One who believes he is in immediate danger of death or
grevious bodily harm from his assailant, may stand his gruond
and defend himself. " **Gant v. U.S., 83 A. 2d. 439**

And,

In **Young v. Scales, 873 A. 2d. 337,** " Self-Defense arises only
when the necessity begins and equally ends with the necessity. "

Mr. Allston held his work knife at his side when the threat
[ necessity ] began, and put it away when he realized the threat
[ necessity ] no longer existed.  He then returned to the front of

the store [in good faith that the problem could be corrected ],
to find out why the men were pursuing him. [" In Assault
prosecutions, it was incumbent upon the government to show that
the act of defense was not accidental, and that he had the
necessary criminal intent." See **Dyson v. U.S., 97A. 2d. 135.** ]

II. The Commission failed to follow it's own Rules, Regulations
and proceedures in their fact finding and decision making
process.

The Commission affirmed the examiners ' Verbal Supplementation '
of the warrant at the end of the hearing, which violates the rules
and proceedures in it's manual ( 28 C.F.R ).

" Revocation may be based only on those charges set forth in
the warrant application or supplement or admitted during the
course of the revocation hearing. "  § 2.50-08 (b).

§ 2.50-07 (h) **Hearing Proceedures**, state : " If during the
course of discussion and review of alleged charges the violator
admits to other charges not known to the Commission previously,
the violator should be told that this fact may be used against
him, and that a violation finding can be made on same.  Further,
the alleged violator must be given time to prepare a defense,
and if this results in a continuance of the proceedings, a
supplemental warrant must be prepared.

Also,

§ 2.48-06 (b) states : " If new charges are received after the
preliminary interview has been conducted, the prisoner and his
attorney, if any shall be informed by letter that such charges

will be considered at the final revocation hearing. "

And,

§ 2.101 (j) **Late Recieved Charges**, states : " If the Commission is notified of additional charges after probable cause has been found, to proceed with a revocation hearing, the Commission may :

> 1) Remand case for supplemental Preliminary interview if new charge may be contested by parolee and possibly result in the appearance of a witness at the revocation hearing.

> 2) Notify prisoner that additional charges will be considered at the revocation hearing, without conducting a supplemental interview, or

> 3) Determine that the new charge shall not be considered at the revocation hearing.

Mr. Allston contends that the Commission had ample time to supplement the warrant prior to the revocation hearing, if they concidered that a ' Simple Assault ' had occured.

The Commission also failed to follow it's rules and proceedure in classifying his ' Offense Caregory '.

> § 2.20 Chapter 13, Subchapter A (1) " If offense category can be classified under more than one category, the most serious applicable category is to be used. "

> § 2.20 Chapter 2, Subchapter B ( Categorizes offense behavior for Assault offenses. )   212 Assault

> 1 (a) If serious bodily injury results or a result intended, Grade Category 7.

> (b) If serious bodily injury results or a dangerous weapon

is used by an offender, Grade as Category 5.

(c) otherwise, Grade as Category 2.

Mr. Allston was graded as a Category 2 offense.  The Commission attempts to justify it's erroneous decision based on Mr. Allston's " own admission " that he pulled a weapon ( knife ) during the incident.  The Commission failed to follow it's own rules in that the most serious category [ category 5 ] should have been used, with their decision being based on the fact that a weapon was used.

The Commission further failed to follow it's rules and proceedures  when Dr. Price failed to respond to and address the proceedural issues raised by Mr. Allston [ through his attorney ]. Mr. Allston raised the following proceedural objections : 1. Basing his decision on future predictions of what would have happened, not on the relevant facts. 2) His verbal supplementation of the warrant at the end of the hearing.  3) His attempt after classifying the adding of Simple Assault as a " Seperate Charge ", to then classify it as a ' Lesser included offense  '.

§ 2.50-02 ( 28 C.F.R ) **Proceedual rights of alleged violator :**
(5) " If proceedual objections are raised by subject or counsel, the examiner is to respond to those objections immediately, and address the issue(s) raised.  Each objection that asserts a specific violation of the commissions own statutes and regulations must be explored, and the examiner is responsible for resolving the issue.

" An agency is bound to follow it's own regulations. " **Cherokee Nation of Oklahoma v. Babbit 117 F. 3d. 1489, 326 U.S. App. D.C 139**

Also,

" An agency may not violate it's own regulations, and court
will not uphold agency interpretation that would be inconsistant
with regulation itself. " **Orengo Caraballo v. Reich, 11 F.3d.
186, 304 U.S. App. D.C. 142.**

III. The Commission Violated Mr. Allston's right to ' Due Process '
when they : 1) Failed to afford him with ' Notice ' of all the
charges he would face [ that would be heard ] during the
revocation hearing, within the parole warrant.  2) failed to
re-issue subpoena(s) for Ofc. Russell Heller and C.S.O Angela
Griffin, and subpoena Video Survailance Tape(s) from Wal-Mart.
3) Made a decision that was totally lacking evidentary support
and was so irrational as to be fundamentally unfair.

1) The revocation proceedures followed in this case were deficient.
The hearing examiner's summary of decision indicates that the
Commission based it's revocation on three (3) alleged Law Violations,
(a) Assault with a Deadly Weapon, (b) Theft, and (c) Simple Assault.
The Third, (c) Simple Assault, was not subjected to any notice to
Mr. Allston ( or his Attorney ), prior to the revocation hearing,
even though the Commission was aware of the alleged violation(s)
five (5) months prior, as a result of C.S.O Griffin's Violation
Report ( dated July 18, 2006 ), and again after C.S.O Griffin's
testimony at initial hearing regarding alleged violation(s).   The
Commission had ample time [ and opportunity ] to supplement warrant
and afford Mr. Allston prior notice regarding count (c) Simple Assault.

Failure to include ' Written Notice ' of claimed violations of
parole violates " The Minimum Requirement of Due Process " outlined

-24-

by the Supreme Court in **Morrissey** ( 408 U.S. 471,489 ).  The requirement of ' Written Notice ' outlined in **Morrissey** and **Kloner**, are designed to further a variety of specific but vital objectives : (1) Minimization of surprise so that the parolee may formulate and organize a coherent and complete defense; (2) The opportunity to ' Directly ' ( and thus more effectively ) challange witnesses speaking against him; and, (3) Objective decision making based on an accurate account of the parolee's conduct. ( See **Morrissey** )

More specifically, the Commission relied upon Mr. Allston's own admission during the course of the hearing, that he pulled out his utility knife.  Although the Commission, well in advance of the revocation hearing was aware that it was alleged that he displayed a knife, and never mentioned this ground (c) Simple Assault in the warrant or any subsequent notice.

The teaching of **Morrissey** is that " It is important for the board to know not only that some violation was committed, but also to know accurately how many and how serious the violation(s) were. " **id. 408 U.S. @ 480, 92 S. Ct. @ 2599**

While the Commission contends that Mr. Allston was on notice of ' Simple Assault ' when he was put on notice with the charge of Assault with a Deadly Weapon, and was permitted to rebut charge at the hearing, and that the witnesses and evidence presented would have been the same.  This opportunity is not an adequate substitute for ' Prior Notice '.  Which enables the parolee to " Marshal the facts in his defense, and clarify what the charges are, in fact. " See **Wolffe v. McDonnell, Supra 418 U.S. @ 564, 94 S. Ct. @ 2978**

-25-

The Commission contends that it viewed the charge ' Simple Assault ' as a " Lesser [ included ] Degree " of the charge, Assault with a Deadly Weapon.  The term " Lesser Included Offense " is described as : " A crime that is composed of some, but not all of the elements of a more serious crime, and that is necessiarily committed in carrying out the greater crime. " **State v. Garcia, App. 100 N.M. 120, 666 P. 2d. 1267,1272** ( also see Black's Law Dictionary, 7th Edition, pg. 1109 )

The Commission used the very same elements that it would have to make a finding of the greater offense, to make a finding of the lesser [ the fact a weapon was involved ].  To convict for the offense of ' Assault with a Deadly Weapon ', it need be found that:

> " An unlawful attempt or offer to do bodily harm without justification or excuse by use of an instrument caculated to do the harm or cause death, coupled with the apparent ability to do so, and any such force (e.g. Pionting a gun at one is an Assault with a Deadly Weapon ).  **State v. Gregory 108 Ariz. 445, 501 P. 2d. 387,390**

The Commission attempts to denote that it is a " Clearly Understood [ Given ] Rule ", that given the charge of Assault with a Deadly Weapon, ' Simple Assault ' is " Automatically " a ' Lesser Included Offense ' . **SanSone v. U.S., 85 S. Ct. 1004 (5,6,7)** States:

> 5) A lesser offense charge is not proper where, on evidence presented, factual issues to be resolved by jury are the same as to both ' Lesser and Greater ' offense. (Fed. Rules Crim. Proc., Rule 31(c) 18 U.S.C.A.)

-26-

6) For defendant to be entitled to a lesser included offense charge, the lesser offense must be included within but not, on facts of case, be completely encompassed by the greater.

7) A lesser included offense instruction is only proper where the charged greater offense required by jury to find a disputed factual element which is not required for convictions of the lesser included offense.

In trial for Assault with a Deadly weapon, District Court is not required by Criminal Proceedure Rule to instruct jury that they may find Defendant guilty of a lesser offense of simple assault and should not instruct them in absence of evidence justifying conviction of simple assault. **Fed. Rules Crim. Proc., Rule 31(c) 18 U.S.C.A.,  MacIllrath v. U.S. 188 F. 2d. 1009.**

Also,

" Evidence in prosecution for Assault with a Deadly Weapon did not require the giving of instruction on lesser included offense of simple assault. " **Williams v. U.S., 328 F. 2d. 178, U.S. App D.C. 206.**

In SanSone, the court assumed and correctly did not authorize a jury in a criminal case to find defendant guilty of a lesser offense than the one charged, unless evidence justified them in doing so.  In this case, upon careful scrutiny of the evidence, the Commission could not find Mr. Allston guilty of Assault with a Dangerous Weapon since the later is grouped with other crimes, which all require particular intent ( SEE **Parker v. U.S. 359 F. 2d. 1009** ).

-27-

Therefore, if the Commission found that there was insufficient evidence [ by the preponderence of the evidence ], to support a finding that a ' Theft ' had occured, to then, thus support a finding that Mr. Allston committed an Assault with a Deadly Weapon in an attempt to cover up [ evade capture for ] a theft.  Then they also could not reasonably find, based on the same evidence, that Mr. Allston committed a Simple Assault.

The Commission alleged [ in their response to Mr. Allston's letter of reconcideration, submitted by his attorney after the December 12, 2006 hearing[34] ], " The assault involved Mr. Allston intimidating three (3) men with a knife.  All of the men were employees of the store Mr. Allston had just left but it does not appear likely that he could have known one of them was a security guard[35] "  The Commission admitted that it was not likely that Mr. Allston knew that one of the men was a security guard.  Thus, it was also evident that Mr. Allston had no knowledge of the fact that **any** of the men worked for the store [ until after the fact ]. " **Motive is Key in evaulating the elements of a crime and/or whether one has been committed.** "

> **Nelson v. U.S., 58 A. 2d. 114**, states : " A defendant cannot be held ' Criminally Liable ' on the charge of Assault on a Police Officer ( or Assault on a Police Officer while armed ), irrespective of force used if the defendant did not believe or have reason to believe that complainant was a Police Officer. "

---

34 - See Letter of reconcideration ( Exhibit IX )
35 - See Response to letter of reconcideration ( Exhibit X )

Simularily, Mr. Allston cannot be held ' Criminally Liable '
if he did not believe or have reason to believe that one of the men
was a secutity guard, or that the other(s) worked for the store
[ and were acting in the capicity of civilians upholding the law ].
And for the Commission to make a finding of an offense  less than
the one(s) charged, is a flagrant disregard of all the evidence
and events leading up to Mr. Allston's arrest and being charged,
as well as the testimony at the hearing, from all concerned
parties.

2) The Commission violated Mr. Allston's right to due process
and was prejudicial when they failed to re-issue subpoena(s) for
Ofc. Russell Heller [ who would have further contradicted Mr.
Gibson's testimony at the hearing to those he made to him on the
scene at the time of Mr. Allston's arrest ], and Community
Supervision Officer Angela Griffin [ who would have refuted
Dr. Price's assertion that Mr. Allston told her something different
than what he testified to at the hearing - which would have
prevented Dr. Price from using false and erroneous information
in making his finding ].  And, for failing to pursue Mr. Allston's
request that they subpoena the Video Survailance tapes ( in-store
& parking lot ) [ which would have displayed the events of the
evening and confirmed Mr. Allston's version of events ].

" Whether adverse witness absence from revocation hearing
is prejudicial depends on the Quality and Quantity of non
hearsay and reliable hearsay evidence supporting decision
revoke parole. "  **431 F. 3d. 826, 369 U.S. App. D.C. 36**

-29-

3) The Commission violated Mr. Allston's right to due process because their decision to revoke [ petitioner's ] parole was totally lacking in evidentiary support and was so irrational as to be fundamentally unfair.

a) All charges were dismissed in court [ because Mr. Gibson/ Wal-Mart was unable to prove that the alleged batteries did come from Wal-Mart.

b) C.S.O. Angela Griffin testified that Mr. Allston informed her of his arrest immediately after and that she believed the version of events he described to her.  Also testified that Mr. Allston had been in complete compliance with the conditions of his release on parole prior to his arrest on the parole warrant, and that she did not request that his parole be revoked [ and was in support of reinstatement at hearing ].

c) The evidence showed that Mr. Allston did not know who the men were at the time of the pursuit and reasonably feared for his immediate safety, and that when he found out otherwise, he returned to the front of the store [ and willfully waited for the police to arrive ] to address ( correct ) the matter.

d) Mr. Gibson's testimony was filled with conflicting statements, inconsistancies and illogical suggestions, but repeatedly stated that Mr. Allston did not point the knife at him or threaten him when he initially approached him or any time after.

In **Bernard v. Poteat 271 F. Supp. 2d. 51,** " The U.S. Parole Commission abused it's descretion where there is not a rational basis in the record for it's findings of facts embodied in it's statement of reasons. "

Because there was no rational basis in record to support the Commission's conclusion, there decision to revoke [ petitioners ] parole and reincarcerate was arbitrary and capricious.  Even moreso, concidering ; " Loss of parole status and reincarceration are not automatic consequences of parole infraction;  Board of parole will also determine whether parole violator is still good risk and such violator may be re-released on parole particularly where parolee brings other factors to the attention of the Board which may induce it to give him another chance. "  **United States ex rel. Vance v. keeton ( 1966, DC Conn ) 252 F. Supp. 344 (18 U.S.C.S. § 4212. 34)**

Mr. Allston's Supervision Officer did not request that his parole be revoked based on arrest and circumstances there of. In fact, C.S.O. Griffin was in support of Mr. Allston being reinstated to parole, and spoke highly of his progress while on parole.  Therefore, it is reasonable to believe that C.S.O Griffin did not view Mr. Allston as a threat to himself or the safety of the public, and that the likelihood of Mr. Allston's continued compliance with the condition(s) of his parole and progress was probable [ Mr. Allston provided evidence supporting the fact that he ( has continuously since his release on parole ) had a stable home, stable and gainful employment, continued to participate in out- patient substance abuse treatment ( self-pay ) and submitted ( random ) urine samples for testing all resulting ' Negative ' between the period(s) of March of 2005 thru August of 2006 ]. In consideration of all, the Commission could have used it's discretion and applied options other than to revoke parole.  ( See **18 U.S.C.A**

§ 4214 (b)(3)(d) ).

All aspects of a revocation hearing are designed to answer the ultimate question of whether " The parolee is entitled to retain his liberty. " ( 408 U.S. @ 479, 92 S. Ct. @ 2599 ) Although this decision making is carried out in two stages, (1) The determination of whether there has been a violation and, if so, (2) The decision as to whether parole should be revoked - the second, or dispositional, step, like the first, " depends on facts. " Requiring a accurate assessment of the parolee's past conduct and the likelihood " of restoring him to normal and useful life within the law. " Id. 408, 484, 92 S. Ct. @ 2601. In both steps, the need to filter out distorted summaries of relevant facts is important.

" The court may set aside ' Final Agency Action ' where it finds arbitrary, capricious, abuse of discretion or otherwise not in accordance with the law. " 5 U.S.C.A. §706 (2)a, 737 F. Supp. 103, Affirmed 925 F. 2d. 490, 288 U.S. App. D.C. 259.

### RELIEF REQUESTED

Petitioner request that the court order the reversal of the Commission's decision to revole parole and immediately reinstate him, with cred for time completed successfully on parole [ from December 2003 thru August 2006 ], and credit for time served on the 16 month(s) ( set-off ) the Commission unjustifiably ordered petitioner to serve prior to reparole. Due Process prohibits

-32-

revocation where the Commission's decision is " either lacking evidentary support or so irrational as to be fundamentally unfair. " There is no rational basis for the Commission's findings here because it is based on erroneous and irrelevant information and, the examiner's flawed understanding of the law of self-defense.

Respectfully Submitted,

11/28/07

Amu A. Allston, Pro-Se
( Petitioner )

-33-

Supporting Documents
And
Transcripts

U.S. PAROLE COMMISSION'S

FINAL NOTICE OF ACTION

DATED JANUARY 30, 2007

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

Notice of Action

| | |
|---|---|
| Name: ALLSTON, Amu | Institution: D.C. – C.T.F. |
| Register Number: 11087-007 | |
| DCDC No: 241-795 | Date:     January 30, 2007 |

As a result of the hearing conducted on December 12, 2006, the following action was ordered:

### DC Local Revocation

Revoke parole. None of the time spent on parole shall be credited. Continue to a presumptive re-parole December 20, 2007 after service of 16 months. This presumptive parole date is conditioned upon your maintaining good institutional conduct and the development of a suitable release plan. The Commission will conduct a pre-release record review up to 9 months prior to the presumptive parole date to ascertain that these conditions have been fulfilled. In order to complete this review, the Case Manager should submit an updated Progress Report to the Commission 10 months prior to the presumptive parole date. If there have been Disciplinary Reports since the Commission's last review, they should be attached to the Progress Report for the Commission's consideration. If the Commission has requested that a current psychological or psychiatric report be prepared for this review, it also should be attached.

In addition, you shall be subject to the Special Drug Aftercare Condition that requires that you participate as instructed by your U.S. Probation Officer in a program (inpatient or outpatient) approved by the U.S. Parole Commission for the treatment of narcotic addiction or drug dependency. That program may include testing and examination to determine if you have reverted to the use of drugs. You shall also abstain from the use of alcohol and all other intoxicants during and after the course of treatment.

### FINDINGS OF FACT:

The Commission finds as a fact that you violated conditions of release as charged as indicated below:

Charge No. 1 - Use of Dangerous and Habit Forming Drugs.

Basis: Your admission to the examiner.

Charge No. 2 - Law Violation: (c) Simple Assault.

Basis: Your admission to the examiner that you pulled out a weapon during the incident.

The Commission makes no findings concerning the following charges:

07 2354

Charge No. 2 - Law Violations: (a) Assault with a Deadly Weapon; (b) Theft.

FILED

Basis: Insufficient evidence.

DEC 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

---

ALLSTON 11087-007                    -1-                    Clerk:   MDD

**REASONS**:

Your parole violation behavior has been rated as criminal conduct of Category Two severity because it involved Simple Assault and administrative violations. Your salient factor score is 3. See the attached sheet for an explanation of your individual Salient Factor Score items. The table at the bottom presents the points for Salient Factor Score Item C. As of 12-19-2006, you have been in confinement as a result of your violation behavior for a total of 4 month(s). Guidelines established by the Commission indicate a customary range of 16-22 months to be served before release. After review of all relevant factors and information, a departure from the guidelines at this consideration is not warranted.

THE ABOVE DECISION IS APPEALABLE.

You may obtain appeal forms from your caseworker or supervising officer and they must be filed with the Commission within thirty days of the date this Notice was sent.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:    D.C. Federal Billing Unit
       D.C. Department of Corrections
       Washington, D.C.  20003

       U.S. Marshals Service
       District of Columbia - District Court
       333 Constitution Ave, N.W., Room 1400
       Washington, D.C.  20001
       Warrants - Attn:  David Baldwin

       U.S. Probation Office
       District of Maryland
       9200 Edmonston Road, Suite 200
       Greenbelt, MD  20770

       Anna Rodriguez
       Public Defender Service
       District of Columbia
       Special Proceedings Division
       633 Indiana Avenue, N.W.
       Washington, D.C.  20004

## SALIENT FACTOR SCORE (SFS-98)

| Your Pts | Salient Factor Score (SFS-98) Item Explanations |
|---|---|
| 0 | **A** - Prior convictions/adjudications (adult or juvenile) None = 3; One = 2; Two or three = 1; Four or more = 0 |
| 0 | **B** - Prior commitments of more than thirty days (adult or juvenile) None = 2; One or two = 1; Three or more = 0 |
| 3 | **C** - Age at commencement of the current offense/prior commitments of more than thirty days (adult or juvenile) (see table below for an explanation) |
| 0 | **D** - Recent commitment free period (three years)<br>No prior commitment of more than thirty days (adult or juvenile), or released to the community from last such commitment at least three years prior to the commencement of the current offense = 1; Otherwise = 0 |
| 0 | **E** - Probation/parole/confinement/escape status violator this time<br>Neither on probation, parole, confinement, or escape status at the time of the current offense; nor committed as a probation, parole, confinement or escape status violator this time = 1; Otherwise = 0 |
| 0 | **F** - Older offenders<br>If the offender was 41 years or more at the commencement of the current offense (and the total score from Items A-E above is 9 or less) = 1; Otherwise = 0 |
| 3 | **Salient Factor Score (SFS-98)** (sum of points for A-F above) |

| Points For SFS Item C | | | |
|---|---|---|---|
| Age | Prior Commitments | | |
| | 0-3 | 4 | 5+ |
| 26 & Up | 3 | 2 | 1 |
| 22-25 | 2 | 1 | 0 |
| 20-21 | 1 | 0 | 0 |
| 0-19 | 0 | 0 | 0 |

U.S. PAROLE COMMISSION'S

NOTICE OF ACTION ON APPEAL

DATED JUNE 18, 2007

U.S. Department of Justice                          **Notice of Action on Appeal**
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

| | | |
|---|---|---|
| Name: Allston, Amu | Institution: | Edgefield FCI |
| Register Number: 11087-007 | Date: | June 18, 2007 |

The National Appeals Board examined the appeal of the above named and ordered the following:

Affirmation of the previous decision.

**REASONS:**

You claim that the Commission violated your due process rights because it erred in finding that you committed assault. The Board finds that the hearing examiner correctly found that you committed assault. An assault can be an attempt to commit a battery, or an intentional placing of another in apprehension of receiving an immediate battery. Dixon v. State, 488 A.2d 962 (1985). The Asset Protection Associate (APA) of Walmart testified that you pulled out your knife and turned to face him. Your posture put him in fear of harm so he backed away from you. His testimony was corroborated by your statement that you indeed pulled out your knife and assumed a threatening posture. Your intention or inability to commit a battery is not material. What is material is what your conduct and the attending circumstances denote to the party being assault at the time. The hearing examiner concluded that the APA and the assistant store manager could reasonably presume that you were going to attack them; therefore, he found that you committed assault. The hearing examiner was not persuaded that you acted in self-defense.

You object to the hearing examiner supplementing the parole violation charges with a charge of assault after the hearing had been conducted claiming that you did not have sufficient notice that the Commission would be considering that charge. The charge of assault is included as a lesser degree in the charge of assault with a deadly weapon and is not a separate and distinct offense. You were on notice that the Commission would be considering the charge of assault with a deadly weapon, which also put you on notice that you would need to defend against a charge of assault. Since both charges arise from the same incident, the witnesses and evidence that you would have presented at the revocation hearing is the same.

There is no merit to your claim that Charge No. 1 was dismissed by hearing examiner at first hearing. According to the summary of the hearing dated 10/26/06, you admitted that you had used drugs, and the hearing examiner made a finding that you had committed the violation. However, the hearing examiner found that that charge alone would not be sufficient for revoking your parole. The finding of violation on Charge No. 1 was not included on the notice of action dated 11/7/06, which continued your case for a hearing. The hearing examiner reviewing the recommendation following the 12/12/06 hearing correctly included Charge No. 1 with the findings on the notice of action dated 1/30/07.

USPC                   6/18/2007  9:01    PAGE 2/2    Fax Server

All decisions by the National Appeals Board on appeal are final.

Cc:

     Anna Rodriques
     Public Defender Service
     District of Columbia
     Special Proceedings Division
     633 Indiana Avenue, N.W.
     Washington, D.C. 20004

**EXHIBIT I**

**ANNE ARUNDEL COUNTY POLICE DEPARTMENT**

**911 TRANSCRIPT**

Page: 1  Document Name: Untitled

GENERAL INCIDENT                                    From JRB

1. Nature: 51K-ARMED SUBJECT/KNIFE        2. Building: WALMART
3. Location: 3549 RUSSETT GREEN E            4. Apt/Lot:
5. Grid: O5                          6. Compl name: GIBOSN, JAMES
        3502 RUSSETT COMMO            7. Address:
        3518 SHARONWOOD RD        8. Phone: 443-250-9607    8a. See ofc: Y
9. Location occ:                                Apt/Lot:
    G:        PA:        PZ:    PJ:    FJ:    FA:    CT:
10. When occur:                                  11. N/watch:
12. Respond to:
13. Persons ... :
14. Persons ... :    WRONG CAR              WRONG TAG
15. Vehicles/dir: GRY VOLVO            Tag: MCT701        MD
16. Weapons ... :
17. Notes: AUTH W521 SLOW DOWN RESPONSE (993092-21)
        Unit V5A1 current location: 10-95 WESTERN (993092-22)
        Unit V5A1 current location: WESTERN (993092-21)
        Assigned report number: 2006-707188 (993092-21)
        *INCIDENT NUMBER GIVEN (993092-21)
        Timer reset to 999 minutes on unit V5A1 at 21:20:15 (993092-21)

        PRESS 'RETURN' KEY: _

--------------------------------------------------------------

        1    Sess-1    10.70.60.32                      1 23/35

EXHIBIT I

**EXHIBIT II**

**U.S. PAROLE COMMISSION**

**CONDITIONS OF RELEASE (PAROLE CONDITIONS )**

**FOR AMU A. ALLSTON**

This CERTIFICATE will become effective on the day of release indicated above. If the releasee fails to comply with any of the conditions listed on the attached page, the releasee may be summoned to a hearing or retaken on a warrant issued by a Commissioner of the U.S. Parole Commission and reimprisoned pending a hearing to determine if the release should be revoked.

## CONDITIONS OF RELEASE

1. You shall go directly to the district shown on the CERTIFICATE OF RELEASE (unless released to the custody of other authorities). Within three days after your arrival, you shall report to your parole advisor if you have one, and the United States Probation Officer whose name appears on the Certificate. If in any emergency you are unable to get in touch with your parole advisor, or your Probation Officer or the United States Probation Office, you shall communicate with the United States Parole Commission, Department of Justice, Chevy Chase, Maryland 20815.

2. If you are released to the custody of other authorities, and after your release from physical custody of such authorities, you are unable to report to the United States Probation Officer to whom you are assigned within three days, you shall report instead to the nearest United States Probation Office.

3. You shall not leave the limits fixed by the CERTIFICATE OF RELEASE without written permission from your Probation Officer.

4. You shall notify your Probation Officer within 2 days of any change in your place of residence.

5. You shall make a complete and truthful written report (on a form provided for that purpose) to your Probation Officer between the first and third day of each month, and on the final day of parole. You shall also report to your Probation Officer at other times as your Probation Officer directs, providing complete and truthful information.

6. You shall not violate any law, nor shall you associate with persons engaged in criminal activity. You shall get in touch within 2 days with your Probation Officer or the United States Probation Office if you are arrested or questioned by a law-enforcement officer.

7. You shall not enter into any agreement to act as an informer or special agent for any law-enforcement agency.

8. You shall work regularly unless excused by your Probation Officer, and support your legal dependents, if any, to the best of your ability. You shall report within 2 days to your Probation Officer any changes in employment.

9. You shall not drink alcoholic beverages to excess. You shall not purchase, possess, use or administer marijuana or narcotic or other habit-forming or dangerous drugs, unless prescribed or advised by a physician. You shall not frequent places where such drugs are illegally sold, dispensed, used or given away.

10. You shall not associate with persons who have a criminal record unless you have permission by your Probation Officer.

11. You shall not possess a firearm, ammunition or other dangerous weapons.

12. You shall permit confiscation by your Probation Officer of any materials which your Probation Officer believes may constitute contraband in your possession and which your Probation Officer observes in plain view in your residence, place of business or occupation, vehicle(s) or on your person.

13. You shall make a diligent effort to satisfy any fine, restitution order, court costs or assessment, and/or court ordered child support or alimony payment that has been, or may be, imposed, and shall provide such financial information as may be requested, by your Probation Officer, relevant to the payment of the obligation. If unable to pay the obligation in one sum, you will cooperate with your Probation Officer in establishing an installment payment schedule.

14. You shall submit to a drug test whenever ordered by your Probation Officer.

15. If you have been convicted of any sexual offense under District of Columbia or federal law (including Uniform Code of Military Justice offenses), you must report for registration with your state sex offender registration agency as directed by your U.S. Probation Officer. You are required to report for registration in any state in which you live, work, attend school, or pursue any vocation. You must be registered in compliance with applicable state law that applies to current or prior federal, state or local convictions for sexual offenses, and in compliance with 42 U.S.C. 14072(i) (which makes it a federal crime for any offender covered by 18 U.S.C. 4042 not to register in accordance with state law). If there is any question as to whether or where you are required to register, you must seek and follow the guidance of your U.S. Probation Officer.

16. You will provide a DNA sample if collection of such sample is authorized pursuant to 3 of the DNA Analysis Backlog Elimination Act of 2000.

By signing this Parole Certificate, I consent to the unrestricted communication between any treatment facility administering a drug or alcoholic treatment program in which I am, or will be participating, and the U.S. Parole Commission and the Probation Office. I further consent to the disclosure by such facility to the U.S. Parole Commission

Queued: 12-05-2003 16:02:34 BOP-Hope Village CCC | USPO-District of Maryland, Greenbelt |

(25)

EXHIBIT II

and the Probation Office of any information requested, and the redisclosure of such information to any agencies that require it for the performance of their official duties. This consent shall be irrevocable until the termination of parole supervision, or the occurrence of one of the items specified in 42 C.F.R. 2.35(b), whichever is earlier.
**You shall also abide by the below listed special condition(s) as indicated:**

In addition, you shall be subject to the Special Drug Aftercare Condition which requires that you participate as instructed by your U.S. Probation Officer in a program (inpatient or outpatient) approved by the U.S. Parole Commission for the treatment of narcotic addiction or drug dependency. That program may include testing and examination to determine if you have reverted to the use of drugs. You shall also abstain from the use of alcohol and all other intoxicants during and after the course of treatment.

Information concerning a releasee under the supervision of the U.S. Parole Commission may be disclosed to a person or persons who may be exposed to harm through contact with that particular releasee if such disclosure is deemed to be reasonably necessary to give notice that such danger exists. Information concerning a releasee may be released to a law enforcement agency as required for the protection of the public or the enforcement of the conditions of the release.



Queued: 12-05-2003 16:02:34 BOP-Hope Village CCC | USPO-District of Maryland, Greenbelt |

(26)

**EXHIBIT III**

**COMMUNITY SUPERVISION OFFICER'S**

**LETTER OF REPRIMAND/MODIFICATION REQUEST**

**MICHELLE MERRETT**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
# PROBATION & PRETRIAL SERVICES OFFICE COMMISSION

**PROBATION OFFICES**

250 W. PRATT STREET
SUITE 400
BALTIMORE, MD 21201
410-962-4740

9200 EDMONSTON ROAD
SUITE 200
GREENBELT, MD 20770
301-344-0510

**WILLIAM F. HENRY**
CHIEF

**PRETRIAL OFFICES**

101 W. LOMBARD STREET
SUITE 1625
BALTIMORE, MD 21201
410-962-4820

6500 CHERRYWOOD LANE
SUITE 180
GREENBELT, MD 20770
301-344-8375

January 24, 2005

United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, MD 20815
Attn: Ms. Mary Jo Williams, Regional Analyst

> **Re:**   **ALLSTON, Amu**
> **Register No.: 11087-007**
> **POSITIVE   URINE   REPORT-**
> **Letter of Reprimand/Modification**
> **is Requested**

Dear Ms. Williams:

Reference is made to the above-mentioned offender who is currently under parole supervision in this office. The term of parole supervision is from 12/19/2003 to 12/24/2009. This notice is to advise the commission on events pertaining to this offender's case.

The offender was released on parole and is being supervised in the District of Maryland.

As part of his/her supervision, the offender is required to participate in drug and/or alcohol treatment. It is noted that in/or about October 2004, the offender moved his residence to Laurel, Maryland. He had originally been placed at our treatment center in Suitland, Maryland. Due to the change in his residence, he was being reassigned to a different program, closest to where he lives.

During this interim period, the offender admitted using marijuana. On December 22, 2004, during a home visit, he admitted use of this drug to this writer. He was at that time directed to report to the probation office on Wednesday, December 29, 2004, to submit to urinalysis testing. He failed to report as instructed.

Since that time, he has reported to the office on two occasions, as directed and submitted two additional urines that were positive for cocaine.

It is therefore noted that the offender is in violation of the following conditions of his parole supervision:

**Condition 9: You shall not drink alcoholic beverages to excess. You shall not purchase, possess, use or administer marijuana or narcotic or other habit-forming or dangerous drugs, unless prescribed or advised by a physician. You shall not frequent places where such drugs are**

*REPLY TO:*
U.S. Probation Office, 9200 Edmonston Road, Suite 200, Greenbelt, MD 20770 Tel:(301) 344-3831 Fax:(301) 344-3637

EXHIBIT III

Re: **ALLSTON, Amu**
**Register No.:**
Page 2
January 24, 2005


**illegally sold, dispensed, used or given away.**

On the following dates, the offender admitted using/and or submitted a positive urinalysis for illegal substances:

| December 22, 2004 | Offender admitted use of Marijuana to this Officer |
| January 3, 2005 | Positive for Cocaine |
| January 10, 2005 | Positive for Cocaine |

On January 24, 2004, the offender reported to the probation office as directed. He is currently scheduled to complete an intake and assessment at Reality Inc., for the 28-day residential program. He will enter that program as a self-pay. Upon completion of that program, he will continue with outpatient treatment with the same program. Should he fail to comply as directed, we will request a warrant be issued.

The offender has agreed to this graduated sanction, and accordingly, has signed the Modification of Release Conditions-Parole Form F-1. We would ask that this modification be imposed, in addition to a letter of reprimand being issued to this offender.

We are attaching documentation for your file.

Sincerely,

Michelle A. Merrett
U.S. Probation Officer


cc: attachments

(17)

EXHIBIT IV

TRIAL SUMMARY

( DEPOSITION OF CHARGES )



Page: 1          Date: 08/28/2006
Room: 4          Time: 11:31 AM

Case No. 6A00159683



# DISTRICT COURT OF MARYLAND FOR ANNE ARUNDEL COUNTY
Located at 251 ROWE BOULEVARD, ANNAPOLIS, MD 21401

## STATE OF MARYLAND  VS.  ALLSTON, AMU ABEID
11721 S LAUREL DR
LAUREL MD 207080000

CC #: 06707188          SID:                LocID:
Eyes: BRN    Hair: BRN   Height: 6"03'      Weight: 210 lb.
Race: 1    Sex: M DOB: 12/27/1968   DL #:

## DEFENDANT TRIAL SUMMARY

The above case was heard today, 08/28/2006 by Judge MULIERI, VINCENT A.
The Court's finding is as follows:

002  ASSAULT-SEC DEGREE
Plea - OTHER PLEA   Verdict - NOLLE PROSEQUI

003  THEFT LESS THAN $100.00
Plea - OTHER PLEA   Verdict - NOLLE PROSEQUI

08/28/2006    Defendant_____    (ALLSTON, AMU ABEID)

You may be entitled to expunge the record relating to the charge or charges against you if you meet certain conditions.
Further information on expungement is contained in a brochure available at the Clerk's Office or on our website at
http://www.courts.state.md.us/district.

Tracking No. 020004133505

EXHIBIT IV

EXHIBIT V

VIOLATION REPORT

COMMUNITY SUPERVISION OFFICER

ANGELA GRIFFIN

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
# PROBATION & PRETRIAL SERVICES OFFICE



| PROBATION OFFICES | WILLIAM F. HENRY CHIEF | PRETRIAL OFFICES |
|---|---|---|
| 250 W. PRATT STREET SUITE 400 BALTIMORE, MD 21201 410-962-4740 | | 101 W. LOMBARD STREET SUITE 1625 BALTIMORE, MD 21201 410-962-4820 |
| 9200 EDMONSTON ROAD SUITE 200 GREENBELT, MD 20770 301-344-0510 | July 18, 2006 | 6500 CHERRYWOOD LANE SUITE 180 GREENBELT, MD 20770 301-344-0375 |

Marc Bransky
Deputy Case Services Administrator
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

> **RE:** **ALLSTON, Amu**
> **Reg. No.: 11087-007**
> **Violation Report-No Action Requested**

Dear Mr. Bransky:

The purpose of this correspondence is to provide a status report on the above referenced individual. Mr. Allston was released to community supervision on December 19, 2003 with an expiration date of December 24, 2009.

On February 21, 2006, the offender was arrested by the Anne Arundel County Police Department for the offense of Assault First Degree, Assault Second Degree, and Theft less than $100.00. On June 9, 2006, he appeared in the District Court of Maryland for Anne Arundel County to address the aforementioned charges. The charge of Assault First Degree was dismissed, but the other charges are still pending. The Assault Second Degree and Theft less than $100.00 are both scheduled to be heard on August 28, 2006.

At this time, we are requesting no action. We will continue to monitor the pending cases and contact your office once a disposition has been reached. Should he incur any additional charges, we will notify your office.

Should you have any questions, I can be reached at (301) 344-3838.

Sincerely,

Angela Griffin
U.S. Probation Officer

**EXHIBIT V**

*REPLY TO:*
U.S. Probation Office, 9200 Edmonston Road, Suite 200, Greenbelt, MD 20770 Tel: (301) 344-3838 Fax: (301) 344-3637

(9)

**EXHIBIT VI**

**U.S. PAROLE COMMISSION**

**WARRANT APPLICATION**



**U.S. DEPARTMENT OF JU_ICE**                              **WA__ANT APPLICATION**
**UNITED STATES PAROLE COMMISSION**                       **D.C. Code Offender**

Name............................ **Allston, Amu**
Reg. No .......................... **11087-007**              Date.......................................... **August 9, 2006**
DCDC No. ...................... **241-795**                   Termination of Supervision ..... **12/24/2009**
FBI No ........................... **764846JA6**              [If Conviction Offense Before April 11, 1987 And
Birth Date ...................... **12/27/1968**              Offender Is On Mandatory Release, Termination
Race ............................... **Black**                 Date Is 180 Days Prior To Full Term]
                                                              Violation Date ......................... **1/3/2005**
                                                              Released .................................**12/19/2003**

Sentence Length............ **17 years; 2563 days (P.V. Term)**
Original Offense ............ **Distribution of Cocaine**

If you have been arrested on a violator warrant in the District of Columbia and you have not been convicted of a new offense, you shall be given a probable cause hearing within five days of your arrest and violator warrant. Probable cause hearings are normally scheduled on Tuesdays and Fridays at the Central Detention Facility. The purpose of the probable cause hearing is to determine if there is probable cause to believe that you have violated the conditions of your release, and if so, whether to release you or hold you for a revocation hearing. If no probable cause is found, you will be released and either reinstated to supervision, or discharged from further supervision if your sentence has expired.

At your probable cause hearing and any subsequent revocation hearing you will be apprised of the information supporting the violation charges. You may present documentary evidence and voluntary witnesses on your behalf. If you deny the charge(s) against you, you may request the presence of those persons who have given information upon which the charges are based. Such adverse witnesses will be made available for questioning unless good cause is found for their non-appearance.

You may be represented by an attorney or, if you are unable to pay for such representation, an attorney will be appointed for you if you fill out and promptly return a request for representation to the hearing examiner.

If, after a revocation hearing, you are found to have violated the conditions of your release the Commission may: (1) restore you to supervision, and, if appropriate, (a) reprimand you; (b) modify your conditions of supervision; or (c) refer you to a residential community treatment center for the remainder of your sentence; or (2) revoke your parole, mandatory release, or supervised release in which case the Commission will also decide when to consider you for further release.

If the Commission revokes your parole, mandatory release, or supervised release you will not receive credit toward service of your sentence for time spent on parole/mandatory release/supervised release.

**CHARGES:**
**Charge No. 1 - Use of Dangerous and Habit Forming Drugs.** The releasee submitted urine specimens which tested positive for:
Marijuana and Cocaine on 1/3/05
Cocaine on 1/6/05 and 1/10/05
This charge is based on the information contained in the violation report dated 1/24/05 from supervising officer Angela Griffin and corresponding drug report.
**I ADMIT [   ] or DENY [   ] this charge.**

---

**Allston, Amu**
**Reg. No. 11087-007    DCDC No. 241-795**

(5)                                                          **EXHIBIT VI**

**Charge No. 2 - Law Violation. a) Assault With a Deadly Weapon-Knife b) Theft.** On 2/21/06, the releasee stole batteries valued at $15.18 from a department store. The releasee was confronted by store security and the releasee responded by pulling out a lock blade knife and displayed it in a threatening manner. The releasee was arrested by the Anne Arundel County Police Department for the above-cited offenses. This charge is based on the information contained in the violation report dated 7/18/06 from supervising officer Angela Griffin and a police report dated 2/20/06. Status of Custody/Criminal Proceedings: Hearing scheduled for 8/28/06

a) I ADMIT [    ] or DENY [    ] this charge.
b) I ADMIT [    ] or DENY [    ] this charge.

**Probable Cause Hearing Is Required**

Warrant Issued................... August 9, 2006

Warrant Recommended By:

Jeoman S. Jackson, Case Analyst Trainee
U.S. Parole Commission

Community Supervision Office Requesting Warrant: **District of Maryland, Greenbelt**

---

**EXHIBIT VII**

**ANNE ARUNDEL COUNTY POLICE DEPARTMENT**

**STATEMENT OF PROBABLE CAUSE**

**( POLICE REPORT )**

DISTRICT COURT OF MARYLAND FOR ......Anne Arundel County..................(City / County )

LOCATED AT ( COURT ADDRESS )

251 Rowe Boulevard
Annapolis, Maryland 21401

RELATED CASES:

| NAME (LAST, FIRST, M.I.) | TITLE | NAME (LAST, FIRST, M.I.) | | | | | TITLE |
|---|---|---|---|---|---|---|---|
| Heller Sr., Russell A. | Officer | Allston, Amu A. | | | | | |

| | | | MAFIS (LAST, FIRST, M.I.) | | | | | TITLE |

| AGENCY | SUB-AGENCY | I.D. NO. (POLICE) |
|---|---|---|
| AC | 0005 | 1323 |

| I.D. NO. | RACE | SEX | HT | WT | D.O.B.(MM/DD/YY) |
|---|---|---|---|---|---|
| | 1 | M | 6-3 | 210 | 12/27/68 |

| WORK TELEPHONE | HOME TELEPHONE |
|---|---|
| (410) 222-8050 | N/A |

| CC/OCA NO. | HAIR | EYES | OTHER DESCRIPTION |
|---|---|---|---|
| 2006-707188 | Black | Brown | |

| ADDRESS | | | APT. NO. |
|---|---|---|---|
| 8495 Veterans Highway | | | |

DRIVER'S LICENSE #                        STATE

| CITY | STATE | ZIP CODE |
|---|---|---|
| Millersville, Maryland 21108 | | |

| WORK TELEPHONE | HOME TELEPHONE |
|---|---|
| Unknown | Unknown |

☐ DOMESTIC VIOLENCE   ☐ HATE CRIME

☐ VULNERABLE ADULT ABUSE   ☐ CHILD ABUSE

Page 1 of _____

| ADDRESS | | APT. NO. |
|---|---|---|
| 2303 Delano Lane | | |

| CITY | STATE | ZIP CODE |
|---|---|---|
| District Heights, MD 20747 | | |

## STATEMENT OF PROBABLE CAUSE

ARREST ON TRAFFIC / NATURAL RESOURCES / MASS TRANSIT CITATIONS / CRIMINAL CHARGES / MUNICIPAL ORDINANCES / PUBLIC LOCAL LAWS

THE DEFENDANT HAS BEEN ARRESTED UPON THE FOLLOWING INFORMATION OR OBSERVATION (MAKE A PLAIN, CONCISE AND DEFINITIVE STATEMENT OF ESSENTIAL FACTS CONSTITUTING THE OFFENSE CHARGED)

On 2/20/06 at approx. 2046hrs., I responded to the Wal-Mart located 3549 Russett Green East, Laurel, MD

20724 for a report of a shoplifter who just pulled a knife security. On location, I observed a male standing

outside a BMW parked in front of the Wal-Mart. An employee of Wal-Mart then pointed to this male and

advised that he stole items belonging to Wal-Mart and he pulled a knife on security. The male was then

detained. Loss Prevention Specialist(LPS) James Gibson then stated that the male entered the electronics

department removed batteries and an unknown electronic item from display and leave the department. The

male then went to the Home Fashions department where he concealed the items in a shopping bag. Once

outside the store, LPS Gibson approached the male, identified himself and asked to speak to the male. The

male then pulled a lock blade knife out, opened it up and stated, "What, What, What." LPS. Gibson then went

inside the store and called police. Inside the vehicle recovered from the shopping bag were three packs of

CONTINUED ON ATTACHED SHEET (FORM DC/CR 4A)

PROBABLE CAUSE CHARGES # _____

LACK OF PROBABLE CAUSE CHARGES # _____

| I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE MATTERS AND FACTS SET FORTH IN THE FOREGOING DOCUMENT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF. | |
|---|---|
| DATE February 20, 2006 | ARRESTING OFFICER _____ I.D. NO. |

| AGENCY | SUB-AGENCY | I.D. NO. |
|---|---|---|
| AC | 0005 | 1323 |

I HAVE REVIEWED THE STATEMENT OF CHARGES AND HAVE DETERMINED THAT THERE IS PROBABLE CAUSE TO DETAIN THE DEFENDANT

THERE IS NOT PROBABLE CAUSE TO DETAIN THE DEFENDANT AND I HAVE ACCORDINGLY RELEASED HIM ON HIS OWN RECOGNIZANCE

| DATE | JUDICIAL OFFICER | COMMISSIONER I.D. NO |
|---|---|---|
| | | |

PC DC/CR 4 (Rev. 10/200C
COURT COP

EXHIBIT VII



DISTRICT COURT OF MARYLAND FOR......Anne Arundel County........................ (City / County )

LOCATED AT ( COURT ADDRESS )

251 Rowe Boulevard
Annapolis, Maryland 21401

DEFENDANT'S NAME (LAST, FIRST M.I.)

Allston, Amu A.

MAFIS NAME

Page_____ of _____

## STATEMENT OF PROBABLE CAUSE (CONTINUED)
ARREST ON TRAFFIC / NATURAL RESOURCES / MASS TRANSIT CITATIONS / CRIMINAL CHARGES / MUNICIPAL ORDINANCES / PUBLIC LOCAL LAWS

"Duracell" batteries valued at $15.18 property of Wal-Mart. I did smell a strong odor of an alcoholic beverage

coming from the males breath. The male was placed under arrest and transported to Western District for

processing.   The male was identified as Amu Allston 12/27/68. All events took place in Anne Arundel

County, State of Maryland.

CONTINUED ON ATTACHED SHEET (FORM DC/CR 4A)

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE MATTERS AND
FACTS SET FORTH IN THE FOREGOING DOCUMENT ARE TRUE TO THE BEST OF MY
KNOWLEDGE, INFORMATION AND BELIEF.

| DATE | ARRESTING OFFICER | |
|---|---|---|
| February 20, 2006 | | |
| AGENCY | SUB-AGENCY | I.D. NO. |
| AC | 0005 | 1323 |



PC DC/CR 4A (Rev 8/
COURT COPY

| ANNE ARUNDEL COUNTY POLICE DEPARTMENT, MILLERSVILLE. MD. | | Incident Report | Page 1 of 2 |
|---|---|---|---|

| 1. OFFENSE | 2. BUSINESS/VICTIM NAME (LAST, FIRST, MIDDLE) | 3. CASE NUMBER |
|---|---|---|
| First Degree Assault/Theft under $100.00 | Wal-Mart | 2006-707188 |

| 4. DATE AND TIME OCCURRED | 5. BUSINESS/VICTIM ADDRESS | CITY | 6. RESIDENCE PHONE |
|---|---|---|---|
| 2/20/06 2046hrs. | 3549 Russett Green East, Laurel, MD 20724 | | N/A |

| 7. DATE AND TIME REPORTED | 8. VICTIMS EMPLOYMENT | CITY | 9. BUSINESS PHONE |
|---|---|---|---|
| 2/20/06 2046hrs. | N/A | | (301) 604-0180 |

| 10. DAY OF WK OCCURRED | 11. DAY OF WK REPORTED | 12. DOB | RACE | SEX | AGE | 13. OCCUPATION | 14. |
|---|---|---|---|---|---|---|---|
| Monday | Monday | N/A | N/A | N/A | N/A | N/A | |

| 15. WEATHER AT TIME OF OCCURRENCE | 16. REPORTING PERSON (LAST, FIRST, MIDDLE) | 17. DOB | 18. RESIDENCE PHONE |
|---|---|---|---|
| CLEAR  RAIN  FOGGY  CLOUDY X COLD  UNK. SNOW  SEVERE WIND  WARM  OTHER | Gibson, James | 7/2/61 | N/A |

| 19. DISTRICT | POST | SHIFT | 20. REPORTING PERSON ADDRESS | CITY | 21. BUSINESS PHONE |
|---|---|---|---|---|---|
| Western | 5A2 | Two | S/A#5 | | S/A#9 |

| 22. PRIMARY VICTIM VULNERABILITY |
|---|
| N/A |

| 23. LOCATION OF OFFENSE | 24. TOTAL LOSS VALUE | 25. DESCRIBE LOCATION |
|---|---|---|
| S/A#5 | $15.54 | Retail Store |

| 26. TOOLS/WEAPON USED | 27. ENTRY POINT/EXIT POINT/ENTRY LOCATION |
|---|---|
| Lock-blade knife | N/A |

| 28. ROUTE/METHOD OF ESCAPE | 29. METHOD OF OPERATION/INTENT |
|---|---|
| N/A | Suspect stole items and pulled knife on security |

| 30. PHYSICAL INJURY/MENTAL CONDITION ( VICTIM,  SUSPECT,  MISSING PERSON) | 31. HOSPITALIZED? WHERE | 32. HOW TRANSPORTED |
|---|---|---|
| N/A | N/A | N/A |

| 32. VEHICLE CODES (CHECK APPLICABLE CODES) |
|---|
| ABANDONED,  DAMAGED,  EVIDENCE,  IMPOUNDED,  RECOVERED STOLEN,  STOLEN,  SUSPECT,  THEFT FROM,  TOWED,  X USED IN CRIME |

| 34. RELEASE | 35. BODY TYPE | 36. YEAR | 37. MAKE | 38. MODEL | 39. COLOR | 40. TAG | 41. STATE | 42. EXPIRES |
|---|---|---|---|---|---|---|---|---|
| YES  NO | Four Door | 88 | BMW | N/A | N/A | MZT 701 | MD | 6/09 |

| 43. VIN NUMBER | 44. VALUE | 45. CONDITION/IDENTIFYING MARKS |
|---|---|---|
| WBAAD2304J8844607 | N/A | |

| 46. LOCATION  STOLEN,  TOWED,  RECOVERED | 47. OWNER NOTIFIED BY | 48. PERSON/OTHER DEPT. NOTIFIED | 49. DATE AND TIME NOTIFIED |
|---|---|---|---|
| | | | |

| 50. TOW CO. | 51. TOWED TO | 52. RADIO NOTIFIED - DATE AND TIME | TTY # | 53. LOCKED: DOORS  WINDOWS  TRUNK  KEYS IN CAR  RADIO  SPARE TIRE |
|---|---|---|---|---|
| | | | | |

| 54. ENTER WITNESS, VICTIM, SUSPECT, RUNAWAY/MISSING PERSON INFORMATION BELOW: (USE LETTER 'CODE' BLOCK) |
|---|
| WITNESS (W), VICTIM (V), SUSPECT (S), RUNAWAY (R) OR MISSING PERSON (M) |

| CODE | 55. NAME | DOB | SEX | RACE | EYES | HAIR | WEIGHT | HEIGHT |
|---|---|---|---|---|---|---|---|---|
| S | Amu Allston | 12/27/68 | M | B | Brown | Black | 210 | 6-3 |
| | ADDRESS 2303 Delano Lane, District Heights, MD 20747 | | | PHONE (home) | | | PHONE (work) | |
| | IDENTIFIERS | | | | | | | |

| CODE | 55. NAME | DOB | SEX | RACE | EYES | HAIR | WEIGHT | HEIGHT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | ADDRESS | | | PHONE (home) | | | PHONE (work) | |
| | IDENTIFIERS | | | | | | | |

| 59. WAS INCIDENT | 60. REPORT TAKEN | 61. EMERGENCY RUN |
|---|---|---|
| RACIAL,  ETHNIC,  RELIGIOUS,  SPOUSAL ASSAULT,  N/A | ● SCENE,  STATION,  PHONE,  OTHER | ● YES  NO |

| 62. DISPOSITION | 63. OPERATION IDENTIFICATION |
|---|---|
| OPEN,  XCLOSED,  SUSPENDED,  1 ARREST  UNFOUNDED,  FALSE REPORT,  FOLLOW-UP NEEDED | YES  NO  N/A |

| 64. FIRST OFFICER | ID | 65. SECOND OFFICER | ID | 66. SUPERVISOR | ID | 67. REVIEW OFFICER | ID |
|---|---|---|---|---|---|---|---|
| R. Heller Sr. | 1323 | | | *[signature]* | 348 | | |

Form # 09-40-7-1

EXHIBIT VIII

U.S. PAROLE COMMISSION'S

NOTICE OF ACTION

INITIAL HEARING

DATED NOVEMBER 7, 2006

USPC

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**Notice of Action**

| | |
|---|---|
| Name: ALLSTON, Amu<br>Register Number: 11087-007<br>DCDC No: 241-795 | Institution: D.C. – C.T.F.<br><br>Date:      November 7, 2006 |

As a result of the hearing conducted on October 26, 2006, the following action was ordered:

Continue for a subsequent hearing to re-subpoena Mr. Gibson who was unable to attend the initial revocation hearing.

Remain in custody pending the continued revocation hearing.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:     D.C. Federal Billing Unit
        D.C. Department of Corrections
        Washington, D.C. 20003

        U.S. Marshals Service
        District of Columbia - District Court
        333 Constitution Ave, N.W., Room 1400
        Washington, D.C. 20001
        Warrants – Attn: David Baldwin

        Anna Rodriguez
        Public Defender Service
        District of Columbia
        Special Proceedings Division
        633 Indiana Avenue, N.W.
        Washington, D.C. 20004

        U.S. Probation Office
        District of Maryland
        9200 Edmonston Road, Suite 200
        Greenbelt, MD 20770

**EXHIBIT VIII**

EXHIBIT IX

LETTER OF RECONSIDERATION

SUBMITTED BY ATTORNEY ANNA RODRIQUES

TO

STEVE HUSK, CASE OPERATIONS MANAGER

U.S. PAROLE COMMISSION

# PUBLIC DEFENDER SERVICE

### FOR THE DISTRICT OF COLUMBIA

BOARD OF TRUSTEES

CYNTHIA D. ROBBINS
  CHAIRPERSON
JO-ANN WALLACE
  VICE CHAIRPERSON
THOMAS L. BOWEN
EMILIO W. CIVIDANES
CLAIRE M. JOHNSON
HANNAH JOPLING
KARL A. RACINE
JEFFREY D. ROBINSON
DONALD R. VEREEN, JR.
ROBERT L. WILKINS

633 INDIANA AVENUE. N.W.
WASHINGTON, D.C. 20004

(202) 628-1200
(800) 341-2582
TTY (202) 824-2531
FAX (202) 824-2351

www.pdsdc.org

AVIS E. BUCHANAN
DIRECTOR

PETER A. KRAUTHAMER
DEPUTY DIRECTOR

Via facsimile to 240-437-0256

December 13, 2006

Mr. Steve Husk
Case Operations Manager
U.S. Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

**Re: Mr. Amu Allston, Fed. Reg. No. 11087-007**

Dear Mr. Husk:

I write to request that the Commission reconsider the recommendation for revocation made by Dr. Price on December 12, 2006. Mr. Allston is entitled to reinstatement because Dr. Price's decision to revoke violated Mr. Allston's right to due process at his parole revocation hearing. Hearing Examiner Price violated Mr. Allston's right to due process under *Morrissey v. Brewer*,[1] when he orally amended the warrant, after the testimony concluded, to add the charge of Simple Assault.

<u>Case Background</u>

Mr. Allston was charged by warrant with 1) Use of Dangerous and Habit Forming Drugs, and 2) Law Violation a) Assault with a deadly Weapon – Knife, b) Theft. Mr. Allston was formally notified of the above charges at his probable cause hearing held on August 25, 2006.

Mr. Allston's initial revocation hearing took place on October 25, 2006 before Hearing Examiner Skvorc. At that hearing testimony was taken only from Ms. Angela Griffin, his U.S. Parole Officer. None of the adverse witnesses necessary for Charge 2

_Exhibit #4_ _____
[1] 408 U.S. 471 (1972)

appeared at the hearing.[2]  Examiner Skvorc found that charge 1 did not rise to the level of revocation and recommended that Mr. Allston be released on a summons.  His recommendation was based on the testimony of Ms. Griffin which established that Mr. Allston received a letter of reprimand from the Commission and that he successfully completed a 28 day in-patient drug treatment program and a 90 day transitional program at Oxford House.  In addition Mr. Allston continued on his own, and at his expense, with drug treatment at the Reality Outpatient program.  Moreover Mr. Allston's behavior in the community, according to Ms. Griffin, was stable in all other aspects -- he is a member of the steamfitters union, had stable housing, and he immediately reported the arrest to her.  She questioned Mr. Allston about the offense and believed his statements.  She not only did not oppose release on a summons but had initially requested on July 18, 2006 that no action be taken pending disposition of the case.

The Commission issued a Notice of Action on November 7, 2006 ordering a subsequent hearing on charge 2 and ordered that Mr. Allston remain in custody.  Mr. Allston's revocation hearing on charge 2 was held on December 12, 2006.  Examiner Price made no findings on charge 2 a) Assault with a deadly Weapon – Knife, and on charge 2 b) Theft.

### Due Process Requires Notice of the Charges upon Which Revocation Will Be Based.

Mr. Allston has the due process right to written notice of the charges against him.[3]  Here the Commission formally charged Mr. Allston only with Assault with a Deadly Weapon and with Theft.  Yet Examiner Price not only provided inadequate notice of the amended charge of Simple Assault, but he did so at the conclusion of the hearing.  Under this set of facts, there is no doubt that Mr. Allston's hearing was precisely the type of proceeding that *Morrisey* meant to forbid.

In *Long v. Gaines*,[4] the District Court held that notice to parolees must include among other things, the violations the parolee is charged with.  Moreover the District Court emphasized that parolees must receive this notice **prior** to the hearing, not after. [5]  Certainly under *Morrissey* and *Long*, Mr. Allston was entitled to notice of the charge of Simple Assault.  The Commission's practice is to include lesser charges, i.e., with drug cases, the charges include Possession with the Intent to Distribute as well as Possession.  The Commission did not follow that practice here in this case.

Thus Examiner Price violated Mr. Allston's due process right to notice of all the charges against him when he revoked parole based on a law violation he was never charged with.

---

[2] According to Examiner Skvorc Officer Heller was recovering from surgery and loss protection officer James Gibson had a "prior appointment."   Counsel argued that a "prior appointment" was not good cause for non-appearance.
[3] )408 U.S. at 488-489.
[4] Long v. Gaines, 167 F.Supp.2d 75 (D.D.C. 2001).
[5] Id. at 91.

Relief Requested

   Mr. Allston, through undersigned counsel, requests that the Commission reinstate him to parole given that no findings were made on the charged offenses and that he has successfully completed the sanction imposed for Charge 1.



   Sincerely Yours,



   Anna Rodriques
   Counsel for Mr. Allston

**EXHIBIT X**

**U.S. PAROLE COMMISSION'S RESPONSE TO**

**LETTER OF RECONSIDERATION**



**U.S. DEPARTMENT OF JUSTICE**
**United States Parole Commission**

_5550 Friendship Boulevard_
_Chevy Chase, Maryland 20815-7201_
_Telephone: (301)492-5821_
_Facsimile: (301)492-5525_

January 31, 2007

Anna Rodriques, Attorney
D.C. Public Defender Service
633 Indiana Avenue, N.W.
Washington, DC 20004

**Re:**   **Allston, Amu**
        **Reg. No. 11087-007**
        **DCDC No. 241-795**

Dear Ms. Rodriques:

Your letter of December 13 to Case Operations Administrator Husk was received and considered during the final review of Inmate Allston's case. The Commissioner did not agree with the arguments you presented in your letter regarding Examiner Price's finding of guilt on a charge of simple assault.

The Commissioner did reduce the offense severity rating from Category Three to Category Two based of the documents that describe the assault. The assault involved Mr. Allston intimidating three men with a knife. All of the men were employees of the store Mr. Allston had just left but it does not appear likely that he could have known one of them was a security guard. Also, an error in the Salient Factor Score that was not corrected at the hearing was noticed during the final review process. The score was changed from 2 to 3 because one too many prior commitments had been counted.

A Notice of Action was issued on January 30. You should receive your copy soon.

Sincerely,

Rob Haworth
Hearing Examiner

JRH

EXHIBIT X

**EXHIBIT A**
**TRANSCRIPT OF REVOCATION HEARING**
**OCTOBER 26, 2006**

## TRANSCRIPT – REVOCATION HEARING
## AMU ALLSTON
### OCTOBER 26, 2006

HE: CASEY SKVORC
AR: ANNA RODRIQUES
AA: AMU ALLSTON

HE: PROCEEDING FOR AMU ALLSTON, 11087-007.  CASEY SKVORC HEARING EXAMINER.  SIR, WOULD YOU PLEASE STATE YOUR NAME AND REGISTER NUMBER?

AA: UHH MY NAME IS AMU ALLSTON AND MY REGISTER NUMBER IS 11087 – DOUBLE O 7.

HE: AND MS. RODRIQUES WOULD YOU PLEASE STATE YOUR NAME AND BUSINESS ADDRESS?

AR: GOOD AFTERNOON, MR. SKVORC, ANNA RODRIQUES ON BEHALF OF MR. ALLSTON. MY BUSINESS ADDRESS IS THE PUBLIC DEFENDER SERVICE LOCATED AT 633 INDIANA AVENUE, NW IN WASHINGTON DC.

HE: ALRIGHT.  MS. RODRIQUES I HAVE BEEN UMM APPRISED THAT NEITHER THE LOSS PREVENTION SPECIALIST OR THE ANN ARUNDEL POLICE DEPARTMENT OFFICER ARE ABLE TO BE HERE FOR TODAY'S HEARING.  THE ANN ARUNDEL POLICE OFFICER IS RECENTLY UHH HAD A SURGERY AND EXPECTS TO BE BACK AT WORK SHORTLY, BUT COULD NOT BE HERE TODAY BECAUSE OF THAT.  THE LOSS PREVENTION SPECIALIST HAD A PRIOR APPOINTMENT AND WAS NOT ABLE TO MAKE THIS HEARING.  SO I CANNOT OFFER ANY OPPORTUNITY FOR YOU TO CROSS EXAMINE EITHER OF THOSE WITNESSES.  AS YOU KNOW, WE HAVE TWO CHARGES, WE HAVE THE ADMINISTRATIVE CHARGE, USE OF DANGEROUS AND HABIT FORMING DRUGS, IN WHICH WE HAVE THE CSO, ANGELA GRIFFIN, HERE TO TESTIFY TODAY.  WE HAVE THAT CHARGE AND THE LAW VIOLATION.  LET ME JUST ASK YOU, WHAT IS THE STATUS OF THE LAW VIOLATIONS.

AR: THE STATUS OF THE LAW VIOLATIONS ARE THAT THE CASE IS ON THE STET DOCKET.

HE: OK

AR: CORRECT?

AA: NO, IT WAS NO PROCESSED

AR: WAS IT NOLLE PROCESSED?



1

AA: YEAH IT WAS NOLLE PROCESSED.

AR: I HAVE A LETTER FROM THE LAWYER, WHAT DOES IT SAY?

HE: NOLLE PROSED.

AR: NOLLE PROSED.

HE: THANK YOU VERY MUCH MS. RODRIQUES. ANYWAY, UMM, AND THAT'S REALLY THE REASON THAT WE ARE HERE TODAY. I TOOK THE LIBERTY OF ASKING THE CSO IF SHE WOULD HAVE REQUESTED THE WARRANT IF THE ONLY CHARGES WERE THE USE OF DANGEROUS AND HABIT FORMING DRUGS. AND I THINK ITS FAIR FOR ME TO SAY THAT YOUR ANSWER TO THAT WAS NO.

AG: THAT'S CORRECT.

HE: IS THAT CORRECT MS. GRIFFIN?

AG: THAT'S CORRECT.

HE: THANK YOU. SO THERE'S NO POINT IN HAVING THE HEARING TODAY WITHOUT THE OPPORTUNITY FOR YOU TO CROSS EXAMINE THE PEOPLE WHO ARE ACCUSING YOU OF A CATEGORY 5 OFFENSE. UMM BOTH OF THEM HAVE JUSTIFICATION FOR NOT BEING HERE TODAY. UH AND SO WHAT I'M GOING TO RECOMMEND MS. RODRIQUES IS THAT, I'M GOING TO MAKE A, UHH, RECOMMENDATION THAT CHARGE NUMBER 1 DOES NOT RISE TO THE LEVEL OF REVOCATION. I GUESS I SHOULD ASK YOUR CLIENT IF HE ADMITS IT, DO YOU ADMIT THE CHARGE?

AA: NO. I..

HE: OR DO YOU DENY THE CHARGE? YOU DENY THE CHARGE, OK. LET'S GO AHEAD WITH THE HEARING ON CHARGE NUMBER ONE. CUZ I WANT TO HEAR FROM THE CSO ON THAT AND THEN I'LL DECIDE IF I'M GOING TO HAVE THAT RECOMMENDATION OR NOT.

AA: OK

HE: BUT FOR CHARGE NUMBER 2, WE'RE DEFINITELY GOING TO CONTINUE THAT. BOTH OF THEM HAVE JUSTIFICATION FOR NOT BEING HERE TODAY AND WE'LL CONTINUE IT FOR THEIR PRESENCE. SO LET ME JUST...

AR: WELL, UMM, I DON'T KNOW. ARE YOU GOING TO GO FORWARD WITH THE OPENING STATEMENTS?

HE: IM GOING TO GO FORWARD WITH THE OPENING STATEMENTS, YES.

AR: CUZ THOSE ARE KEY AND THERE ARE SOME THINGS I WANT TO PUT ON THE RECORD.

HE: ABSOLUTELY YOU WILL HAVE YOUR CHANCE TO DO THAT. AND THEN WE WILL HEAR FROM THE CSO AND I'LL MAKE, I'LL DECIDE IF I'M GOING TO MAKE THAT FINDING ABOUT CHARGE NUMBER ONE OR NOT. OK. SO, THIS IS A REVOCATION HEARING TO DETERMINE WHETHER YOU HAVE VIOLATED THE CONDITIONS OF YOUR RELEASE. I WILL REVIEW AND MAKE FINDINGS OF FACTS AS TO EACH OF THE CHARGES AGAINST YOU. IF I RECOMMEND REVOCATION OF YOUR RELEASE I WILL MAKE A RECOMMENDATION AS TO WHETHER YOU SHOULD BE REPAROLED. BECAUSE YOURE SERVING A DC SENTENCE, IF YOU'RE RELEASE IS REVOKED YOU WILL NOT RECEIVE CREDIT FOR THE TIME SPENT ON RELEASE. THIS IS AN ADMINISTRATIVE HEARING; THE RULES LIMITING THE TYPE OF EVIDENCE ADMISSIBLE IN A CRIMINAL TRIAL DO NOT APPLY IN A PAROLE REVOCATION HEARING. DISPUTED CHARGES WILL BE RESOLVED BY THE PROPONDERENCE OF THE EVIDENCE. THE PROPONDERENCE OF THE EVIDENCE MEANS EVIDENCE THAT TAKEN AS A WHOLE IS MORE CREDIBLE AND CONVINCING THAN EVIDENCE OFFERED IN OPPOSITION TO IT. YOU CAN CONFER WITH YOUR ATTORNEY AT ANY TIME DURING THE HEARING AND IF AT ANY TIME DURING THE HEARING YOU HAVE A QUESTION ABOUT THE PROCEDURE, YOU CAN ASK ME ABOUT IT. IN THIS HEARING YOU HAVE CERTAIN RIGHTS THAT I WILL NOW REVIEW WITH YOU. MR. ALLSTON DID YOU OR YOUR RECEIVE NOTICE OF THIS HEARING?

AA: YES

HE: DID YOU OR YOUR ATTORNEY RECEIVE A PACKET OF INFORMATION WHICH INCLUDES THE LETTER OF PROBABLE CAUSE, A COPY OF THE WARRANT APPLICATION AND THE INFORMATION SUPPORTING THE CHARGES AGAINST YOU?

AA: THAT'S CORRECT

HE: DID YOU HAVE ENOUGH TIME TO TALK TO MS. RODRIQUES?

AA: YES

HE: MS. RODRIQUES DID YOU HAVE ENOUGH TIME TO CONFER WITH YOUR CLIENT.

AR: YES, BUT LET, LET ME PUT THIS ON THE RECORD NOW AND THAT IS THAT MR. ALLSTON AND I HAVE DISCUSSED UHH MY REPRESENTATION AND WHETHER I WOULD CONTINUE TO REPRESENT HIM OR ANOTHER LAWYER WOULD UHH BE APPOINTED TO HIM. HOWEVER, MR. ALLSTON

3

HAS INFORMED ME THAT HE WISHES TO CONTINUE WITH MY
REPRESENTATION AND I WOULD JUST LIKE MR. ALLSTON TO BE ON THE
RECORD THAT HE IS IN AGREEMENT WITH THIS.

AA: YES I AM IN AGREEMENT.

HE: OK SO YOU WANT MS. RODRIQUES TO CONTINUE TO REPRESENT YOU.

AA: YES. RIGHT.

HE: ARE YOU SATISFIED THAT WE HAVE GOT THAT ON THE RECORD MS.
RODRIQUES?

AR: YES.

HE: OK. GOOD. ALRIGHT, ALRIGHT. SO YOU'RE READY TO GO FORWARD
MS. RODRIQUES?

AR: WELL WHAT I AM GOING TO DO IS ASK FOR A UHH, I REALIZE I, I
GUESS, IM CONCERNED ON THE LOSS PREVENTION OFFICER. IM NOT
SURE THAT THE COMMISSION HAS ESTABLISHED GOOD CAUSE ON THAT
ONE. A PRIOR APPOINTMENT, WHAT SORT OF APPOINTMENT WAS IT?

HE: I DON'T KNOW

AR: HE HAD A SUBPOENA, HE SHOULD HAVE KNOWN.

HE: RIGHT. BUT WE ARE GOING TO GIVE HIM TWO TIMES TO APPEAR, THE
WAY WE ALWAYS DO.

AR: WELL, I, YEAH BUT I, I, I GUESS I, I DONT, IM GOING TO OBJECT TO
THAT.

HE: SURE

AR: TO THE LPO NOT BEING HERE

HE: SURE.

AR: I CAN OF COURSE FORGIVE SURGERY, THERES NOTHING I CAN OBJECT
TO THAT.

HE: ALRIGHT. OK. ALRIGHT. ILL NOTE THAT WHEN WE GET TO
PROCEDURAL PART, MS. RODRIQUES. OK. DO YOU HAVE ANY VOLUNTARY
WITNESSES?

AR: WE HAVE VOLUNTARY WITNESSES PRESENT FOR THE LAW
VIOLATIONS.

HE: OH, OK.

AR: BUT NOT FOR THE FIRST CHARGE.

HE: OK.

AR: THE, THE DRUG USE. UMM I WILL NOTE, MR. SKVORC, THAT MR. UHH ALLSTON DID COMPLETE A 28 SANCTION PROGRAM ON THAT.

HE: ON THE...

AR: ON CHARGE ONE.

HE: CHARGE ONE.

AR: DRUG USE. SO ESSENTIALLY HES BEEN SANCTIONED AND HE COMPLETED...

HE: BUT HES DENYING THIS CHARGE?

AR: HES DENYING IT BECAUSE...

AA: OH NO, NO, GO AHEAD IM SORRY.

AR: PLEASE, BECAUSE WE ARE CONTINUING THE HEARING, ESSENTIALLY HE IS IN DENIAL JUST BECAUSE WE'RE GOING TO CONTINUE.

HE: BUT YOU'RE ADMITTING THE DRUG USE.

AA: YES, YES, YES.

HE: OK, GOOD, GOOD, GOOD. ALRIGHT. ALRIGHT NOW SINCE WE AREN'T GOING TO GET TO CHARGE NUMBER TWO, IS THERE ANY REASON FOR US TO HEAR THE VOLUNTARY WITNESSES TODAY?

AR: UMM, MR. ALLSTON, CORRECT ME IF I'M WRONG MR. ALLSTON, BUT UHH WE'RE IN AGREEMENT THAT WHAT WE WILL DO IS HOLD OFF ON PUTTING ANY EVIDENCE ON THOSE CHARGES IN THE RECORD GIVEN THAT YOU WILL NOT BE, IT PROBABLY WILL NOT BE THE SAME HEARING EXAMINER AND THAT PERSON SHOULD HEAR THE ENTIRE CASE.

HE: SO NOTED MS. RODRIQUES. GOOD, GOOD.

AR: ARE YOU IN AGREEMENT MR. ALLSTON?

AA: YES, YES.

HE: OK. GREAT. YOU HAVE RIGHT TO SUBMIT DOCUMENTARY EVIDENCE AND IF YOU HAVE ANY DOCUMENTARY EVIDENCE YOU CAN GIVE IT TO ME WHEN WE DISCUSS THE CHARGE TO WHICH IT APPLIES. YOU HAVE THE RIGHT TO CROSS EXAMINE ADVERSE WITNESSES WHO TESTIFY. SO HERES, HERE WE GO. OK. TODAY WE HAVE THE FOLLOWING ADVERSE WITNESSES. WE HAVE ANGELA GRIFFIN WHO IS HERE AS YOUR CSO.

AA: RIGHT.

HE: WE DO NOT HAVE THE LOSS PREVENTION SPECIALIST HERE AND WE DO NOT HAVE THE ANN ARUNDEL POLICE DEPARTMENT OFFICER AND WE HAVE GONE THROUGH WHY, AND MS. RODRIQUES' OBJECTIONS TO THAT. I AM OVERRULING MS. RODRIQUES' OR DENYING HER MOTION TO UHH ANY MOTION TO DISMISS THE LAW VIOLATION, BECAUSE OF THE ABSENSE OF THE LOSS PREVENTION SPECIALIST HERE TODAY. WHAT WE ARE GOING TO DO IS CONTINUE CHARGE NUMBER TWO. I'M GOING TO HEAR CHARGE NUMBER 1. MY BRIEF UNDERSTANDING IS THAT YOURE TAKING RESPONSIBILITY FOR CHARGE NUMBER ONE.

AA: YES

HE: AND I'LL PROVIDE MY RECOMMENDATION ON THAT AS, AS WE GO. NOW MS. RODRIQUES, OTHER THAN THE LOSS PREVENTION SPECIALIST AND OFFICER HELLER, ARE THERE ANY OTHER ADVERSE WITNESSES WHO'S PRESENCE YOU REQUESTED FOR TODAYS HEARING THAT I DID NOT LIST?

AR: NO.

HE: ALRIGHT. I WILL REVIEW EACH CHARGE AND INFORM YOU OF THE INFORMATION UNDERLYING THE CHARGE AND I WILL THEN ASK YOU TO ADMIT OR DENY EACH CHARGE AND I WILL GIVE YOU AN OPPORTUNITY TO RESPOND TO THE CHARGE. IF YOU CHOOSE TO MAKE NO REPLY TO THE CHARGE THE HEARING WILL PROCEED AND MY RECOMMENDATION WILL BE MADE ON THE BASIS OF THE INFORMATION AVAILABLE. AT THE CONCLUSION OF THE HEARING I WILL INFORM YOU OF MY RECOMMENDATION. THESE WILL THEN BE FORWARDED TO THE CENTRAL OFFICE WHERE THEY WILL BE REVIEWED. A PAROLE COMMISSIONER WILL MAKE THE FINAL DECISION AND A NOTICE OF ACTION CONTAINING THE DECISION WILL BE ISSUED WITHIN 21 DAYS OF THIS HEARING. I WILL NOW GIVE YOU AN INFORMATIONAL SHEET THAT YOU CAN READ LATER. IT EXPLAINS THE PROCESSING OF THE CASE AFTER THE HEARING AND YOUR RIGHT TO AN ADMINISTRATIVE APPEAL IF YOU BELIEVE THE DECISION THE COMMISSION MAKES IS INNAPPROPRIATE. MS. RODRIQUES YOU HAVE ALREADY OBJECTED TO THE NONAPPEARANCE OF THE LOSS PREVENTION OFFICER. DO YOU HAVE ANY OTHER PROCEDURAL MATTERS YOU WISH TO RAISE BEFORE WE BEGIN?

AR: UHH, LET ME JUST CALL ON THE RECORD TO MAKE THIS POINT THAT MR. ALLSTON WOULD REQUEST OF THE COMMISSION TO SUBPOENA ANY TAPES FROM WALMART THAT WERE RECORDED AT THE TIME OF THIS INCIDENT.

HE: OK, I'M GOING TO HAVE TO DENY THAT BECAUSE THAT WAS NOT REQUESTED AT THE PROBABLE CAUSE HEARING. AND THE POSITION OF THE PAROLE COMMISSION IS THAT IF IT IS NOT REQUESTED AT THE PROBABLE CAUSE HEARING, WE DON'T GO FORWARD WITH NEW, NEW REQUEST FOR DOCUMENTATION OR EVIDENCE UMM AT THIS TIME.

AR: WELL GIVEN THAT WE'RE CONTINUING THE HEARING BECAUSE WE HAVE NO WITNESSES, UHH WE WOULD REQUEST ADDITIONAL EVIDENCE AT THAT JUNCTURE. I DON'T THINK THAT THAT REQUEST IS UNREASONABLE FOR THE DEFENSE. I DON'T THINK ITS UNREASONABLE.

HE: HERES, HERES WHAT I WILL DO. I WILL ASK WHEN UMM THE LOSS PREVENTION OFFICER IS CONTACTED FOR HIM TO BRING ANY DOCUMENTATION THAT HE HAS. OK, IS THAT FAIR?

AR: YES.

HE: ALRIGHT. DO YOU HAVE ANY MORE PROCEDURAL MATTERS YOU WISH TO RAISE BEFORE WE BEGIN?

AR: NO.

HE: TESTIMONY OF TODAYS HEARING WILL BE TAKEN UNDER OATH. MR. ALLSTON WOULD YOU PLEASE RAISE YOUR RIGHT HAND AND MS. GRIFFIN WOULD YOU PLEASE RAISE YOUR RIGHT HAND? DO YOU SOLEMNLY SWEAR UNDER THE PENALTY OF PERJURY THAT THE TESTIMONY YOU ARE ABOUT TO GIVE IN THE CASE NOW IN HEARING WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH?

CSO: YES.

HE: OK. MS. GRIFFIN YOU HAVE BEEN VERY PATIENT FOR WAITING TODAY AND I REALLY APPRECIATE THAT. THANK YOU VERY MUCH AND THANK YOU FOR YOUR PRESENCE HERE TODAY. WE HAVE A SINGLE ADMINISTRATIVE CHARGE AND THAT CHARGE IS USE OF DANGEROUS AND HABIT FORMING DRUGS. UMM, MR. ALLSTON SUBMITTED URINE SPECIMINES WHICH TESTED POSITIVE FOR MARIJUANA AND COCAINE ON JANUARY 3RD OF 2005 AND COCAINE ON JANUARY 6TH OF 2005 AND JANUARY 10TH OF 2005. NOW MS. RODRIQUES, AS I UNDERSTAND IT, YOUR CLIENT IS ADMITTING THAT CHARGE, RIGHT?

AR: CORRECT.

HE: OK.

AA: [INAUDIBLE] IT WASN'T AN ADMISSION, I TALKED TO MY PO AND I TOLD HER I HAD BEEN USING DRUGS AFTER THE FIRST TIME. IT WAS ONLY TWO TIMES THAT I HAD ACTUALLY SUBMITTED DIRTY URINES.

AR: OK. THAT'S IT. NO. WE'RE SPLITTING HAIRS.

HE: OK. NOW WHAT ID LIKE TO DO NOW, MS. GRIFFIN, YOU AND I HAVE SPOKEN BEFORE AND WEVE ACTUALLY SPOKEN A MOMENT AGO ABOUT YOUR RECOMMENDATION REGARDING MR. ALLSTON AND IF YOU THINK THAT BASED ON THAT CHARGE ALONE, ONLY THAT CHARGE, IF YOU THINK THAT WOULD RISE TO THE LEVEL OF REVOCATION?

CSO: NO

HE: WHY'S THAT?

CSO: MR. ALLSTON, HE DID TEST POSITIVE, AND HE DID ADMIT TO THE UMM DRUG USE. HIS SUPERVISION OFFICER AT THAT TIME WAS MICHELLE MERRIT. I DID NOT RECEIVE MR. ALLSTON'S CASE UNTIL MARCH OF THIS YEAR., SO I'M GOING FROM HER NOTES AND WHATS CONTAINED IN THE CASE FILE MATERIAL. UMM USP MERRIT HAD REPORTED THE POSITIVES UMM DRUG RESULTS TO THE UNITED STATES PAROLE COMMISSION AND AT THAT POINT SHE HAD REQUESTED A LETTER OF REPRIMAND AS WELL AS A MODIFICATION FOR INPATIENT COUNSELING. THE LETTER OF REPRIMAND, AND SHE HAD WRITTEN THAT LETTER, EXCUSE ME, ON JANUARY 24TH 2005. THE LETTER OF REPRIMAND WAS ISSSUED ON FEBRUARY 3RD 2005, ADMONISHING MR. ALLSTON FOR USE OF DANGEROUS AND HABIT FORMING DRUGS.

HE: OK.

CSO: IN ADDITION TO THAT, ON FEBRUARY 7TH 2005, A MODIFICATION FOR UHH 28 DAY RESIDENTIAL TREATMENT WAS APPROVED IN A NOTICE OF ACTION FORWARDED TO OUR OFFICE. MR. ALLSTON ENTERED UHH REAL – UHH LAUREL REGIONAL HOSPITAL INITIALLY AND FROM THERE HE WENT TO UHH, DETOX?

AA: AVERY RHODE

CSO: AVERY RHODE FOR DETOXIFICATION AND THEN FROM THERE HE WENT TO UMM THE OXFORD HOUSE?

AA: YES, THAT'S CORRECT.

8

CSO: WHICH WAS A UHH 90 DAY HALFWAY HOUSE PLACEMENT FOLLOWING THE INPATIENT TREATMENT. HE COMPLETED THAT SUCCESSFULLY AND SINCE THAT TIME UP UNTIL THE TIME OF HIS ARREST HE WAS PARTICIPATING IN OUTPATIENT SERVICES AT REALITY AS A SELF PAID CLIENT. SO HE WAS PAYING FOR, PAYING UHH FOR HIS OWN TREATMENT AND HE ACTUALLY WOULD HAVE COMPLETED THAT PROGRAM IF NOT FOR THE FACT THAT HE HAD UHH HE WAS ARRESTED.

HE: MS. RODRIQUES, DO YOU HAVE ANY QUESTIONS?

AR: YES CAN YOU GIVE ME THE NAME OF THE PROGRAM THAT HE WAS SELF PAYING TO ATTEND?

CSO: UHH REALITY OUTPATIENT. THEY ARE LOCATED AT...

AR: THAT'S OK, I CAN FIND IT I JUST WANTED TO GET THE NAME. AND THAT'S SOMETHING THAT IF HE WERE RELEASED UHH ON A SUMMONS BY THE COMMISSION THAT HE COULD JUST GO RIGHT BACK INTO, CORRECT?

CSO: YES.

AR: OK. IT'S NOT SOMETHING THAT REQUIRES BEDSPACE, OR...

CSO: NO IT'S AN OUTPATIENT SUBSTANCE ABUSE TREATMENT PROGRAM.

AR: OK, ALRIGHT. AND IN, READING YOUR UMM LETTER TO THE COMMISSION ON UHH JULY 18TH 2006...

CSO: YES

AR: DO YOU HAVE THAT IN FRONT OF YOU?

CSO: I DO.

AR: UMM, YOU UHH, YOU UHH INFORMED THE COMMISSION OF THE ARREST BUT REQUEST THAT NO ACTION BE TAKEN..

CSO: THAT IS CORRECT

AR: UNTIL DISPOSITION

CSO: THAT IS CORRECT

AR: CORRECT. AND MR. ALLSTON WAS STABLE IN ALL ASPECTS, CORRECT?

CSO: YES. HE WAS EMPLOYED FULL TIME, HE WAS ATTENDING SUBSTANCE ABUSE COUNSELING AND UMM I HAD CONDUCTED VISITS AT

9

THE HOME AND I MET WITH MR. ALLSTON AND HIS FIANCE MS. COOK AND FROM ALL APPEARANCES HE APPEARED TO BE DOING WELL.

AR: AT HIS, HES A STEAMFITTER

CSO: THAT IS CORRECT

AR: SO THAT HE HAS VERY SIMILAR [INAUDIBLE]

CSO: THAT'S CORRECT

AR: AND UH,, DID YOU HAVE ANY CONTACT WITH HIS CHURCH OR HIS PASTOR?

CSO: ON ONE OCCASION UHH I BELIEVE THAT UMM IF MY MEMORY SERVES ME CORRECTLY, I HAD GONE OUT THERE AND MET WITH MR. ALLSTON, HE WAS PERFORMING COMMUNITY SERVICE WORK AND I BELIEVE YOUR PASTOR WAS THERE WITH HIM.

AA: YES

AR: OK. AND THEN GIVEN THAT HIS CASE HAS NOW BEEN RESOLVED AND NOLLE PROSSED UMM WOULD YOU UHH RECOMMEND OR AGREE WITH A SUMMONS HIM BEING RELEASED ON A SUMMONS BY THE COMMISSION, IF THE COMMISSION WERE TO DO THAT AND GO BACK UNDER SUPERVISION [INAUDIBLE]?

CSO: IF, IF THE COMMISSION CHOOSES TO DO THAT THAT'S FINE, I WOULD NOT HAVE ANY OBJECTIONS TO THAT.

AR: WOULD, WOULD YOU BE WILLING TO RECOMMEND IT?

CSO: I'VE NEVER DONE SO BEFORE AT THIS JUNCTURE UMM I WOULD NOT BE OPPOSED TO IT, BUT I WOULD LEAVE IT UP TO THE COMMISSION TO SUSTAIN ON THAT, ON THE BODY THAT MAINTAINS JURISDICTION OVER THESE CASES.

AR: OK, OK. NOTHING FURTHER.

HE: OK. ALRIGHT THEN. MY, FIRST OF ALL I WANT TO SAY TO THE GOOD FOR YOU, YOU BELONG TO THE UNION AND YOU'VE GOT A JOB. PLUS YOU'VE GOT A GOOD RELATIONSHIP WITH YOUR USPO.

AA: YES SIR

HE: THAT IS KEY. I MEAN, AND THIS LADYS REALLY TRYING TO HELP YOU.

AA: RIGHT

HE: I MEAN I WOULD LISTEN TO WHAT SHE HAS TO SAY. IF SHE HAS A RECOMMENDATION FOR YOU, I WOULD MAKE THAT MY TOP PRIORITY, OK. IM GOING TO BE HONEST AND STRIAGHT UP WITH YOU, MR. ALLSTON, THE BEST THING YOU'VE GOT GOING FOR YOU TODAY IS THIS LADY RIGHT HERE, SHE IS SUPPORTING YOU. OK. DON'T, DON'T MESS THAT UP.

AA: NO, YEAH ,YEAH.

HE: I MEAN KEEP, KEEP YOUR USPO HAPPY.

AA: RIGHT

HE: OK AND SHE CAN, YOU KNOW, SHE CAN DO GOOD THINGS FOR YOU. OK. UMM. I WANT TO COMMEND YOU FOR GETTING YOUR ACT TOGETHER AND GETTING THROUGH THAT PROGRAM. I THINK UMM, GOOD, GOOD, GOOD. THE DIFFICULT PART HERE IS WE'VE GOT A REALLY SERIOUS CHARGE AGAINST YOU -- REALLY SERIOUS CHARGE AGAINST YOU. AND WE HAVE A POLICE REPORT HERE THAT THE OFFICER DIDN'T SEE ANYTHING BUT HE SAYS THAT IN THE POLICE REPORT THAT YOU HAD THE SMELL OF ALCOHOL ON YOU IN PRESENCE. MS. RODRIQUES WILL HAVE THE OPPORTUNITY TO CROSS EXAMINE HIM ABOUT THAT WHEN HE TESTIFIES UHH ABOUT THAT. UHH MY RECOMMENDATION TO THE COMMMISSIONERS IS THAT THERE BE A FINDING ON CHARGE ONE, BUT THAT CLEARLY DOES NOT AND FROM MY POINT OF VIEW, RISE TO THE LEVEL OF REVOCATION. WHAT WE NEED TO DO IS TO GET THIS CASE HEARD WITH THE LOSS PREVENTION SPECIALIST EITHER HERE OR NOT. ONCE AND FOR ALL AND GET THIS CASE TAKEN CARE OF. MS. RODRIQUES IM GOING TO RECOMMEND TO THE COMMISSION THAT THIS CASE BE CONTINUED AND THAT WE FAST TRACK GETTING THIS ON THE DOCKET AS QUICKLY AS POSSIBLE SO THAT YOUR CLIENT CAN KNOW WHETHER HES GOING TO BE REVOKED OR NOT AND HE CAN GET HIS LIFE GOING AGAIN. SO WHERE DO YOU WORK NOW?

AA: I WORK IN CHANTILLY VIRGINIA. UMM, [INAUDIBLE].

HE: HOW MUCH MONEY DO YOU MAKE?

AR: MORE THAN YOU [LAUGHTER]

HE: YEAH COME ON, IT DOESN'T TAKE MUCH BUT…

AA: BUT IF IM PAID HOURLY, I'M, I GET PAID $25 AN HOUR WHEN NORMALLY I WORK BY PIECEWORK SO I MAKE UMM, IF I JUST CHANGE AN OUTSIDE UNIT, WHICH MAY TAKE AN HOUR TO DO, I GET PAID $200 FOR THAT. IF I CHANGE AN OUTDOOR AND INDOOR UNIT, UMM, I MAKE A COMBINATION FOR $220 FOR EACH.

HE: OK. WE GOT A LOT RIDING ON THIS. SO MR. ALLSTON, HERES THE, LIKE I SAY, I'M GOING TO RECOMMEND THAT THIS BE REHEARD AS QUICKLY AS POSSIBLE. LET ME ASK YOU THIS. MS. RODRIQUES, DOES MS. GRIFFIN NEED TO COME BACK FOR THE, FOR THE UMM REHEARING.

AR: HOW DO YOU FEEL ABOUT THAT MR. ALLSTON?

HE: FOR THE CONTINUED PROCEEDING.

AA: UMM I MEAN IT JUST DEPENDS ON WHETHER, WHAT, YOU KNOW, HER RECORDS WERE SHOWING.

HE: OH IM ALREADY DISPOSING OF CHARGE NUMBER ONE.

AA: OH OK.

HE: SO THERE AREN'T ANY OTHER ADMINSTRATIVE CHARGES. THERE'S, THERE'S REALLY NOTHING FOR HER TO TESTIFY ABOUT, REGARDING THE LAW VIOLATION. DID HE TELL YOU ANYTHING ABOUT IT?

CSO: YES, IMMEDIATELY AFTER IT HAPPENED. HE ACTUALLY REPORTED IT TO THE PROBATION OFFICER.

HE: OK, WHAT DID HE TELL YOU ABOUT IT?

CSO: HE, HE TOLD ME THAT HE HAD BEEN ARRESTED AND UHH ACTUALLY INFORMED OF WHAT THE CHARGES WERE AND THAT HE HAD PLANNED TO HIRE AN ATTORNEY AND TOLD HIM HIS VERSION OF THE CIRCUMSTANCES SURROUNDING THAT CASE.

HE: WHAT WAS HIS VERSION?

CSO: UHH, HIS VERSION…

AR: WELL, YOU KNOW WHAT, MAYBE WE SHOULD

HE: NO, NO.

AR: BRING HER BACK.

HE: WELL, YEAH, YEAH, YEAH BUT ID LIKE HEAR IT NOW.

AR: OK

HE: LETS HEAR IT NOW.

CSO: HE TOLD ME THAT HE HAD ACTUALLY VISITED WALMART WITH HIS FIANCE AND THAT UMM THEY WERE LEAVING THE STORE AND THAT IT WAS DARK OUTSIDE AND THAT AS THEY WERE LEAVING THERE WAS SOMEONE RUNNING FROM BEHIND IN A HOODED SWEATSHIRT AND THAT IT WAS DARK AND AS MR. ALLSTON TURNED AROUND HE SAW THIS GUY RUNNING TOWARDS HIM AND HE DIDN'T KNOW WHO IT WAS, SO I GUESS HE, WHAT HE TOLD ME, HE UMM TOOK A DEFENSIVE STANCE. FROM THAT POINT THE POLICE OFFICERS WERE CALLED AND HE WAS ACCUSED OF THEFT AND ASSAULT WITH SECOND DEGREE.

HE: GOTCHA, GOTCHA. NOW...

AA: NOW, I HAD, I ALSO WANTED HER TO KNOW THAT I HAD THE OPPORTUNITY TO LEAVE BUT I STAYED AROUND AND WAITED FOR THE POLICE TO ARRIVE, BECAUSE I, WELL I FELT SECURELY THAT I DIDN'T DO ANYTHING WRONG. YOU KNOW, WHAT IM SAYING?

HE: NOW. I'M NOT ASKING YOU TO LOOK INTO A CRYSTAL BALL, OK, EVEN THOUGH YOU PROBABLY COULD, BUT DO YOU BELIEVE HIM?

CSO: I DO. I DO.

HE: OK.

CSO: [INAUDIBLE]

HE: ALRIGHT. WELL. I'LL NOTE THAT. UHH DO YOU HAVE ANY OBJECTION TO COMING BACK WHEN THE CASE IS UHH

CSO: NO, I DON'T

HE: LETS GO AHEAD AND WE, WE'LL ASK HER TO COME BACK AGAIN, THEN WHEN THE CASE IS CONTINUED FOR FRIDAY AND YOU CAN ASK HER ALL KINDS OF QUESTIONS.

AR: WELL, THIS WOULD BE, I'M ASSUMING, UHH, MR. SKVORK YOU'RE GOING TO, PULL UP A REPORT ON THIS...

HE: OH, YES, YES, YES, YES, YES, YES.

AR: RIGHT, SO THAT IT WILL BE...

HE: OH YEAH, YEAH, YEAH, YEAH.

AR: FOR THE NEW EXAMINER TO

HE: RIGHT, RIGHT, RIGHT. AND WHAT YOU SHOULD DO IS UMM THAT EXAMINER WILL READ MY REPORT PRIOR TO THE HEARING. IT WOULDN'T

HURT FOR YOU TO SAY, AS YOU KNOW WE HAD THE INITIAL HEARING WITH CASEY SKVORK PLEASE READ HIS RECOMMENDATIONS ON THAT. AND, I WILL, I WILL DO JUST THAT.

AR: NOW MR. SKVORK WHAT WILL YOUR POSITION BE ON MAKING A RECOMMENDATION THAT MR. ALLSTON UHH BE RELEASED ON A SUMMONS AS TO HIS RE-HEARING. I MEAN THIS IS A MAN WHO HAS BEEN OUT FOR TWO YEARS WITHOUT, OVER TWO YEARS, IS STABLE IN ALL ASPECTS OF HIS LIFE. YOU KNOW, CLEARLY SHOWING THAT…

HE: WELL, LET ME ASK YOU SOME QUESTIONS. YOU KNOW, IF YOU GO OUT, I, I, I HAVE NOT MADE ANY KIND OF DECISION ON THIS YET, AND I HAVE, HAVE I EVER RELEASED ANYBODY TO SUMMONS HERE THAT YOU'RE AWARE OF?

AR: [INAUDIBLE] NOT WITH ME, BUT [INAUDIBLE] WELL YOU CAN MAKE A RECOMMENDATION.

HE: RIGHT, WHAT, WHAT, WHAT I'M SAYING IS, IF YOU WERE TO GO OUT INTO THE COMMUNITY ON THAT RECOMMENDATION AND YOU DO ANYTHING WRONG, IT WILL BE BAD. DO YOU UNDERSTAND THAT? I MEAN, BAD…

AA: IVE BEEN.

HE: IF YOUR USPO CONTACTS THE PAROLE COMMISSION AND SAYS WE'VE GOT A DIRTY URINE, IT DOESN'T MATTER HOW STRESSED YOU WERE. IT DOESN'T MATTER, ANYTHING. IF SHE SAYS YOU MISSED AN APPOINTMENT, IT IS GOING TO BE BAD, I PROMISE YOU. BAD, VERY BAD. AND IF I RELEASE YOU TO THE COMMUNITY AND YOU DON'T SHOW UP FOR THE HEARING, I CANNOT BEGIN TO IMPRESS UPON YOU, THE, YOU THINK THIS IS BAD…

AA: RIGHT.

HE: THAT WILL BE CATASTROPHIC. AND, AND I REALLY MEAN THAT.

AA: RIGHT

HE: I MEAN THAT WILL BE THE END OF THE WORLD. THAT MEANS THAT THE DAY OF THE HEARING YOU CANNOT BE CALLING MS. RODRIQUES AND SAYING " OH, I DON'T FEEL WELL." YOU HAVE TO BE THE FIRST PERSON HERE. AND IM NOT, I DON'T MEAN TO BE DISRESPECTFUL TO YOU

AA: NO, NOT AT ALL

HE: BUT I WANT YOU TO UNDERSTAND

**14**

AA: I JUST

HE: IT WILL BE THE TRAIN WRECK OF YOUR LIFE.

AA: RIGHT

HE: IF YOU'RE NOT HERE. YOU NEED TO GET HERE HOURS IN ADVANCE SO THAT IF THERES AN ACCIDENT ON THE BELTWAY, IF METRO ISNT WORKING, IF THE MESSIAH SHOULD RETURN. I MEAN, YOU GOTTA BE HERE. DO YOU UNDERSTAND THAT?

AA: YES SIR I DO.

HE: OK. THIS MEANS NO CRIMES.

AA: MHMM

HE: NONE. THIS MEANS REPORTING TO YOURR USPO, WHENEVER SHE TELLS YOU TO. AND I'M TELLING YOU, THIS LADY HERE IS YOUR LIFELINE. IF I HEAR, OR THE PAROLE COMMISSION HEARS FROM HER THAT THINGS ARENT WORKING OUT, I SAY THIS WITH RESPECT, IT WILL MAKE YOUR HEAD SPIN, HOW QUICKLY YOU'LL BE BACK IN CUSTODY

AA: I'M SURE

HE: AND HOW BAD THE OUTCOME WILL BE AT THE NEXT HEARING.

AA: RIGHT

HE: ON UHH. MS. RODRIQUES I'M INCLINED TO, TO RELEASE YOUR, TO RECOMMEND RELEASE OF YOUR CLIENT.

AR: THANK YOU

HE: NOW THE PAROLE COMMISSION, SOMETIMES THEY AGREE WITH ME, SOMETIMES THEY DON'T. DON'T CELEBRATE TOO PREMATURELY, BUT BASED ON WHAT YOUR USPO SAYS AND ANNA RODRIQUES, SHE AND I HAVE WORKED TOGETHER A LONG TIME, PLEASE DON'T SPOIL IT FOR EVERY OTHER CLIENT THAT SHE HAS, FROM NOW ON BY NOT DOING RIGHT.

AA: RIGHT

HE: CUZ IM TELLING YOU, IT WILL BE BAD, BAD.

AA: I MEAN I'M JUST REALLY TRYING TO MOVE ON WITH MY LIFE...

**15**

HE: I HEAR YA, I HEAR YA

AA: [INAUDIBLE]

HE: YOU'VE GOT A GOOD JOB, YOU'VE GOT A UNION MEMBERSHIP. I
WOULD LOVE TO SEE YOU, YOU KNOW WHEN YOU, YOU MANAGED TO
TURN YOURSELF AROUND. BUT I GOTTA TELL YOU MR. ALLSTON, ONE
MORE DRUG USAGE, THERE WONT BE A SECOND ONE.

AA: MHMM I UNDERSTAND

HE: THERE WILL NOT BE A SECOND ONE. YOU MUST REPORT TO THIS
LADY WHATEVER SHE TELLS YOU. IF SHE TELLS YOU TO CALL HER 6
TIMES A DAY, THAT IS YOUR WORLD.

AA: RIGHT

HE: OK, SO YOU UNDERSTAND THAT?

AA: YES, SIR, I DO.

HE: OK. OK THAT'S GOING TO BE MY RECOMMENDATION THAT YOU BE
RELEASED UHH UNTIL, THE HEARING IS RESET. PLEASE DON'T
DISAPPOINT ME IN THAT.

AA: I SURE WON'T.

HE: BECAUSE IF YOU DON'T, IF YOU DO, IT, IT WILLNEVER HAPPEN FOR
MS. RODRIQUES' FURTHER CLIENTS. WITH THAT, AND YOU'LL HAVE TO
DEAL WITH HER ON THAT. BUT THAT MEANS, LIKE I SAY, IF YOUR
HEARING IS SET FOR 9 O'CLOCK, YOU BETTER BE IN THAT PARKING LOT
AT 6:30.

AA: YEAH

HE: IF YOU'RE HEARING IS SET FOR 12, YOU BETTER BE HERE,

AR: ALRIGHT

HE: YOU BETTER BE MEETING HERE THERE, BECAUSE IT WONT MATTER
WHY YOURE NOT HERE

AA: RIGHT

HE: IS THAT RIGHT MS. GRIFFIN?

CSO: THAT IS CORRECT. THAT IS CORRECT

HE: SHE WON'T CARE. AND NEITHER WILL SHE. THEY HAVE BOTH GONE OUT ON A LIMB FOR YOU, AND SO AM I, SO DON'T DO ANYTHING THAT'S GOING TO GET YOURSELF IN TROUBLE. NOW THAT MEANS, DON'T GO BACK TO THIS WALMART

AA: RIGHT, RIGHT, RIGHT

HE: EVER WHILE, IM NOT KIDDING, WHILE YOURE ON SUPERVISION

AA: OK, I UNDERSTAND

HE: YOU DON'T NEED ANOTHER ARREST.

AA: RIGHT

HE: AND IF YOU DO, IT WILL BE SO BAD. OK THAT'S MY RECOMMENDATION, WERE DONE.

AR: THANK YOU

CSO: THANK YOU.

**EXHIBIT B1**
**TRANSCRIPT OF REVOCATION HEARING**
**DECEMBER 12, 2006**

TRANSCRIPTION – REVOCATION HEARING
AMU ALLSTON
DECEMBER 20, 2006

HE: DR. PRICE
AA: AMU ALLSTON
AR: ANNA RODRIQUES
CSO Officer (CSO)
JG: JAMES GIBSON
DC: DEWANA COOK-ALLSTON

HE: LOCAL REVOCATION HEARING FOR AMU ALLSTON, REG #
    11087-007.  FOR THE RECORD PLEASE STATE YOUR NAME
    AND YOUR FEDERAL REGISTER NUMBER.

AA: UHH YES, MY NAME IS AMU ALLSTON.  UMM MY FEDERAL
    REGISTRATION NUMBER IS 11087-007.

AR: GOOD AFTERNOON DR. PRICE, ANNA RODRIQUES FROM THE
    PUBLIC DEFENDER SERVICE, UHH 633 INDIANA AVENUE.

[MESS UP IN TAPE]

HE: [INAUDIBLE] TO DETEMINE WHETHER YOU HAVE VIOLATED
    CONDITIONS OF YOUR RELEASE. .  I WILL REVIEW AND
    MAKE FINDINGS OF FACTS AS TO EACH OF THE
    CHARGES AGAINST YOU.  IF I RECOMMEND
    REVOCATION OF YOUR RELEASE I WILL MAKE YOUR
    RECOMMENDATION AS TO WHETHER YOU SHOULD BE
    REPAROLED.  AS YOU ARE SERVING A DC CODE
    SENTENCE, IF YOURE RELEASE IS REVOKED YOU WILL
    NOT RECEIVE CREDIT FOR THE TIME SPENT ON
    RELEASE. THIS IS AN ADMINISTRATIVE HEARING.  THE
    RULES LIMITING THE TYPE OF EVIDENCE ADMISSIBLE IN
    A CRIMINAL TRIAL DO NOT APPLY IN A PAROLE
    REVOCATION HEARING.  DISPUTED CHARGES WILL BE
    RESOLVED BY THE PROPONDERENCE OF THE
    EVIDENCE.  THE PROPONDERENCE OF THE EVIDENCE
    MEANS EVIDENCE THAT TAKEN AS A WHOLE IS MORE
    CREDIBLE AND CONVINCING THAN THE EVIDENCE
    OFFERED IN OPPOSITION TO IT.  YOU MAY CONFER
    WITH YOUR ATTORNEY AT ANY TIME DURING THE
    HEARING.  IF AT ANY TIME DURING THE HEARING YOU
    HAVE A QUESTION ABOUT THE PROCEDURE, FEEL
    FREE TO ASK ME ABOUT IT.  AT THIS HEARING YOU
    HAVE CERTAIN RIGHTS WHICH I WILL NOW REVIEW

1

TRANSCRIPTION – REVOCATION HEARING
AMU ALLSTON
DECEMBER 20, 2006
TESTIMONY OF MR. ALLSTON & JAMES GIBSON & MRS. COOK-ALLSTON

HE: DR. PRICE
AA: AMU ALLSTON
AR: ANNA RODRIQUES
JG: JAMES GIBSON
DC: DAWANA COOK-ALLSTON

HE: LOCAL REVOCATION HEARING FOR AMU ALLSTON, REG #
11087-007. FOR THE RECORD PLEASE STATE YOUR NAME
AND YOUR FEDERAL REGISTER NUMBER.

AA: UHH YES, MY NAME IS AMU ALLSTON. UMM MY FEDERAL
REGISTRATION NUMBER IS 11087-007.

AR: GOOD AFTERNOON DR. PRICE, ANNA RODRIQUES FROM THE
PUBLIC DEFENDER SERVICE, UHH 633 INDIANA AVENUE.

[MESS UP IN TAPE]

HE: [INAUDIBLE] TO DETEMINE WHETHER YOU HAVE VIOLATED
CONDITIONS OF YOUR RELEASE. . I WILL REVIEW AND
MAKE FINDINGS OF FACTS AS TO EACH OF THE
CHARGES AGAINST YOU. IF I RECOMMEND
REVOCATION OF YOUR RELEASE I WILL MAKE YOUR
RECOMMENDATION AS TO WHETHER YOU SHOULD BE
REPAROLED. AS YOU ARE SERVING A DC CODE
SENTENCE, IF YOURE RELEASE IS REVOKED YOU WILL
NOT RECEIVE CREDIT FOR THE TIME SPENT ON
RELEASE. THIS IS AN ADMINISTRATIVE HEARING. THE
RULES LIMITING THE TYPE OF EVIDENCE ADMISSIBLE IN
A CRIMINAL TRIAL DO NOT APPLY IN A PAROLE
REVOCATION HEARING. DISPUTED CHARGES WILL BE
RESOLVED BY THE PROPONDERENCE OF THE
EVIDENCE. THE PROPONDERENCE OF THE EVIDENCE
MEANS EVIDENCE THAT TAKEN AS A WHOLE IS MORE
CREDIBLE AND CONVINCING THAN THE EVIDENCE
OFFERED IN OPPOSITION TO IT. YOU MAY CONFER
WITH YOUR ATTORNEY AT ANY TIME DURING THE
HEARING. IF AT ANY TIME DURING THE HEARING YOU
HAVE A QUESTION ABOUT THE PROCEDURE, FEEL
FREE TO ASK ME ABOUT IT. AT THIS HEARING YOU
HAVE CERTAIN RIGHTS WHICH I WILL NOW REVIEW

WITH YOU.  MR. ALLSTON, DID YOU OR YOUR ATTORNEY RECEIVE NOTICE OF THIS HEARING?

AA: YES

HE: DID YOU OR YOUR ATTORNEY RECEIVE A PACKET OF INFORMATION WHICH INCLUDES THE LETTER OF PROBABLE CAUSE, A COPY OF THE WARRANT APPLICATION AND THE INFORMATION SUPPORTING THE CHARGES AGAINST YOU?

AA: YES

HE: HAVE YOU HAD SUFFICIENT TIME TO CONFER WITH YOUR ATTORNEY?

AA: YES, I HAVE

HE: MS. RODRIQUES HAVE YOU HAD SUFFICIENT TIME TO CONFER WITH YOUR CLIENT?

AR: YES

HE: READY TO GO FORWARD?

AR: YES

HE: YOU HAVE RIGHT TO CALL VOLUNTARY WITNESSES.  DO YOU HAVE ANY WITNESSES TO TESTIFY TODAY?

AR: YES WE DO.  AND THAT WITNESS IS DEWANNA COOK-ALLSTON.  AND SHE IS THE FIANCE, COMMON LAW WIFE.

AA: YEAH

AR: WHICH ONE?

AA: UHH COMMON LAW WIFE.

AR: COMMON LAW WIFE OF MR. ALLSTON.  UMM AND SHE WAS A WITNESS TO THE ARREST, THE [INAUDIBLE] AND ARREST OF MR. ALLSTON.

HE: CAN YOU SPELL HER FIRST NAME?

AA: HER NAME? D-A...

AR: PHENETIC, RIGHT?

AA: D-A-W-A-N-A
HE: DAWANA, OK

AA: DAWANA

HE: OK, I WAS ABOUT TO DEWANA.

[MESS UP TAPE]

AR: UH NO.

HE: YOU HAVE RIGHT TO SUBMIT DOCUMENTARY EVIDENCE.
IF YOU HAVE ANY DOCUMENTARY EVIDENCE YOU MAY
GIVE IT TO ME WHEN WE DISCUSS THE CHARGE TO
WHICH IT APPLIES.    YOU HAVE THE RIGHT TO CROSS
EXAMINE ADVERSE WITNESSES.  TO TESTIFY TODAY WE
HAVE THE MR. JAMES GIBSON. [INAUDIBLE] RUSSELL
HELLER, OFFICER, SAID HED BE HERE, BUT I HAVE NOT
HEARD FROM HIM.  AND LETS SEE [INAUDIBLE]
RECEIVED A PHONE CALL FROM ANNE ARUNDELL
COUNTY, POLICE DEPARTMENT.  AND OFFICER HELLER
WOULD NOT BE AVAILABLE, HE WILL NOT BE BACK TO
WORK UNTIL LATER THIS MONTH. UHH APPARENTLY HE
HAD SOME SERIOUS SURGERY.

AR: OK

HE: SO HE WILL NOT BE HERE TODAY.  WERE THERE ANY
OTHER ADVERSE WITNESSES THAT YOU REQUESTED
THAT I HAVE NOT LISTED.

AR: NO

HE: OK.  I WILL REVIEW EACH CHARGE AND INFORM YOU OF
THE INFORMATION UNDERLYING THE CHARGE.  I WILL
THEN ASK YOU TO ADMIT OR DENY EACH CHARGE AND
WILL GIVE YOU AN OPPORTUNITY TO RESPOND TO THE
CHARGE.  IF YOU CHOOSE TO MAKE NO REPLY TO THE
CHARGE THE HEARING WILL PROCEED AND MY
RECOMMENDATION WILL BE MADE ON THE BASIS OF
THE INFORMATION AVAILABLE.  AT THE CONCLUSION
OF THE HEARING I WILL INFORM YOU OF MY
RECOMMENDATIONS.  THESE WILL THEN BE

3

FORWARDED TO THE CENTRAL OFFICE WHERE THEY WILL BE REVIEWED. A PAROLE COMMISSIONER WILL MAKE THE FINAL DECISION. A NOTICE OF ACTION CONTAINING THE FINAL DECISION WILL BE ISSUED WITHIN 21 DAYS OF TODAYS HEARING. I APOLOGIZE TO YOU BECAUSE I DID NOT BRING ENOUGH UMM DOCUMENTS POINTING OUT YOUR RIGHTS TO AN ADMINISTRATIVE APPEAL, WHICH YOU [INAUDIBLE] INAPPROPRIATE.

AR: I HAVE AN APPEAL FORM. UMM I DON'T HAVE THAT DOCUMENT.

HE: YEAH WELL [INAUDIBLE] THE PROCESS OF REVOCATION, IN OTHER WORDS, THE PROCESSING OF THE CASE, YOU KNOW, WHAT WILL HAPPEN TO THE CASE AFTER, AFTER THE HEARING. A [INAUDIBLE] WILL LOOK AT EVERYTHING AND THEN WILL GO FORWARD TO THE DAILY REVIEWER TO THE COMMISSIONER WHO WILL MAKE THE DECISION. THIS WILL BE DONE WITHIN 21 DAYS AND YOU HAVE A RIGHT TO AN APPEAL THIS IF YOU THINK THEIR DECISION'S INAPPROPRIATE.

AA: OK

HE: ARE THERE ANY PROCUDURAL ISSUES YOU WANT TO RAISE BEFORE WE BEGIN?

AR: UHH NO.

HE: THE TESTIMONY OF TODAYS HEARING WILL BE TAKEN UNDER OATH. PLEASE RAISE YOUR RIGHT HAND. DO YOU SOLEMNLY SWEAR OR AFFIRM UNDER THE PENALTY OF PERJURY THAT THE TESTIMONY YOU ARE ABOUT TO GIVE IN THE CASE NOW IN HEARING WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH?

AA: I DO.

HE: ALRIGHT. NOW ON DECEMBER 26TH 2006, A HEARING WAS HELD AND [INAUDIBLE] THE HEARING ON NOVEMBER 7TH, 2006, THE COMMISSIONER ORDERED THAT THE CASE BE CONTINUED TO A SUBSEQUENT HEARING TO SEE IF MR. GIBSON, WHO WAS UNABLE TO

4

ATTEND THE HEARING. [MESS UP IN TAPE]  FACING TWO CHARGES HERE TODAY, MR. [INAUDIBLE] USE OF DANGEROUS AND THE SECOND CHARGE WE ARE DEALING WITH TODAY IS A LAW VIOLATION, ASSAULT WITH DEADLY WEAPON, KNIFE.  AND THE CHARGE TO BE [INAUDIBLE].  IS THAT CORRECT?

AA: THAT'S CORRECT.

HE: TO THE CHARGE 2A–ASSAULT WITH A DANGEROUS, A DEADLY WEAPON, KNIFE.  DO YOU DENY OR ADMIT TO THAT CHARGE?

AA: I DENY IT SIR.

HE: THAT'S 2A, 2B – THEFT.  DO YOU ADMIT OR DENY?

AA: I DENY.

HE: [INAUDIBLE] DO YOU WANT TO SAY ANYTHING PERTAINING TO THESE CHARGES?  MS. RODRIQUES?

AR: UHH MR. ALLSTON WOULD LIKE TO TELL YOU ABOUT THESE CHARGES.  UMM DO YOU FEEL MORE COMFORTABLE IN A NARRATIVE FORM, TELLING HIM WHAT HAPPENED.

AA: YES, YEAH THAT WOULD BE FINE.

AR: OK

AA: IF I MAY, JUST BRIEFLY, UHH I, I HAVE, I HAVE TO BEGIN WITH THE DAY PRIOR, TO FULLY GIVE YOU THE SCOPE OF WHAT HAPPENED ON THAT PARTICULAR DAY.  MY, MS. COOK, DEWANA, MY WIFE, WHEN SHE HAD SCHEDULED A LITTLE OUTTING FOR THE WEEKEND, THAT WEEKEND PRIOR.  AND UMM IT CONSISTED OF MY FAMILY, HER SISTER AND HER FAMILY, HER TWO SISTERS, BOTH SISTERS IN THAT FAMILY, AND [INAUDIBLE] A TRIP, UP NEAR FREDERICK, TOOK THE KIDS AND THE FAMILY UMM SO WE DID SOME SHOPPING AND THINGS.  UMMM WE WAS TAKING THE KIDS SNOW TUBING.  SO WE DID SOME SHOPPING AND THINGS THE WEEK PRIOR. UMM

AR: WHERE DID YOU SHOP?

AA: WE SHOPPED AT WALMART, WE SHOPPED AT TARGET, WE SHOPPED AT BEST BUY, WE SHOPPED, YOU KNOW, AT A FEW STORES.

AR: WAS THIS THE WALMART YOU SHOPPED AT, THE SAME ONE IN CLIFTON?

AA: YES WE DID.  YEAH WE SHOPPED AT THIS WALMART. UMM WE PURCHASED THINGS LIKE BATTERIES, CLOTHING, UHH DVD'S, UMM [MESS UP IN TAPE].  WHEN I RETURNED, WE RETURNED THAT SUNDAY, AND ON THAT SUNDAY, WE HAD RENTED A, UHH 15 PASSENGER VEHICLE, SO WE HAD TO, UPON OUR RETURN WE HAD TO RETURN THE VEHICLE.  WE RETURNED THE VEHICLE.  AT THAT POINT WE WENT TO MY MOTHER-IN-LAW'S HOUSE, BECAUSE I HAD TO RECONNECT HER STOVE, WHICH I DID FRIDAY, PRIOR TO LEAVING.  UMM AND SHE HAD SOME ISSUES WITH THE HEAT.  UMM, AT THAT POINT WE WAS IN ROUTE TO WALMART, BECAUSE WE HAD TO PURCHASE SOME ITEMS, SOME FOOD ITEMS FOR THE KIDS FOR SCHOOL, THE FOLLOWING DAY, BREAD, MILK, CEREAL, SANDWICH MEAT, STUFF LIKE THAT.  UMM WHILE IN ROUTE, MY WIFE MENTION THAT WE HAD PURCHASED SOMETHING, MY WIFE, WHEN WE WAS OUT IN FREDERICK, WE HAD UMM, SHE HAD WENT TO A WALMART OUT THERE, AND PURCHASED SOME SWEATSUITS WITH HER SISTER. THEY HAD MADE SOME PURCHASES OUT THERE.  COME TO FIND OUT UMM THE ITEMS WERE A MISMATCHED.  IT WAS LIKE AN EXTRA LARGE TOP AND 2X BOTTOM, OR THEY, IT WAS 4 SWEAT SUITS IN TOTAL.  UMM 3 OF THEM WAS MISMATCHED.  SO WHEN WE WAS, WHEN WE GOT BACK AND WE WAS GOING TO GO TO WALMART THAT DAY, THAT SUNDAY EVENING, TO PICK UP SOME FOOD FOR THE KIDS UMM, WE DECIDED, SHE SAID THAT WE MIGHT AS WELL RETURN THOSE ITEMS AT THIS WALMART WHILE WE WAS ON OUR WAY, WHILE WE WAS GOING TO WALMART.  WHEN WE GOT THERE, WELL WE CALLED, WELL ENROUTE TO THE WALMART, MY WIFE HAD CALLED THE HOUSE AND TOLD MY KIDS, MY DAUGHTER TO BRING OUT THE BAG THE BAG THAT WE HAD, THESE, THESE SWEATS, THESE SWEATCLOTHES IN.  SHE BROUGHT THE CLOTHES,

SHE BROUGHT THE CLOTHES OUT ONCE WE GOT THERE AND WE PROCEEDED TO WALMART. AND THIS IS OUR LAW [?]. WE WENT TO WALMART AND EXCHANGED THE ITEMS THAT WE HAD. UMM, SO WE WENT IN TO THE STORE. AND I HAVE, I HAVE WITH ME A DIAGRAM HERE THAT I HAD DREW UP AND WE ENTERED THE WALMART HERE, AND WE WENT TO THE SERVICE COUNTER. VISITING SERVICE COUNTER. SO WE ENTERED THE WALMART AND WENT DIRECTLY TO THE SERVICE COUNTER TO EXCHANGE THE ITEMS. ONCE WE EXCHANGED, ONCE THE YOUNG LADY WHO WAS HELPING US SAID THAT YEAH IT WAS FINE TO EXCHANGE. MY WIFE WENT TO THE MENS DEPARTMENT TO GET THE NEXT, THE, THE ITEMS AND BROUGHT THEM BACK TO THE COUNTER. AT THAT POINT WE DIDN'T LEAVE THE STORE, BECAUSE LIKE I SAID WE WAS COMING TO GET SOME BREAD AND STUFF. SO AT THAT POINT WE WENT TO THE FROZEN FOOD SECTION AND PICKED UP THE ITEMS THAT WE WANTED THERE.

AR: WHERE IS IT IN RELATION TO THE [INAUDIBLE] COUNTER.

AA: ITS UMM, JUST ABOUT DIRECTLY IN FRONT OF IT. UMM WE WENT TO THE FROZEN FOODS SECTION PICKED UP, AND THEN IN THE FOOD ISLES PICKED UP THE BREAD AND THINGS OF THAT NATURE. UMM, UPON CONCLUSION TO THAT, UMM I HAD MADE MENTION TO MY WIFE THAT I WANTED TO SEE IF THEY, WHAT NEW DVD'S HAD COME OUT. UMM AND [INAUDIBLE] HAD WANTED TO BUY ONE OF THE NEW DVD'S. I HAVE A HOBBY, I COLLECT A LOT OF DVD'S. SO WE WALKED TO THE BACK AND LOOKED AT THE DVD'S. AS WE WERE DOING SO, MY WIFE UMM MENTIONED TO ME THAT SHE FELT LIKE SOMEONE WAS WATCHING HER, MR. GIBSON. UHH ONE OF THE, ONE OF THE LOSS PREVENTION GUYS. I DIDN'T REALIZE, I DIDN'T KNOW WHO IT WAS UNTIL AFTER THE FACT. UMM, SO AT THAT POINT, SHE WAS, AND SHE HAD MENTIONED THIS ON, ON A NUMBER OF OCCATIONS PRIOR TO THIS PARTICULAR INCIDENT. BUT UHH, SO AT THAT POINT SHE, SHE INSISTED THAT, YOU KNOW, WE JUST LEAVE THE STORE, WE, YOU KNOW WE WAS READY TO GO. SHE WAS READY TO GO, SHE UMM AT THAT POINT. SO I, I, I BELIEVE AND WE WENT TO THE CHECK OUT

COUNTER TO CHECK OUT, TO PAY FOR THE ITEMS THAT WE HAD. UMMM...

AR: WAIT. LET ME ASK YOU THIS. DID YOU NOTICE MR. GIBSON.

AA: NO I DIDN'T ACTUALLY NOTICE MR. GIBSON.

AR: OK

AA: I DIDN'T ACTUALLY [MESS UP IN TAPE]. SO AS WE PROCEEDED TO THE, TO THE CHECK OUT COUNTER, I UMM OH, WHEN ONE LADY GAVE US THE EXCHANGE, MADE, WE MADE THE EXCHANGE AT THE SERVICE COUNTER, MY, LIKE I SAID, MY, IT WAS 4 SWEATSUITS, ONLY 3 OF THEM WAS EXCHANGED, BUT THEY WAS ALL IN ONE BIG BAG. ALRIGHT? AND SO WHEN WE GOT TO THE COUNTER AND WE WAS TAKING THE CLOTHES OUT THAT WE WAS EXCHANGING, THERE WAS OTHER ITEMS IN THE BAG THAT WE WASN'T EXCHANGING, SO UMM WE MADE MENTION OF THAT TO THE PERSON, TO THE PERSON WHO WAS HELPING US. AND SHE TOLD US, AND UHH SO SHE SAID YOU KNOW, THAT'S FINE, NO PROBLEM, UMM IM JUST GOING TO PUT THE ITEMS THAT YOU ALL ARE EXCHANING INTO WALMART BAGS SO YALL DON'T HAVE NO PROBLEMS. SO SHE PUT EACH INDIVIDUAL SWEATSUIT INTO AN INDIVIDUAL WALMART BAG AND I HAD JUST PUT THEM ALL ON THE TOP, ON THE LITTLE, THE PART WHERE A CHILD WOULD SIT IN, I HAD SET EVERYTHING UP TOP THERE. UMM I HAD SET THE BIG BAG THERE AND THE OTHER CLOTHES WAS DOWN IN THE BOTTOM, SO THEN AS WE WAS GOING UP TO THE COUNTER, I ATTEMPTED TO SEPARATE THE ITEMS THAT WE HAD TO PAY FOR UHH FROM THE ITEMS THAT WAS ALREADY PURCHASED, THE EXCHANGED ITEMS. AND IM TAKING THOSE INDIVIDUAL WALMART BAGS AND PUT THEM BACK INTO THE BIG BAG THAT I CAME INTO THE STORE WITH. UMM AS WE GET UP TO, AS WE GET UP TO THE CASHREGISTER, UMM, I TAKE A FEW ITEMS OUT OF THE, OF THE CART, PUT THEM ON THE COUNTER FOR, FOR MY WIFE AND MAYBE ONE PERSON IN FRONT OF HER. SO AT THAT POINT I TAKE THE BAG THAT WE HAD MADE THE RETURNS AND, I PROCEED TO WALK OUT THE STORE TO GO GET THE CAR, TO BRING THE CAR TO THE FRONT. UHH AS I WALK OUT...

AR: WAIT, BEFORE I... LET ME STOP YOU THERE. WHY DON'T YOU USE THESE PHOTOGRAPHS TO SHOW DR. PRICE WHERE YOU WERE UPON ENTERING.

8

AA: YEAH, YEAH. WE WAS FINE, WE WAS FINE.

HE: AND I WANT TO WAIT TO MOVE ALONG, GET TO THE ISSUE THAT ACTUALLY [INAUDIBLE] IT.

AA: YEAH, YEAH.  THIS IS THE ISSUE, BECAUSE THIS IS THE THEFT. THIS IS THE THEFT THAT HAPPENED.

HE: OK. BUT WHERE WERE YOU [INAUDIBLE]

AA: THIS IS WHAT IM SAYING.  OK.

AR: THE BATTERIES.

AA: THE BATTERIES, LIKE I SAID, WHEN WE GOT TO THE COUNTER, UMM AND WE MADE THE EXCHANGE, THERE WERE SOME ITEMS IN THE BAG, ALONG WITH THE SWEATSUITS, THERE WAS, THERE WAS A COUPLE PACKS OF BATTERIES, ANOTHER SWEATSUIT, ANOTHER SWEATSHIRT OR SOMETHING IN, IN THE BAG, AS WELL, THAT WE MADE, WE TOLD THE REPRESENTATIVE THAT WE WERE NOT EXCHANGING, SO THIS IS WHY SHE GAVE US THE INDIVIDUAL WALMART BAGS.  UMM, AND SO AS IM PROCEEDING OUT THE STORE, WHICH IS UHH..

AR: WELL, BEFORE WE GET THERE, THE, THE POINT THAT THESE PHOTOGRAPHS MAKE, DR. PRICE AND YOU CAN, IS THAT THE DVD'S ARE NOT ANYWHERE NEAR THE BATTERIES OR THE ELECTRONIC ITEMS AND THE BATTERIES ARE NOWHERE NEAR THE ELECTRONIC ITEMS.  HERE ARE, IS THE, SEE [INAUDIBLE]

HE: THE QUESTION THAT I HAVE IS, [MESS UP IN TAPE], HAD YOUR BAG, WAS THEY IN A PACK OF BATTERIES?

AA: YES THEY...

HE: OR WERE THEY LOOSE BATTERIES

AA: NO THEY WAS IN THE PACK.

HE: OK

AA: ALRIGHT.  BUT, WHAT UHH THE ISSUE WAS IS THAT UMM AS I WAS TRYING TO SHOW YOU HERE, THIS IS, I CAME TO THE ISLE HERE, WHERE WE WAS LOOKING AT THE DVD'S.  AND I WALKED BACK THROUGH THE ISLE AND WE WENT UP TO THE FRONT TO CHECK OUT.  AND WHEN I WALKED, AND I MUST, I MUST GO OUT THE STORE BECAUSE I DIDN'T KNOW

9

WHAT WAS GOING ON UNTIL THESE GENTLEMEN APPROACHED ME OUTSIDE, OK. SO I HAD NO IDEA THAT ANYBODY WAS COMING, YOU KNOW THAT THERE WAS EVEN AN ISSUE ABOUT BATTERIES OR ANYTHING BEING STOLEN UNTIL THE GENTLEMEN APPROACHED ME OUTSIDE. UMM SO AS I, AS I WENT TO GET TOOK, TO GET THE CAR, I WALKED OUT THIS, THIS MIDDLE DOOR HERE AND AS I WALKED OUT AND WALKED ALL THE WAY TO MY CAR, MY CAR IS PARKED WAY OVER HERE, AS I WALKED ALL THE WAY OVER AND GOT TO ABOUT THIS POINT HERE, 2 GENTLEMENT, I, I, I REALIZED 2 GENTLEMEN RUNNING BEHIND ME.

AR: I HEARD

AA: YEAH I HEARD

AR: YOU NEVER SAW THEM

AA: 2 GENTLEMEN RUNNING BEHIND ME AND AS I TURNED, I HEARD SOMEONE SAY GIVE ME THAT BAG AND AS I TURNED AROUND I SEE A GENTLEMAN WITH A HOOD ON HIS HEAD. AS I SAID, I HAD BEEN DOING SOME WORK FOR MY, I HAD JUST FINISHED DOING SOME WORK FOR MY MOTHER-IN-LAW AND I HAD TO WORK KNIFE ON MY HIP, SORTA LIKE A LITTLE UHH FLIP OUT UTILITY KNIFE. SORT OF. AND SO WHEN I HEARD THAT, YOU KNOW IN THE DEFENSIVE POSITION I HAD PULLED THE KNIFE OFF MY HIP AND TURNED AROUND AND WAS, YOU KNOW, AND WAS QUESTIONING LIKE WHAT? YOU KNOW WHAT I MEAN? UHH AND SO AT THAT POINT THE GENTLEMEN STOPPED AND THEY RETREATED AND THEY GOT ON THE PHONE AND STARTED CALLING 9 1 1. THIS IS WHAT I HEARD. SO, AT THIS POINT I REALIZED THAT THEY MUST WORK FOR WALMART AND NOW IM TRYING TO FIGURE OUT WHAT THE PROBLEM IS. SO, UMM, [MESS UP IN TAPE] I, AT THAT POINT I GO, I GET IN MY CAR, PUT MY BAGS IN THE CAR AND I DRIVE BACK TO THE FRONT OF THE WALMART. BECAUSE NOW IM TRYING TO FIND OUT, I WANT TO FIND OUT WHAT THE PROBLEM IS, WHAT THE ISSUE, WHY THEY CAME RUNNING OUT THE STORE AT ME. AND IN DOING SO, AS I GET UP, AS IM DRIVING UP TOWARDS THE FRONT O FHTE STORE, MY WIFE WALKS OUT AND COMES OUT THE STORE AND SHES WALKING TO WEAR THE CAR IS PARKED AT. SHE CALLS ME ON THE CELL PHONE AND YOU KNOW, IS LOOKING FOR ME, WHERE AM I, ASKING WHERE AM I AT. I SAID IM ON MY WAY BACK TO THE FRONT OF THE STORE. AND THEN SHE ASKED AT THAT POINT, YOU KNOW, WHAT WAS WRONG, WHAT HAPPENED. AND I TOLD HER, I EXPLAINED TO HER THAT, YOU KNOW,

THAT I WAS WALKING TO THE CAR AND 2 GENTLEMEN CAME RUNNING BEHIND ME AND I DIDN'T KNOW WHO THEY WERE AND I PULLED MY KNIFE OFF MY HIP AND I THINK THEY WAS WALMART EMPLOYEES. SO IM ON MY WAY BACK TO THE FRONT OF THE STORE. SO AT THAT POINT SHE TELLS ME, WELL SHE HEARD SOMEBODY, 2 EMPLOYEES, SHE HEARD SOMEBODY CALLING THE POLICE. UMM AND THEY SAID THAT WE WAS IN, THAT, THAT SOMEONE HAD PULLED A KNIFE ON THEM AND THAT I WAS IN A, A, A GRAY VOLVO. RIGHT? AND UMM, SO SHE, AT THAT POINT, SHE WAS, SHE WAS, OUT OF FEAR SHE WAS TELLING ME THAT SHE JUST WANTED TO LEAVE BECAUSE SHE DIDN'T WANT ME TO GET INTO ANY TROUBLE BECAUSE SHE KNOWS MY PAROLE SITUATION. AND SO AT THAT POINT I WAS EXPLAINING TO HER, LOOK I DIDN'T DO ANYTHING AND I WANT TO GET TO THE BOTTOM OF THIS. AND SO, I DROVE, I TOL- I TOL, I ASKED HER TO MEET ME BACK IN FRONT OF THE STORE. [MESS UP IN TAPE] AS I GET IN FRONT OF THE STORE, THE GENTLEMENT, THE 2 GENTLEMEN IS STANDING AT THE FRONT OF THE STORE AND, YOU KNOW, IM ENQUIRING WHATS THE PROBLEM. AND, YOU KNOW, I SAID, YOU KNOW, I ASKED THEM WHY THEY RUN OUT ON ME, I SAID EVERYTHING I HAD IN MY BAGS WAS PAID FOR, I HAVE RECEIPTS FOR THEM. UMM AT THAT POINT I CONTINUED TO WAIT UNTIL THE POLICE ARRIVED. ONCE THE POLICE ARRIVED THEN UMMM, THE GENTLEMEN, AND WE, I ALSO HAVE THE RADIO RUN OF THE POLICE REPORT WHEN THE GENTLEMAN CALLED THE POLICE. AND THERES AN ISSUE WHEN THEY CALLED POLICE HE SAID THAT I HAD STOLEN SOME ELECTRONICS OR I HAD STOLEN ELECTRONICS IN MY CAR, SO WHEN THE POLICE GET THERE, THE POLICE, THE POLICE DETAINED ME BECAUSE HE TELL, HE TELLS THEM THAT I HAD ALLEGEDLY STOLE SOMETHING OR WHATEVER, THEY DETAINED ME. UMM, SO I GIVE THE POLICE THE CONSENT TO SEARCH MY CAR, I SAID I DON'T HAVE ANYTHING, EVERYTHING THAT I HAVE IN MY BAGS I HAVE RECEIPTS FOR, I PAID FOR. UMM, SO HE SEARCHED MY CAR, HE TELLS THE GENTLEMAN HE DOESN'T HAVE ANYTHING IN HIS CAR, HE DOESN'T HAVE ANY ELECTRONICS. UMM, THEN HE GOES, HE GOES UHH HE GOES AGAIN THROUGH THE CAR AGAIN, TAKES EVERYTHING OUT THE BAGS AGAIN AND COMPARING EVERYTHING WITH THE RECEIPT.

AR: WHO IS DOING THAT? THE OFFICER?

AA: THE OFFICER, OFFICER HELLER, HE IS COMPARING EVERYTHING WITH THE RECIEPT THAT I HAVE IN MY BAG. SO THEN, AS HE, HES DOING THAT, UMM HE SEES SOME BATTERIES IN, THE BATTERIES THAT WAS IN THE BAG AS

WELL, AND THOSE BATTERIES WERENT ON THAT
PARTICULAR RECEIPT. AND UMM SO AT THAT POINT THEY
ALLEGED THAT I STOLE SOME BATTERIES, SO THIS IS
WHERE THE BATTERIES COME INTO PLAY. NOW, WITH THAT
IN MIND, WITH THESE PICTURES HERE, THEY SHOW WHERE
THE BATTERIES ARE LOCATED IN RELATION TO THE
ELECTRONICS DEPARTMENT, WHERE UMM, WHERE THE
GENTLEMAN SAID HE SAW ME GO INTO, THE ELECTRONICS
DEPARTMENT. AND THESE, THESE PICTURES SHOW WHERE
THE BATTERIES ARE IN RELATION TO THAT. WHERE, WHERE
THEY UMM YEAH IN RELATION TO THE ELECTRONICS
DEPARTMENT, WHERE HE ALLEGED THAT I HAD WENT INTO
IF I WAS SUPPOSED TO HAVE STOLE SOME BATTERIES, I
WAS NOWHERE NEAR THAT.

AR: DO YOU WANT TO SHOW HIM THIS ONE IN PARTICULAR?

AA: YEAH. OK. [MESS UP IN TAPE] THIS ONE IS, IS A LONG
DISTANCE SHOT. BUT THIS IS THE HOME ENTER – WELL,
YEAH, LET ME SEE ME SEE IF I HAVE A, THIS IS A CLOSE UP
PICTURE OF WHERE I AM. OK YEAH THIS ONE IS A BIGGER
PICTURE. THIS IS THE ELECTRONICS DEPARTMENT, THE
HOME ENTERTAINMENT DEPARTMENT. THIS ISLES, THESE
ISLES HERE, WHICH, WHICH ARE THESE ISLES. [MESS UP IN
TAPE] THIS IS THE PHOTO DEPARTMENT BACK HERE,
WHICH IS RIGHT HERE WHERE YOU SEE THE SIGN PHOTO
AT. AND THE BATTERIES ARE IN THIS PHOTO ISLE ON THE
BACK SHELF. LETS SEE, HERE WE GO, [INAUDIBLE] PICTURE
OF THE BATTERIES IN THAT BACK PHOTO ISLE, I HAVE
ANOTHER PICTURE IN HERE FROM UHH A DIFFERENT
ANGLE, WHERE IS THAT PICTURE AT? ANOTHER PICTURE
FROM A DIFFERENT ANGLE, HERE IT GO, HERE IT GO OK.
THIS IS THE BACK, THIS IS THE BACK OF THAT ISLE. THIS IS,
THE ISLE IS THIS WAY, THE ISLE WOULD BE HERE AND THIS
IS THE BACK, SAY YOU LOOKING FROM THIS ISLE, FROM
HERE UP THE ISLE, THIS WOULD BE THE PHOTO
DEPARTMENT HERE AND THE BATTERIES, AS YOU SEE ARE
RIGHT HERE ON THIS CORNER. THIS IS THE BATTERY RACK,
RIGHT. AND THIS IS THE DISTANCE, THIS IS THE HOME
ENTERTAINMENT, THE ELECTRONICS ISLE AND THIS IS THE
PHOTO ISLE AND THIS IS THE ONLY PLACE WHERE THE
BATTERIES ARE LOCATED ARE HERE AND AT THE CHECK
OUT COUNTERS INSIDE, INSIDE THIS WALMART. AND THE
PARTICULAR BATTERIES, THE BIG PACKS THAT I HAD, THEY
DON'T HA – THEY DON'T KEEP THOSE ON THE CHECK OUT
COUNTER, THEY ONLY KEEP THOSE BIG PACKS, CUZ THEY
WERE BIG PACKS, SORTA LIKE THESE HERE. THEY WASN'T
THE SMALL 4 PACK. AND THEY, THEY DON'T KEEP THOSE UP
AT THE CHECKOUT COUNTER, THEY ONLY KEEP THOSE IN

THIS SECTION HERE.  SO THIS IS WHERE THE ALLEGED, THE ALLEGED THEFT COMES FROM, HOWEVER, LIKE I SAID, AS FAR AS WE WENT, IN, AS FAR AS WE WENT THAT PARTICULAR DAY, WE WENT FROM THE CUSTOMER SERVICE DESK, TO THE FROZEN FOOD ISLES UP TO THE DVD'S SECTION, WHICH IS DIRECTLY IN FRONT OF THIS IS HOME ENTERTAINMENT AND IF YOU SEE HERE, THESE ARE THE DVD'S.  THIS IS AS FAR AS WE WENT.  AND THEN FROM THERE WE WENT BACK UP TO THE FRONT AND WENT OUT OF THE STORE.  NEVER WENT DOWN THIS FAR.  NEVER WENT DOWN THIS FAR. UMM AND SO, AND THE ONLY, THE ISSUE ONLY CAME WAS BATTERIES AFTER I ASKED, I TOLD THE OFFICER TO SEARCH MY CAR.  AND HE SEARCHED MY CAR AND THERE WAS NO, NO ELECTRONICS FOUND, NOWHERE.

AR: OK

AA: AND...

HE: BUT YOU KNOW, I MEAN [MESS UP IN TAPE] LOTS OF STUFF I UNDERSTAND THAT, BUT, BUT THE KNIFE IS THE BIGGEST PROBLEM OF THIS SIR.

AA: OK, OK, I UNDERSTAND THAT, SIR, I UNDERSTAND THAT, I UNDERSTAND THAT.

AR: DID YOU POINT IT AT THE OFFICER?

AA: I DIDN'T, NO I DIDN'T POINT THE KNIFE.  I DIDN'T POINT THE KNIFE, I DIDN'T POINT A KNIFE.  WHAT HAPPENED WAS, I WAS STARTLED, I WASN'T TRYING TO ASSAULT ANYONE, I WAS STARTLED.  IT WAS DARK, IT WAS DARK OUTSIDE.  IT WAS, IT WAS, IT WAS DARK, THIS IS IN FEBRUARY, ROUGHLY ALMOST CLOSE TO 9:00 AT NIGHT.  ITS DARK OUTSIDE.  I WAS STARTLED, I WAS JUST ABOUT AND IF YOU LOOK AT THE DISTANCE, IF YOU LOOK AT THE DISTANCE FROM THE ENTERANCE THAT I WALKED OUT FROM THE DIAGRAM.  I WALKED OUT THIS ENTRANCE AND THE DISTANCE FROM HERE AND THIS IS JUST A SMALL, A VERY SMALL, BUT IT'S A, IT'S A WAYS FROM THE FRONT OF THE STORE TO WHERE MY CAR WAS PARKED AT.  IT WAS DARK OUTSIDE, I WAS STARTLED WHEN, WHEN 2 MEN CAME RUNNING AT ME, TELLING ME TO GIVE ME THEIR BAGS, GIVE ME THEIR, GIVE THEM MY BAGS.

AR: WHAT DID YOU FIRST HEAR?

13

AA: THE ONLY THING I HEARD WAS, WAS FOOTSTEPS AND GIVE ME MY BAG. THAT'S ALL I HEARD. THAT'S ALL I HEARD AND AS I TURNED AROUND AND I SEEN 2 MEN, ONE HAD A HOOD ON HIS HEAD. I, I HAD NO IDEA WHO IT WAS. AND SO I HAD THE WORK KNIFE ON MY HIP AND, AND IF I MAY DEMONSTRATE, WHEN I WAS WALKING TOWARDS MY VEHICLE, SEE MY VEHICLE IS PARKED HERE, AND AS I TURNED AROUND AND PULLED THE KNIFE ON MY HIP, I AM STILL BACKING UP. AND I, I NEVER ACTUALLY [INAUDIBLE] I HAD IT BEHIND MY LEG. BUT THEY HEARD IT WHEN IT OPENED UP, SO THAT HOW THEY REALIZED THAT I HAD A KNIFE.

HE: [INAUDIBLE] ANY WEAPON ON YOU.

AA: SIR, IT WAS A WORK KNIFE. AND I HAD, THIS, THIS IS WHAT I HAD ON ME. IT WASN'T A BIG KNIFE, IT WAS A, IM A HEATING AND AIR CONDITIONING MAN, I DO HEATING AND AIR CONDITIONING WORK SIR, AND LIKE I SAID, PRIOR TO GOING UP TO UMM ON THIS ROAD, ON THIS LITTLE WEEKEND EXCURSION WITH MY FAMILY, UMM MY MOTHER-IN-LAW WAS GETTING HER HARD WOOD FLOORS LAID IN HER KITCHEN, WHAT SHE DID, AND SO I HAD TO DISCONNECT HER STOVE, HER GAS STOVE. SO I DID THAT FRIDAY, WHEN WE CAME BACK SUNDAY, HER FLOORS WAS LAID AND SHE NEEDED ME TO COME BACK AND RECONNECT IT. ALONG WITH THAT, HER HEAT WASN'T WORKING, SO WHEN I CAME UP THERE, I WENT UP THERE WITH TOOLS. AND, AND UMM, THE TYPE OF WORK I DO, I, I, I NEED TO CUT INSILLATION, I HAVE TO CUT TAPE, I HAVE TO CUT WIRES.

HE: I DON'T HAVE A PROBLEM WITH THAT. I, ALL IM SAYING IS THAT YOU KNOW, YOU SHOULDN'T BE OUT IN PUBLIC WITH IT. I MEAN, WORKING, WORKING IS ONE THING...

AA: YES SIR

HE: OK, BUT YOU WERENT WORKING AT WALMART.

AA: BUT SIR, I LEFT DIRECTLY FROM HER HOUSE, AND HAD IT, I HAD IT ON...

HE: [INAUDIBLE] YOU GO WORK FOR YOUR MOTHER-IN-LAW, WHAT YOU GOING TO DO? WHEN [INAUDIBLE] WHAT ARE YOU GOING TO DO WITH IT.

AA: I DIDN'T HEAR YOU SIR.

14

HE: WHAT DO YALL DO WHEN YOU ARE FINISHED WITH THE TOOLS THAT YOU NEED?  WHAT ARE YOU GOING TO DO?

AA: UMM, I GUESS I NEED TO PUT THE UP SIR.

HE: YOU'RE GOING TO PUT THEM UP.

AA: BUT WHAT IM SAYING SIR, IS THAT I NORMALLY, THIS, THIS IS BECAUSE I USE IT SO OFTEN, I NORMALLY KEEP IT ON MY HIP.  I NORMALLY KEEP IT ON MY HIP BECAUSE I USE IT SO OFTEN AND ITS, ITS, IT'S A UTILITY KNIFE.  YOU KNOW, IM SURE YOU'RE FAMILIAR WITH A UTILITY KNIFE.  IT WASN'T A, IT WASN'T A BIG UHH [INAUDIBLE] KNIFE, IT WAS A UTILITY KNIFE.  AND, AND LIKE I SAID, THE ONLY REASON I HAD IT ON MY HIP, AND I NORMALLY KEEP IT ON MY HIP WHEN IM WORKING, AND I WAS WORKING THAT PARTICULAR DAY, THAT EVENING, AND, AND WHEN I WAS ON MY WAY, I WAS, I WAS, WE WAS GOING FROM THERE TO PICK UP SOME FOOD AND I WAS GOING RIGHT BACK TO THE HOUSE.  SO IT WASN'T, I MEAN, I DON'T KNOW HOW ELSE TO EXPLAIN IT SIR.  I MEAN, I, IT WASN'T, I DIDN'T HAVE IT ON...

HE: [INAUDIBLE] EXPLAIN IT WELL, THAT WHOLE [INAUDIBLE]  I WAS GOING TO TELL YOU IS THAT YOU HAVE TO REMAIN CONGNISENT OF OTHER FACTS.  BECAUSE YOU HAVE A NUMBER NEXT TO YOUR NAME.

AA: YES SIR.

HE: AND THEY ARE [INAUDIBLE] OF YOU.

AA: YES

HE: VERY SIMPLE

AA: YES SIR.  BUT WHAT...

HE: WEAPONS, WHETHER SMALL OR BIG, IT DOESN'T MATTER.  THERES NO PLACE FOR THAT.

AA: YES SIR.

HE: [MESS UP IN TAPE] OK. [INAUDIBLE] A 6 INCH KNIFE AND, AND UHH KILLED A GUY. [MESS UP IN TAPE]  THE [INAUDIBLE] ISNT AN ISSUE.

AA: BUT SIR, IF YOU, IF YOU JUST TAKE IT FOR A MINUTE SIR, AND I UNDERSTAND EXACTLY WHAT YOU'RE SAYING, BECAUSE OF THE FACT THAT I AM ON PAROLE AND I HAVE A FELLONY

THAT, YOU KNOW, IM SAYING, IS I HAVE TO BE EXTRA
CAREFUL.

HE: THAT'S RIGHT

AA: AND I UNDERSTAND THAT. AND I REALLY DO, HOWEVER,
WHAT IM SAYING IS THAT THIS IS MY TRADE. AND THESE ARE
TOOLS IN MY TRADE.

HE: AND I HAVE NO PROBLEM WITH THAT AT ALL.

AA: AND, AND IN NO WAY WAS I, WHAT, DO I USE MY TOOLS IN AN
AGGRESSIVE MANNER. NO WAY AT ALL.

HE: UNLESS YOU WERE IN THE PROCESS OF USING IT IN AN
AGGRESSIVE MANNER.

AA: I WAS NOT SIR. I WAS NOT, AND THIS IS WHAT, WHAT IM
TRYING, WHAT IM TRYING TO EXPRESS TO YOU. I WAS NOT
USING IT IN AN AGGRESSIVE MANNER, WHAT I WAS, I WAS,
[INAUDIBLE] I DIDN'T KNOW WHO THESE GENTLEMEN WERE,
I DID NOT, I, IN NO WAY WAS I AGGRESSIVE IN ANY WAY.

HE: OK BUT WHAT IM TRYING TO TELL YOU IS THAT, OK, HAD A GUY
CONTINUED TO PROCEED TOWARDS YOU, YOU WOULD
HAVE USED THE KNIFE.

AA: I CANT EVEN SAY THAT SIR.

HE: [INAUDIBLE] WOULD DO THAT, COME ON.

AA: I, I, I PULLED IT OUT MORE SO AS A DETERRANT AS OPPOSED
TO, YOU KNOW, TO TRY TO PUT FEAR INTO SOMEONE, I, I
PULLED IT OUT AS A DETERRANT.

HE: OK, WELL AGAIN, I MEAN, IF YOU BE HONEST WITH YOURSELF,
HAD THE GUY, THE ONE WITH THE HOOD ON, HAD
CONTINUED TOWARDS YOU, YOU WOULD HAVE USED THE
KNIFE.

AA: I, I, I...

HE: OR YOU WOULD NOT HAVE [INAUDIBLE] A [INAUDIBLE] GUY.

AA: NO, I WOULDN'T HAVE [INAUDIBLE] THEM, BUT I, I CANT SAY
THAT I WOULD HAVE, BUT WHAT IM SAYING IS MY INTENT
WAS MORE SO AS A DETERRANT, I WASN'T TRYING TO HURT
ANYBODY. I DIDN'T KNOW WHO THESE GENTLEMEN WAS.
AND, IF YOU KEEP IN MIND, THE SAME TIME THIS INCIDENT

16

OCCURRED IT WAS SHORTLY AFTER THIS, AFTER THE GENTLEMAN UP IN NORTHWEST WAS ATTACKED, YOU KNOW, THIS, THIS, THIS UHH NEW YORK TIMES REPORTER. HE WAS ATTACKED IN THE DARK FROM BEHIND. AND THIS WAS AROUND THE SAME TIME, SO THIS WAS FRESH ON MY MIND AS WELL.

AR: DID THEY EVER IDENTIFY THEMSELVES AS WALMART SECURITY?

AA: NEVER, NEVER, NO ONE EVER, AND IT, THE GENTLEMAN HAD A HOOD ON HIS HEAD. I HAD NO, I HAD NO IDEA.

HE: [INAUDIBLE] HE MAY HAVE BEEN UNDERCOVER.

AA: UHH YEAH, YEAH HE WAS LOS PREVENTION SO THEY DON'T WEAR, THEY DON'T...

HE: OK

AA: AND THEN ONCE I REALIZED WHO HE WAS SIR, ONCE I REALIZE WHO THEY WERE, I WENT, I WENT TO THE FRONT OF THE STORE TO TRY TO ADDRESS THIS ISSUE, BECAUSE I KNEW THAT I DIDN'T DO ANYTHING WRONG AND THIS WAS MY ONLY REASON FOR STAYING AND WAITING FOR THE POLICE TO ARRIVE, BECAUSE I KNEW THAT I DIDN'T DO ANYTHING WRONG. AND I FELT, I FELT OFFENDED BECAUSE, YOU KNOW, I WORK HARD EVERY DAY AND I FELT OFFENDED BECAUSE HE CAME RUNNING OUT ON, OUT THE STORE LIKE I STOLE SOMETHING, AND I DIDN'T. AND SO THIS IS WHY I CAME BACK, THIS IS WHY I WAITED FOR THE POLICE, THIS IS WHY I TOLD THE OFFICER TO SEARCH MY CAR, BECAUSE, HE, HE ALLEGED THAT I STOLE SOMETHING AND HAD IT, AND HAD, AND, AND, AND HAD IT NOT BEEN FOR THAT NONE OF, AND NOTHING ELSE AFTERWARDS WOULD HAVE EVEN HAPPENED. [MESS UP IN TAPE] BECAUSE OF HIS MISTAKE, MISTAKING ME FOR STEALING SOMETHING, THEN THAT, THAT PROVOKED HIM TO RUN OUT THE STORE BEHIND ME AND THEN, IN, IN, IN FEAR THEN I PULLED THAT KNIFE OFF OF MY HIP. NOW, IF HE HAD, IF, IF NONE OF THAT WOULD HAVE HAPPENED, THEN, THEN WE WOULDN'T HAVE HAD ANYTHING ELSE BEHIND IT. THERE WOULD NEVER HAVE BEEN AN INCIDENT OF ME PULLING A KNIFE OFF MY HIP OR ANYTHING. BUT ONCE I REALIZED WHO THEY WERE, I WENT TO ADDRESS THE ISSUE.

HE: OK. [INAUDIBLE] IM GOING TO CALL MR. GIBSON IN.

[END OF SIDE]

(HE)  MR. GIBSON PLEASE STATE YOUR NAME, YOUR TITLE AND THE COMPANY THAT YOU WORK FOR?

(JG)  MY NAME IS JAMES GIBSON; I'M AN ATA FOR WAL-MART CORPORATION,

(HE)  ATA

(JG)  ATA, THEY CHANGE THE NAME FROM LOST PREVENTION TO ASSET PROTECTION

(HE)  (INAUDIBLE) WHICH WAL-MART DO YOU WORK FOR?

(JG)  I WORK AT DIFFERENT ONES IN THE DISTRICT

(HE)  OKAY

(JG)  (INAUDIBLE) IT COULD BE AT EITHER EIGHT STORES, (INAUDIBLE) STAY THE SAME STORE

(HE)  OKAY, (INAUDIBLE) IN MARYLAND

(JG)  YES

(HE)  OKAY, THE TESTIMONY AT THE TODAY'S HEARING TAKE YOU UNDER OATH, CAN YOU PLEASE RAISE YOUR RIGHT HAND, DO YOU SOLEMNLY SWEAR OR AFFIRM (INAUDIBLE) PERJURY, THAT THE TESTIMONY THAT YOU ARE ABOUT TO GIVE IN THE CASE NOW AT HEARING WILL BE THE TRUTH THE WHOLE TRUTH AND NOTHING BUT THE TRUTH

(JG)  I DO

(HE)  OKAY THERE WAS AN INCIDENT FEBRUARY 20TH 2006, THAT INVOLVED MR. ALLSTON IS THAT CORRECT

(JG)  YES

(HE)  CAN YOU TELL ME WHAT (INAUDIBLE) OF HAVING TRANSPIRED?

(JG)  (INAUDIBLE) DEPARTMENT AND WAS JUST WALKING THE FLOOR AND (INAUDIBLE) I MET ANOTHER LADY THAT WAS WITH HIM AND SHE WAS THROWING SOMETHING IN THE BASKET AND I JUST STOPPED AND I LOOKED AND THEN I FOLLOWED THEM UM AND THEN THEY PROCEEDED TO ELECTRONICS DEPARTMENT ON THE BACK ISLE AND I JUST WALKED THAT WAY AND ONCE WE GOT TO THE ELECTRONICS DEPARTMENT AND I AH IN NATIONALITY THERE'S A DISPLAY (INAUDIBLE) TIME I WATCH THEM REMOVE THEM, I DON'T HOW MANY IT WAS CAUSE I WAS LIKE AT A DISTANCE (INAUDIBLE)

18

(HE)  ABOUT FAR WERE FROM THE (INAUDIBLE)

(JG)  FIVE FEET OR SO, I DON'T KNOW EXACTLY HOW FAR I WAS, (INAUDIBLE) WAS WHERE, WHERE THE RUGS AND STUFF, IN WHICH YOU CALL HOME FASHION, WHICH HE STOPPED, SHE CONTINUE TO WALK AND I WAS PEEPING AROUND THE AH AH THE ISLE, THE SHELF OR THE ISLE AND SEEING THEM PLACE THE BATTERIES IN THE BAG, LIKE A GREY BAG, (INAUDIBLE) STARTING WALKING AGAIN THEY WENT UP TO THE A REGISTER AND THEY WERE STANDING IN LINE AT THE REGISTER THEN THAT'S WHEN HE GRAB THE BAG OUT OF THE REGISTER, OUT OF THE CART AND PROCEEDING OUT THE DOOR AND THAT'S WHEN ME AND ASSISTANT MANGER AND A CART PUSHER WALKED OUT THE DOOR AND AT THAT TIME HIS BACK WAS TURNED TO US AND I ASK HIM, EXCUSE ME SIR AND THAT'S WHEN HE TURNED AROUND AND HE SAID WHAT WHAT WHAT, THAT'S WHEN I NOTICED THAT HE HAD A KNIFE IN HIS HAND AND THAT'S WHEN I TOLD HIM TO BACK UP AND I JUST WAS REALLY GOING TO LET HIM GO AND THAT'S WHEN THE ASSISTANT MANAGER TOLD ME TO CALL THE POLICE. I DIDN'T, HE DIDN'T GIVE ME A CHANCE TO SAY ANYTHING ELSE BUT EXCUSE ME SIR, THAT'S ALL THAT I HAD A CHANCE TO SAY TO HIM.

(HE)  WELL WHEN YOU AND THE ASSISTANT MANAGER WALKED OUT THE DOOR APPROXIMATELY HOW FAR FRONT OF THE STORE WERE YOU WHEN AH YOU BEGIN TO TRY TO GET THE ATTENTION AND

(JG)  WELL WE WERE, IT ALL HAPPEN RIGHT AT THE FRONT OF THE STORE, WHEN HE WALKED OUT THE DOOR, WE CAME RIGHT OUT THE DOOR AND IT WAS RIGHT THERE, I THINK RIGHT ABOUT TWO OR THREE STEPS RIGHT OFF THE SIDEWALK

(HE)  AND THE CLOTHES YOU WERE WEARING THAT DAY?  THE PERSON WHO WAS WITH YOU, DO YOU RECALL WHAT HE WAS WEARING?

JG: WELL THE CART PUSHER, HE JUST HAD A UMM ORANGE VEST ON AND THE MANAGER, THEY WEARING TIES [INAUDIBLE]. AND WE ALL HAD OUR BADGE – WE ALL BEFORE WE STARTED, WE PUT OUR BADGES ON.

HE: ANY WALMART EMPLOYEES, THEIR AKA'S OR OTHERWISE WEARING HOODS?

JG: NO.  I MEAN, YOU ASKING ME DO I WEAR HOODS?

HE: WELL, WHETHER OR NOT YOU WERE WEARING ONE THAT DAY.

JG: I WEAR HOODIES, BUT I DON'T KNOW IF I HAD ONE ON THAT DAY OR NOT.

HE: AND THEN YOU CALLED POLICE AND THEN WHAT HAPPENED?

JG: WELL, ONCE I CALLED THE POLICE, THEY HAD, THEY WAS ASKING ME WHAT WAS GOING ON AND HE WALKED, HE WALKED UHH HE JUST WALKED AWAY AND WALKED TO HIS CAR AND I THOUGHT HE WAS GOING TO LEAVE AND HE OPENED THE TRUNK, CLOSED THE TRUNK. HE GOT INTO THE CAR AND HE DROVE, HE NEVER TURNED HIS LIGHTS ON, AND THEN HE DROVE BACK IN FRONT OF THE BUILDING AND THAT'S WHEN I WALKED BACK INSIDE THE BUILDING BECAUSE I DIDN'T KNOW IF IT, WHETHER IT WAS INTENDED AT THE TIME, THEN I REALISED THAT HE DID COME WITH SOMEBODY. SO HE PARKED IN FRONT OF THE STORE AND HIM GOT OUT OF HIS CAR, AND HIM AND THE MANAGER HAD WORDS. I DON'T KNOW WHAT THEY WAS, YOU KNOW I DON'T KNOW WHAT HE WAS SAYING TO HIM BECAUSE HES NEVER SAID ANYTHING ELSE TO ME. THEY WAS JUST TALKING BACK AND FORTH TO THE OTHER MANAGER. CUZ I WAS AT THE MIDDLE DOOR AND THE MANAGER WAS AT THE LIKE THE FIRST DOOR, CUZ THE DOOR HAD LIKE 3 DOORS, ENTRY DOORS. AND [INAUDIBLE] THEN UHH THE, ONCE THE POLICE ARRIVED, THAT'S WHEN I CAME BACK OUTSIDE, ITS WHEN HE WAS STILL STANDING ON THE OUTSIDE OF THE VEHICLE AND THEY STOPPED AND THEY GRABBED HIM AND THEN THEY PULLED A KNIFE OFF HIM AND HE ASKED ME DID HE POINTED IT AT ME AND I TOLD HIM NO. HE ASKED ME WAS THIS DISCHARGED, I JUST SAID YES IT WAS DOWN TO HIS SIDE BUT HE NEVER POINTED IT TO, AT ME. LOOKING FOR THE BAGS THAT HE HAD, CAME IN THE STORE WITH AND UMM THE BATTERIES IN THE BAG, THEN UHH THEY SAID UMMM COME OUT OF A RETURN BAG THEY WAS RETURNING ITEMS OR SOMETHING.

HE: [INAUDIBLE] DID THEY END UP THROWING THE BATTERIES IN THE [INAUDIBLE]

JG: UHH

HE: WAS THERE ANYTHING OTHER THAN THROWING BATTERIES?

JG: THE BATTERIES WERE IN THE BAG.

HE: WHAT OTHER [INAUDIBLE] THAT THEY WERE THROWING? I MEAN DID HE HAVE [INAUDIBLE] WITH THE BATTERIES?

JG: WHERE, AT WALMART?

HE: MHMM

JG: NO, BECAUSE HE WENT TO GET IN LINE AND HE JUST GRABBED THE BAGS OUT OF THE CART AND WALKED OUT OF THE STORE AND HE MUST HAVE UMM, THE LADY THAT HE WAS WITH IN LINE. [INAUDIBLE] SHE COMES OUT OF THE STORE AFTER THE POLICE WAS ALREADY THERE. HAD HER, YOU KNOW, AFTER THE POLICE WAS ALREADY THERE, THAT'S WHEN SHE SHOWED, I DON'T KNOW WHEN SHE CAME OUT THE STORE, BUT SHE SHOWED UP AFTER THE POLICE CAME.

HE: HAVE YOU HAD TO GO TO COURT ON THIS CHARGE?

JG: YES, I WENT UMM TWICE IN ARRUNDELL COUNTY, IN ANNAPOLIS.

HE: HAS THE CASE RESOLVED? OR...

JG: I, I THOUGHT THE CASE WAS RESOLVED UNTIL I, THAT UMM, WHAT THEY SAYING IN HERE.

HE: AND THIS HAD NOTHING TO DO WITH THAT CHARGE.

JG: WELL, UHH THEY TELL ME THE FIRST TIME, I THINK IT WAS SOMETHING LIKE COMMUNITY SERVICE, I DON'T KNOW. BUT SHE DIDN'T REALLY TELL ME.

HE: WERE YOU CONVICTED SIR?

AA: NO SIR. EVERYTHING WAS DISMISSED.

JG: BECAUSE, SEE THE STATES ATTORNEY TOLD ME I COULD LEAVE, LEAVE THE COURTROOM. AND SHE TOLD ME I COULD LEAVE BECAUSE HE JUST WANTED TO DO COMMUNITY SERVICE, THAT'S WHY I LEFT. AND I THINK THE FIRST TIME SHE SAID ITS GOING TO BE COMMUNITY SERVICE. THEN I GOT A SUBPOENA, ANOTHER SUBPOENA TO GO BACK TO COURT AND NORMALLY THAT WAS JUST TO SEE IF THEY DO COMMUNITY SERVICE OR NOT. AND I DIDN'T STICK AROUND CUZ THEY TOLD ME I COULD LEAVE, SO THAT'S WHYN I THOUGHT IT WAS ALL SETTLED AND EVERYTHING WAS TAKEN... WAS ALL OVER WITH. I DON'T KNOW WHAT THE OUTCOME OF IT WAS, BECAUSE I THOUGHT IT WAS COMMUNITY SERVICE AND THEY DIDN'T TELL ME THEY WAS DISMISSING ANYTHING.

HE: MHMM.  WELL, GETTING BACK TO, TO THE, THE WEAPON THAT HE HAD.  WHAT, WHAT, HOW WOULD YOU DESCRIBE THAT WEAPON?

JG: I GUESS IT WAS A POCKET KNIFE BECAUSE IT WAS, IT WAS, IT WAS DARK AND ITS JUST THE LIGHTS FROM THE PARKING LOT.  AND I NEVER SEEN HIM GO IN HIS POCKET, I NEVER SEEN HIM GO IN HIS POCKET AND GET IT.  I JUST, I JUST, WHEN I WALKED UP AND SAID EXCUSE ME SIR, HE TURNED AROUND AND HE JUST STARTED YELLINIG, WHAT? WHAT? WHAT?  AND THAT'S WHEN I LOOKED DOWN AND SAW IT IN HIS HAND.  AND I JUST BACKED UP OFF OF HIM.  AND I WAS LIKE I WAS SAYING, I WAS JUST GOING TO LET IT GO AND THAT'S WHEN THE STORE MANAGER TOLD ME TO CALL THE POLICE AND I THOUGHT HE WAS JUST GOING TO LEAVE BEFORE THEY GOT HERE, BUT HE STAYED, AND HE UHH JUST STAYED.

HE: MHMM.  SO, OTHER THAN THAT [INAUDIBLE] HE PULLED A LIFE ON YOU, DID HE MAKE ANOTHER COMMENT IN YOUR PRESENCE?

JG: MMM, WE WAS JUST, JUST, UHH ANGRY AND CALLED A BUNCH OF NAMES AND STUFF AND THAT WAS IT.

HE: ALRIGHT

AR: DON'T FORGET, I NEED TO TALK TO MR. ALLSTON FOR ONE MINUTE.  THANK YOU

[BREAK IN TAPE]

HE: BACK ON THE RECORD.

AR: THANK YOU DR. PRICE.  GOOD AFTERNOON MR. GIBSON.

JG: GOOD AFTERNOON.

AR: MR. GIBSON YOU JUST TESTIFIED, THAT YOU WATCHED UMM MR. ALLSTON REMOVE BATTERIES FROM A DISTANCE OF ABOUT 20 FEET?  IS THAT CORRECT?

JG: YEAH I DON'T KNOW EXACTLY HOW FAR IT WAS.

AR: OK.  CAN YOU SHOW US ON HERE, WHERE MR. ALLSTON WAS. PLEASE [INAUDIBLE] INITIALS WHERE MR. ALLSTON WAS AND THAT WHEREVER THAT IS ON HERE.  LET ME SEE IF I CAN FIND A DIFFERENT COLORED PEN.  DO YOU HAVE A BLACK MARKER?

JG: THE ELECTRONICS DEPARTMENT WAS IN THE FRONT.  IN THE FRONT, ALL OVER HERE, ELECTRONICS.  HERE.  ALRIGHT. YOU SURE THAT YOU SEE THAT, RIGHT?  [INAUDIBLE] DISPLAYS [INAUDIBLE] HERE FROM WHERE, THERES LIKE A DISPLAY BUT, THE DISPLAY ISNT THERE BUT THE DISPLAY AND THEY DON'T KEEP THE SAME DISPLAYS IN THE SAME AREA.  SO THE DISPLAYS... DO YOU WANT ME TO MY INITIALS THERE TOO?

AR: WERE YOU STANDING BY THE...

JG: NO, I WAS JUST STANDING HERE.

AR:WHY DON'T YOU WRITE WHERE THE DISPLAY IS.

JG: IN HERE.  BECAUSE YOU GOT, NOWHERE I THINK... ITS SITTING RIGHT IN FRONT OF ELECTRONICS.

A. A. AE: HERE GOES SOME PAGE NUMBER, [INAUDIBLE] LIKE A LOOK TO SEE WHERE THE DISPLAY IS AT.  AND THIS IS THE ONE, THIS IS THE COUNTER WHERE YOU'RE TALKING ABOUT, HE WAS ON THIS SIDE.  [INAUDIBLE]  THE DISPLAY THAT'S WHERE THEY AT, THAT'S WHERE THE DISPLAY IS AT, RIGHT THERE.  THIS IS ANOTHER PICTURE OF THAT SAME AREA, THAT YOU MUST....

JG: SEE ALL THIS, THIS WASNT THE SAME BECAUSE WE, WHAT HAPPENED IS WE REDID ELECTRONICS BEFORE ALL THESE, WELL, BEFORE ALL THESE PICTURES, WE TOOK THESE PICTURES WHEN WE JUST DID ELECTRONICS. ELECTRONICS WASN'T LIKE THIS.

AR: WHEN DID YOU REDO ALL OF ELECTRONICS.

JG: I DON'T KNOW, IT WAS, WE JUST RECENTLY DID ELECTRONICS, MAYBE ABOUT UMM A COUPLE OF MONTHS AGO.  ALL THIS STUFF RIGHT HERE, ALL THIS STUFF IS NEW BECAUSE THE CONNECTION SETUP.  THIS CONNECTION SETUP WASN'T HERE, THIS CONNECTION SETUP USED TO BE SITTING IN THE MIDDLE OF THIS ISLE AND IT USED TO BE, IT HINK, CINGULAR, BUT NOW THEY DID ALL OF THIS AND NONE OF THIS STUFF WAS LIKE THIS IN FEBRUARY.

AR: OK.  BUT YOU SAID, YOU SAY, THEY RECENTLY REDID IT?

JG: ITS BEEN A COUPLE MONTHS, I DON'T KNOW EXACTLY HOW LONG ITS BEEN

AR: RIGHT

JG: AND ALL T HIS STUFF...

AA: NOW MIND YOU, LET ME, LET ME SAY SOMETHING, RIGHT, CUZ I DID MAKE NOTES.

JG: OK

AA: AND THERES A LITTLE DOOR THAT I WALKED OUT.

JG: YEAH, RIGHT. IT'S A LITTLE DOOR.

AA: MAYBE, I MAYBE THE CHANGES. I MAYBE CHANGED IT.

JG: OK

AA: THIS LITTLE DOOR IS NO LONGER THERE, RIGHT?

JG: RIGHT

AA: I HAVE A PICTURE WHERE IT SHOWS THAT THEY WAS STILL A...

JG: CUSTOM — CUSTOMER SERVICE IS DOWN THERE

CSO: RIGHT, EXACTLY.  IF YOU LOOK HERE, IN THIS PICTURE YOU'LL SEE WHERE YOUR LITTLE DOOR IS SEALED UP.  YOU CANT SEE IT THAT WELL, BUT OVER HERE, THIS IS WHERE THE LITTLE DOOR USED TO BE.

JG: RIGHT.

AA: SO I'M NOTING ALL THE CHANGES THAT WAS MADE ON IT.

JG: OK

AA: ALRIGHT?  WELL, I MEAN AS YOU GO THROUGH IT.  SO, AND, JUST TO GIVE YOU A DIAGRAM,  NOW THIS CUSTOMER SERVICE, THIS CAN CHECK OUT THEN, AND FINISHED, SEE WHAT IM SAYING?  THIS, IS THE CHECKOUT COUNTER IN ELECTRONICS, RIGHT?

JG: RIGHT

AA: AND YOU USED TO HAVE THE CINGULAR WITH THE TELEPHONES ON IT, RIGHT?

JG: [INAUDIBLE] UMM TELEPHONES STILL ON IT.

24

AA: AND ITS, ITS CALLED, AND ITS STILL THE SAME CHECK OUT
    THEN THAT [INAUDIBLE] CORRECT?

JG: RIGHT.  BUT IT DOESN'T HAVE THE [INAUDIBLE] BUT ITS NOT,
    ITS NOT LIKE THIS, IT WASN'T LIKE THIS AT FIRST.  THIS IS
    WHAT IM SAYING.  ALL THIS STUFF IN HERE AND THESE
    DISPLAYS OUT HERE WAS NOT THERE AT THE TIME.

AA: OK, ONE QUESTION, WAS THE DVDS, IN THE DVD RACK?  THE
    DVD RACK, THAT I HAVE RIGHT HERE...

JG: ALRIGHT

AA: WHICH IS ALMOST IN FRONT OF THAT DESK, IS A DVD RACK
    STILL THERE?

JG: ITS NOT A RACK, IT'S A BIN.

AA: EXCUSE ME.

JG: ITS BUILT UP WITH, IT, IT'S A BIN AND ITS FILLED UP WITH
    HUNDREDS AND HUNDREDS OF CDS AND INSIDE THE BIN...

AA: IS THIS THE BIN YOU ARE TALKING ABOUT RIGHT HERE?  IS
    THAT THE BIN?

JG: YEAH.

AA: OK.  THAT'S THE BIN RIGHT THERE, THAT HES TALKING ABOUT.

JG: RIGHT

AA: WITH THE DVDS RIGHT BESIDE IT.  THE DVD BIN AND THE
    DVDS.  RIGHT THERE AND YOUR DESK THAT YOU TALKING
    ABOUT IS RIGHT BEHIND IT.  THIS IS YOUR BIN, THAT'S YOUR
    DVDS.

JG: YEAH BUT THIS, WHAT IM TELLING YOU, THAT IT WAS A
    DISPLAY OF BATTERIES, THIS, ALL THIS WASN'T HERE AT
    THE TIME.  THESE WERE FURTHER DOWN ON THE OTHER
    SIDE TOO.

AR: OK.  LETS, SINCE YOU'RE SAYING THIS IS NOT THE WAY IT WAS
    AT THE TIME

JG: RIGHT, IT, IT, ITS ALMOST, ITS AL, WHAT HAPPENED IS, ITS
    ALMOST EXACTLY BUT THEY REDID OUR ELECTRONICS
    DEPARTMENT.

25

AR: OK.  WELL LET'S FLIP THIS OVER.  AND WHY DON'T YOU DRAW FOR US WHERE THE UMM AREA WAS THAT YOU SIGHTED MR. ALLSTON.

JG: WELL ITS RIGHT HERE.

AR: WHERE IS IT?

JG: IT'S RIGHT HERE UP FRONT.  THIS IS THE REGISTER, THIS IS HERE, I WAS STANDING, THIS IS THE REGISTER HERE...

AR: AND THAT'S WHERE YOU WERE STANDING

JG: THAT WAS THE REGISTER HERE

AR: OK

JG: THIS IS THE AISLEWAY HERE WHERE YOU GOT YOUR CD'S DVD'S AND STUFF IN IT

AR: OK

JG: SO I WAS STANDING HERE...

AR: PUT A CIRCLE AROUND THAT

JG: I WAS STANDING HERE...

AR: UH HUH

JG: LOOKING ACROSS AT HIM HERE, OVER HERE WHERE THE UHH DISPLAY OF DURICEL WAS

AR: OK, SO HES RIGHT ACROSS [INAUDIBLE] THERES A DISPLAY THERE.

JG: RIGHT

AR: AND WHAT IS IT LIKE?  IS IT LIKE, LIKE THE [INAUDIBLE] THE RECENT PHOTO WITH ALL THE BATTERIES?

JG: ITS UMMM IT'S LIKE THIS, ITS SOMETHING LIKE THIS ON ALL 4 SIDES YOU'VE GOT DURICEL BATTERIES, ON ALL 4 SIDES

AR: SO THEN IT'S NOT A STRAIGHT WALL

JG: NO IT'S NOT LIKE THAT

AR: ITS ALL 4 SIDES

26

JG: HE WAS, HE WAS THROWING THIS AWAY AND LIKE I WAS STANDING HERE AND IM LOOKING AT HIM, THE CART HE HAD WAS PUSHING WAS HERE. HE'S STANDING HERE. AND IM LOOKING, IM ON AN ANGLE, IM NOT DIRECTLY BEHIND HIM.

AR: BUT THERE WAS AN ANGLE.

JG: YES

AR: OK AND WHAT IS PRECISELY DID YOU SEE HIM DO?

JG: I TOOK UP, UMM, I DON'T KNOW EXACTLY HOW MANY HE TOOK UP, ITS JUST LIKE AND PUT THEM IN THE BASKET.

AR: OK. SO YOU SAW HIM TAKE SOME PACKAGE?

JG: MA'AM?

AR: YOU SAW HIM TAKE...[INAUDIBLE]

JG: I SAID I DON'T KNOW HOW MANY HE TOOK, I JUST SAW HIM TAKE STUFF OFF THERE AND PUT IT IN THE CART. LIKE I TOLD YOU. I DIDN'T SEE HOW MANY, I DIDN'T COUNT, I DIDN'T SEE HOW MANY WAS TAKEN.

AR: BUT YOU KNEW THEY WERE BATTERIES, RIGHT?

JG: RIGHT, BECAUSE THAT'S THE ONLY THING ON THE DISPLAY.

AR: OK. [WHISPERING] OK UHH. SIR, NOW YOU CALLED THE POLICE, RIGHT?

JG: YES

AR: OK. AND, YOU CALLED 911 RIGHT?

JG: YES

AR: AND WHAT YOU DID WAS, YOU TOLD THE POLICE THAT UMM THERE WAS A MAN IN HIS VEHICLE WHO HAD STOLEN SOME STUFF FROM THE STORE, RIGHT?

JG: NO

AR: NO?

JG: I TOLD THEM WHEN I CALLED THEM, I, HE WASN'T IN HIS VEHICLE WHEN I CALLED. WHEN I CALLED, HE HAD THE KNIFE IN HIS HAND. I TOOK STEPS BACKWARDS, HE

28

AR: OK. AND YOU TOLD THE POLICE... YOU TOLD THE POLICE ON THE 911 TAPE THAT MR. ALLSTON HAD STOLEN ELECTRONICS IN HIS VEHICLE, IS THAT CORRECT?

JG: NO I TOLD THEM HE HAD MURCHANDISE FROM THE ELECTRONICS DEPARTMENT.

AR: SIR, LET ME SHOW YOU WHATS A COPY OF THE UHH 911 CALL. LET ME START ON THE FRONT PAGE. SIR THIS IS THE FRONT PAGE, IT SAYS ANNE ARUNDELL COUNTY.

JG: RIGHT

AR: NOT ALL 9-11 AUDIO RECORDINGS. OK. AND THIS IS A COPY OF IT. ITS GOT YOUR NAME ON IT, UHH [INAUDIBLE] MR. GIBSON.

JG: RIGHT

AR: AND WHAT IT SAYS, WOULD YOU AGREE, IT SAYS YOU STATE "HE HAS STOLEN ELECTRONICS" [INAUDIBLE]

JG: [INAUDIBLE] ELECTRONICS. THAT'S WHAT, THAT'S WHAT THAT IS.

AR: YOU SAID STOLEN ELECTRONICS. CORRECT?

JG: THAT IS A PART OF ELECTRONICS.

AR: OK. NOW THERE CAME A TIME WHEN YOU WERE INTERVIEWED BY THE OFFICER WHO'S SICK, UHH OFFICER HELLER. AND OFFICER HELLER INTERVIEWED YOU, CORRECT?

JG: YES

AR: OK. AND YOU TOLD OFFICER HELLER THAT THE MALE, MEANING MR. ALLSTON, ENTERED THE ELECTRONICS DEPARTMENT, REMOVED BATTERIES AND AN UNKNOWN ITEM FROM THE DISPLAY AND LEFT THE DEPARTMENT. WOULD YOU AGREE?

JG: RIGHT.

AR: OK, SO YOU ADDED SOMETHING ONTO THE BATTERIES, CORRECT?

JG: NO, BECAUSE WHAT YOU, WHAT HAPPENED, HE PICKED UP THE BATTERIES. SEE HE NEVER ASKING ME WHAT DID I SAW AFTER HE LEFT THE DISPLAY AND HE WENT INTO HOME FASHION. I ONLY SAW HIM PUT THE BATTERIES IN THE BAG, AND THEY WENT UP TO THE REGISTER, I THOUGHT THEY WAS GOING TO PAY FOR THE STUFF OR WHATEVER THEY HAD, BUT WHEN HE REACHED INTO THE CART AND TOOK THE BAGS OUT, LEFT THE BASKET AND LEFT THE LADY WITH THE BASKET, HE WALKED OUT THE STORE. I DIDN'T SAY I SEEN HIM PUT OTHER STUFF, OTHER ELECTRONIC STUFF IN THE BAG.

AA: UMM, IF I MAY. JUST BRIEFLY, LIKE SHE WAS SAYING, THIS IS THE POLICE REPORT, RIGHT?

AR: NO, IT'S THE 911...

AA: I MEAN 911 REPORT, RIGHT. OK? AND IT BEGINS FROM THE INITIAL CONTACT WITH THE 911 OPERATOR. ALRIGHT, AND IT GIVES, IT HAS HIS NAME, HIS PHONE NUMBER, THE NUMBER HES CALLING FROM, WHICH THEY CONSEQUENTLY CHANGED LATER ON, TO SAY THAT AND GIVES THE NUMBER FOR THE INSIDE OF THE STORE, THE STORE NUMBER, RIGHT? FIRST HE GAVE HIS CELL PHONE NUMBER, WHICH IS ON HERE. UMM AND IT GOES IN SEQUENCE, IM SURE YOU ARE PROBABLY FAMILIAR WITH IT

HE: ARE YOU QUESTIONING HIM?

AA: YES SIR, YES SIR. WHAT IM ASKING IS, AS SHE ASKED YOU, DO YOU CONSIDER ELECTRIC ELECTRONICS?

JG: YES

CSO: YOU CONSIDER BATTERIES ELECTRONICS.

JG: THAT'S WHY WE KEEP THEM, THAT'S WHERE ELECTRONICS, WE KEEP THEM BACK THERE.

[UNIDENTIFYABLE VOICE]: EHH NEVER MIND.

AR: OK AND, YOU ALSO GAVE THEM A DESCRIPTION OF THE CAR AND THE TAG, CORRECT? THAT THE SUBJECT WAS IN, CORRECT?

JG: I DIDN'T KNOW THE TAGS. I GAVE THEM A DESCRIPTION OF THE CAR, AND I WASN'T OAK... I WAS AT THE MIDDLE DOOR AND I COULD ONLY SEE THE CAR, I COULDN'T GIVE THEM A TAG UNTIL THE ASSISTANT MANAGER AND THE BI — THE

CART PUSHER WENT OVER BY HIS CAR AND THEY TOLD ME WHAT THE TAG NUMBER WAS. I DIDN'T SEE THE TAG NUMBERS, I WAS, BUT MY SECOND PARTY TOLD ME WHAT THE TAG NUMBER WAS.

AR: OK AND YOU DESCRIBE THE CAR AS A GREY VOLVO, IS THAT CORRECT.

JG: IT WAS BMW.

AR: WELL, SIR, WHAT THE 911 CALL SAYS IS A GREY VOLVO.

JG: WELL, IT STILL, WHEN THEY TELLING ME WHAT THE CAR WAS I WASN'T CLOSE ENOUGH TO SEE WHAT THE CAR WAS. I KEPT TELLING, BECAUSE IM NOT...

AR: SO THEN ARE YOU SAYING THAT SOMEBODY DESCRIBED IT TO YOU AS A GREY VOLVO?

JG: I COULD HAVE SWORN I TOLD THEM IT WAS A BMW, BUT IF YOU LET ME FINISH EXPLAINING. IM NOT ALLOWED TO LEAVE BUT 3 OR 4 STEPS OFF THE SIDEWALK OR I COULD BE LOSE MY JOB. THAT'S WHY I STOPPED. I TRIED TO GET THE ASSISTANT MANAGER, DON'T GO OVER BY HIS CAR, COME BACK, BECAUSE WE DON'T KNOW WHAT HIS DEAL WAS. SO THEY WAS HOLLERING TO ME WHAT KIND OF CAR IT WAS AND WHAT THE TAG NUMBER WAS, AND THAT'S WHAT I TOLD THEM. BECAUSE WE'RE NOT, IM NOT ALLOWED TO GO OUT INTO THE PARKING LOT.

AR: SO THE ASSISTANT MANAGER AND THE OTHER GUY WENT INTO THE PARKING LOT.

JG: RIGHT. THEY WERE, AND I KEPT TRYING TO GET THEM TO COME BACK. I KEPT TELLING THEM TO COME BACK, BECAUSE IM NOT, I CANT GO IN THE PARKING LOT BECAUSE WE ARE RESTRICTED FROM LEAVING OUR FRONT OF THE STORE.

AR: OK, WELL MY QUESTION IS SIMPLE. THE VEHICLE WAS DESCRIBED AS A GREY VOLVO ON THE 911 CALL, IS THAT CORRECT?

JG: IT COULD HAVE BEEN, BUT I DON'T REMEMBER WHAT EXACTLY...

AR: OK. ALRIGHT. DON'T REMEMBER, YOU DON'T REMEMBER.

JG: I JUST KNOW THAT WHEN HE PULLED UP IN FRONT OF THE STORE, IT WAS A BMW.

CSO: WERE YOU ALONE WHEN HE APPROACHED YOU?

JG: NO

CSO: HOW MANY PEOPLE?

JG: THERE WAS 2.

AR: [INAUDIBLE] TALK OUTSIDE FOR ABOUT 3 MINUTES? OK. I KNOW ITS...

HE: OFF THE RECORD.

[BREAK IN TAPE]

HE: BACK ON THE RECORD.

AR: MR. ALLSTON, HAVE YOU SEEN UHH, IM SORRY, MR. GIBSON, HAVE YOU SEEN MR. ALLSTON AND HIS FAMILY IN THIS UHH AWALMART PRIOR TO THIS INCIDENT?

JG: NO

AR: YOU'VE NEVER SEEN HIM?

JG: NO BECAUSE HE WAS TELLING ME THAT SAME NIGHT, THAT HE WAS TIRED OF ME FOLLOWING HIM. AND I TOLD HIM THAT I AINT NEVER SEEN HIM BEFORE.

AR: OK, SO THEN YOU HAVE NO MEMORY OF AN INCIDENT IN DECEMBER OF 200–

CSO: 2005

AR: 2005 WHERE THEY HAD A CART, HE AND HIS WIFE AND YOU FOLLOWED THEM AROUND THE STORE?

JG: [INAUDIBLE] IN 2005?

AR: MHMM

JG: BECAUSE LIKE I WAS TELLING YOU, IM NOT, I COULD HAVE BEEN, IM NOT AT THE SAME STORE A LOT. I COULD HAVE BEEN, BECAUSE I KNOW BACK IN DECEMBER I WAS AT ARUNDELL MILLS TOO. AND THERES ANOTHER GUY, MY COMPLEXION AND STUFF THAT'S AT THE STORE TOO.

AR: OK

JG: SO I DON'T REMEMBER, YOU KNOW, REMEMBER FOLLOWING HIM, I DON'T REMEMBER EVERYBODY THAT I LOOK AT OR FOLLOW IN THE STORE?

AR: HAVE YOU SEEN MRS. ALLSTON RECENTLY? DID YOU FOLLOW HER AROUND THE STORE RECENTLY?

JG: NO I HAVENT FOLLOWED HER AROUND THE STORE RECENTLY.

AR: OK. UMM HAVE YOU EVER SUSPECTED SOMEBODY OF SHOP LIFTING AND BEEN WRONG?

JG: YES

AR: OK. [INAUDIBLE] MR. GIBSON ONE MORE AND THEN WE'RE DONE.

JG: OK, NO PROBLEM

AR: OK. THESE BATTERIES THAT WERE IN THERE, HOW MANY PACKETS WERE THERE? HOW MANY BATTERIES DID YOU FIND? DID YOU RECOVER?

JG: [INAUDIBLE] THERE MIGHT HAVE BEEN 2, IM NOT FOR SURE

AR: OK

JG: BUT UMM, IM NOT FOR SURE, BECAUSE WHEN THEY TOOK, THEY TOOK EVERYTHING WITH THEM. I THINK THERE WERE TWO AT LEAST, UMM LOOKED IN THE BAG, GOT OUT OF THE BAG, IM NOT FOR SURE.

AR: OK. SO THERE WERE 2 BATTERY PACKS, YOU THINK

JG: YES

AR: OK. AND DID YOU EVER IDENTIFY THESE AS DEFINITELY COMING FROM WALMART?

JG: NO, BUT THEY, UMM BECAUSE WHEN THE OFFICERS TOOK THEM, TOOK HIM, THEY TOOK THE STUFF TOO. THEY NEVER, I GAVE THEM BACK THE BATTERIES AND STUFF.

AR: SO THEN THEY WERE NEVER IDENTIFIED AS DEFINITELY COME FROM WALMART, IS THAT CORRECT?

JG: RIGHT.

AR: OK.  SO THEY COULD HAVE BEEN BOUGHT AT TARGET, RIGHT?  ON AN EARLIER OCCATION?  CORRECT?

JG: NO, BECAUSE I SEEN HIM PUT THEM IN THE BAG.

AR: OK.  NOTHING FURTHER.

HE: HAVE YOU BEEN [INAUDIBLE] AT THIS TIME ABOUT UMM MR. ALLSTON HAVING ANY [INAUDIBLE]

JG: SAY THAT AGAIN.

HE: COULD YOU BE IN ERROR THIS TIME THAT CONCERNING HIS SHOPLIFTING THE BATTERIES. [INAUDIBLE] NO MORE QUESTIONS.  WE ARE GOING OFF THE RECORD.

[BREAK IN TAPE]

HE: BACK ON THE RECORD.  MA'AM WOULD YOU PLEASE STATE YOUR NAME AND ADDRESS.

DC: [INAUDIBLE] VERONICA [INAUDIBLE].  I LIVE AT 2708 RHODE ISLAND AVENUE, THAT'S IN MARYLAND.

HE: AND WHAT PART OF MARYLAND AGAIN?

DC: DISTRICT HEIGHTS

HE: AND THE TESTIMONY TODAY WILL BE TAKEN UNDER OATH.  PLEASE RAISE YOUR RIGHT HAND.  I SWEAR AND AFFIRM UNDER PENALTY OF PERJURY THAT THE TESTIMONY ABOUT TO GIVE IN THE CASE NOW IN HEARING WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH?

DC: YES SIR I DO.

AR: GOOD AFTERNOON MS. ALL.. MS. COOK-ALLSTON.  WHAT IS YOUR RELATIONSHIP TO MR. ALLSTON?

DC: THAT'S MY FIANCE.

AR: OK.  AND HOW LONG HAVE YOU KNOWN HIM?

DC: 8 YEARS

AR: 8 YEARS. OK. AND HAVE YOU LIVED TOGETHER WITH HIM THAT ENTIRE TIME?

DC: YES

AR: OK. WERE YOU WITH MR. ALLSTON ON THE NIGHT OF THIS UHH WHEN HE WAS ARRESTED FOR ALLEGEDLY STEALING FROM WALMART?

DC: YES MA'AM.

AR: OK. UMM DID YOU, DO YOU KNOW JAMES GIBSON THE LOSS PREVENTION OFFICER? ARE YOU FAMILIAR WITH HIM?

DC: YES, VERY.

AR: OK. AND PRIOR TO THIS INCIDENT, WHAT WAS YOUR FAMILIARITY WITH HIM.

DC: UMM ONE TIME ME AND AMU WENT INTO WALMART ALL THE TIME, IVE BEEN GOING THERE FOR 8 YEARS. BUT THERE WERE A WHOLE LOT OF ITEMS IN MY CART. AND I HAD A BIKE, CARRYING IT AROUND. AND I NOTICED THE GUY FOLLOWING ME. AMU WASN'T WITH ME AT THE TIME, HE WAS OVER IN THE MENS SECTION AND I WAS IN THE WOMENS SECTION. AND EVERY TIME I WOULD STOP, HE WOULD LIKE STOP. HE HAD A BAG, SO I DIDN'T KNOW WHO HE WAS AT THIS TIME, I THOUGHT HE WAS JUST A REGULAR PERSON SHOPPING AND FOLLOWING ME.

AR: MHMM

DC: SO BY THE TIME AMU CAME BACK TO ME, I HAD TOLD HIM, I SAID THERS THIS GUY FOLLOWING ME AROUND THE STORE. HE SAID "WELL WHERE IS HE?" I SAID I DON'T KNOW WHERE HE WENT. AND THEN WE WENT THROUGH SERVICE DESK TO CHECK OUT I NOTICED THAT SAME GUY STANDING IN FRONT OF US, WITH NO BAGS THIS TIME. SO IM LIKE THERE HE IS RIGHT THERE. SO THAT'S WHEN WE REALIZED THAT HE WAS PART OF WALMART BECAUSE HE HAD A LOT, WELL I HAD A LOT OF STUFF, HE WAS FOLLOWING ME TO SEE IF I WAS GOING TO PAY FOR EVERYTHING. SO HE STOOD THERE THE WHOLE TIME AND THE LADY RUNG EVERYTHING I HAD UP. IT WAS ABOUT PROBABLY $300-SOME WORTH OF ITEMS. THEN, WHEN WE LEFT, HE JUST LOOKED AT US AND I LOOKED AT HIM AND ROLLED MY EYES AT HIM AND THREW MY UP AND LEFT.

AR: OK AND THEN ON FEBRUARY 6TH, IS THE INCIDENT IN QUESTION HERE, DO YOU RECALL SEEING MR. GIBSON THAT NIGHT?

DC: THE 20TH OF FEBRUARY?

AR: IM SORRY, YES THE 20TH.

DC: UMM I DIDN'T SEE HIM UNTIL AFTER THE FACT, BECAUSE WHEN WE WENT IN, WE CAME IN TO RETURN ITEMS THAT I HAD BOUGHT WHEN WE WENT OUT TO, WENT TO OUT A PART OF MARYLAND ON A [DON'T UNDERSTAND]. SO WHEN WE CAME IN IS WENT TO THE RETURN DESK. AND WE WENT TO THE RETURN DESK, THE LADY HAD, YOU KNOW, I TOLD HER THE SITUATION. I WAS BRINGING SOME ITEMS BACK BECAUSE I NOTICED THAT WHEN, ONE THE TOP WAS LARGE AND THE BOTTOMS WERE TWO X'S. AND WE DIDN'T REALIZE IT UNTIL AFTER THE FACT. SO, WE GOT IT FOR A CHEAP PRICE BUT...

[END OF TAPE]

**EXHIBIT B2**
**TRANSCRIPT OF REVOCATION HEARING**
**DECEMBER 12, 2006**

TRANSCRIPTION—REVOCATION HEARING
DECEMBER 20, 2006
AMU ALSTON
2ND SIDE –TESTIMONY FROM MRS. ALLSTON & CLOSING

(HE)   HEARING EXAMINER, DR. PRICE
(C)    CLIENT (AMU ALSTON)
(A)    ATTORNEY (ANNA RODRIQUES
(MA)   MRS. ALSTON


(HE)   GO AHEAD

(MA)   SO I HAD, SHE HAD ASKED, SHE SAID SHE HAD TO ASK HER STORE, FLOOR MANAGER, WHICH WAS DENNIS, I REMEMBER HIM, BECAUSE HE HAD HELP US, HE CAME OVER AND SHE EXPLAINED TO HIM THE SITUATION, HE SAID OH SURE, YOU KNOW THEY CAN EXCHANGE, EVEN EXCHANGE. AMU STAYED AT THE REGISTER WHEN I WENT OVER TO GET THE CLOTHES BECAUSE IT WAS FOR MY DAUGHTER, MY SON AND ME, HIS WAS OKAY. WHEN I CAME BACK, I MEANT WELL WHEN I TOOK THE STUFF OUT I REALIZED IT WAS LIKE A SWEATSHIRT IN THERE AND IT WAS SOME BATTERIES IN THERE AND I TOLD THE YOUNG LADY, I SAID LOOK, YOU KNOW CAUSE WE WERE RUSHING, I DIDN'T GET A CHANCE TO LOOK IN THE BAG AND I TOLD HER, LIKE THESE ARE OURS, YOU KNOW WE CAME IN HERE WITH THESE, SHE SAID THAT'S FINE, SHE SAID I JUST GIVE YOU A WAL-MART BAG, CAUSE YOU KNOW HOW THESE GUYS ARE.  I SAID OKAY, THAT'S FINE CAUSE SHE MUST WAS ASSUMING WE WERE GOING RIGHT OUT THE DOOR, BUT I WANTED TO DO MORE SHOPPING BECAUSE I ALWAYS GET THEIR LUNCH FROM THERE, SO I WENT TO GET THEIR TURKEY AND GOT THE LITTLE LUNCH AND EVERYTHING, THEN AMU WAS LIKE LET'S GO AND SEE WHAT DVD'S ON SALE, CAUSE HE LOVES DVD'S, THAT'S ALL HE DO IS BUY DVD'S ALL THE TIME. SO WE GO OVER BY THE DVD'S SECTION AND I HAPPEN, I AM ALREADY UPSET CAUSE I READY TO GO, I'M TIRED, I HAVEN'T BEEN IN THE HOUSE SINCE WE LEFT YOU THE SKI TRIP.  SO I HAPPEN TO TURN AROUND AND SEEN SOMEBODY PEEPING IN AND OUT, THE MIDDLE OF THE AISLE AND I GOT UPSET AND I WAS LIKE LOOK, I AM TIRED OF THIS, I SAY LOOK WE CAN GO TO TARGET AND GET DVD AND STUFF, WE DON'T HAVE TO DEAL WITH THIS, YOU KNOW

(A)    SO YOU SAW THE PERSON PEEPING AT YOU (INAUDIBLE)

1

(MA) I SEEN, I SEEN, I DIDN'T REALLY GET TO SEE THE FACE AT THE TIME CAUSE HE DID IT SO FAST, BUT I KNEW IT WAS SOMEBODY (INAUDIBLE) WELL I ASSUME

(A) YOU ASSUMED IT WAS (INAUDIBLE)

(MA) WELL I ASSUMED I'M SORRY, BECAUSE EVERY TIME I GO IN THERE IT'S LIKE EVEN WHEN I AM NOT WITH AMU, IT'S ALWAYS ON ME AND I HAVE NEVER EVER DID NOTHING THEM PEOPLE FOR HIM OR THEM TO BE LIKE THAT. SO AMU HAD UM

(A) DID YOU SEE AMU HAD GO OVER TO THE BATTERY SECTION

(MA) HE DIDN'T, HE DIDN'T GO OVER TO THE BATTERY SECTION. WE WERE OVER BY THE DVD SECTION

(A) OKAY AND WERE THE BATTERIES NEAR THERE

(MA) NO

(A) WERE (INAUDIBLE)

(MA) THE BATTERIES WERE NO WHERE NEAR THERE, THE BATTERY

(A) WAS THERE A BATTERY STAND ANYWHERE NEAR THERE?

(MA) NO NOTHING, NOTHING

(A) DID, NOW WHO PACKED UP THIS RETURN BAG?

(MA) THE, WHAT YOU MEAN, PACK THE

(A) WHEN YOU BROUGHT THE ITEMS BACK FOR RETURN

(MA) AH WE JUST, WE WAS COMING FROM THE TRIP, SO WE HAD THE STUFF IN THERE, BUT NO TELLING WHO, CAUSE ALL THE KIDS WAS WITH US, SO WE JUST GRABBING BAGS, SEPARATING EVERYBODY'S STUFF, CAUSE IT WAS LIKE 26 OF US TOGETHER, SO WE SEPARATED BAGS AND EVERYBODY IS TAKING BAGS IN THE HOUSE, AND I DIDN'T NEVER GET A CHANCE TO GO BACK IN THE HOUSE, I JUST TOLD MY DAUGHTER, I CALLED HER AND TOLD TO BRING THE WAL-MART BAG OUTSIDE, CAUSE I WANTED TO TAKE WHILE WE WAS GOING TO THE WAL-MART, I WANTED TO TAKE IT BACK AND EXCHANGE IT, BECAUSE WE HAD WENT UP MY MOM'S HOUSE FOR HIM TO FIX HER HEAT BECAUSE SHE HAD CALLED ME THAT, EARLIER AND SHE WANTED HIM TO PUT THE STOVE BACK BECAUSE

2

HER FLOOR WAS GETTING TAKING UP, SHE WAS GETTING NEW FLOORS AND SHE ALSO WANTED HIM TO CHECK THE HEAT BECAUSE MY GRANDMOTHER LIVED THERE AND IT WAS BROKE, SO WE WAS LIKE THAT'S FINE WE'LL DO THAT, AND THEN WE'LL RUN TO WAL-MART. DURING THAT TIME I NEVER GOT A CHANCE TO GO IN THE HOUSE TO SEPARATE ANYTHING

(A)    SO MY DAUGHTER DID THAT

(MA)   MY DAUGHTER JUST BROUGHT THE BAG OUT TO ME, THAT'S WHY I LET THE LADY KNOW IN ADVANCE WHEN I WAS TAKING THE STUFF OUT, WELL THIS IS THIS, THIS THAT, SHE SAID THAT'S FINE AND DENNIS WAS RIGHT THERE BESIDE HER WHEN WERE DOING IT. SO THEREFORE WE DIDN'T THINK IT WAS GOING TO BE A PROBLEM UNTIL WHEN WE WALK THROUGH THE DVD, I MEANT WHEN I TOLD AMU LETS GO, HE PUT THE DVD BACK ON THE TABLE, WE WALKED THROUGH THE AISLES TO GO PAY FOR THE LITTLE BIT OF STUFF THAT I HAD TO PAY TO FOR.  HE WAS JUST SEPARATING THE STUFF THAT WE HAD THAT WAS ALREADY PAID FOR ON THE RECEIPTS FROM THE STUFF THAT I HAD TO PAY FOR SO AS WE WERE APPROACHING THE SERVICE COUNTER, HE, WE HAD BIG GRAY BAG, HE JUST PUT THE STUFF THAT WAS PAID FOR INTO THAT BAG AND HE HAD LEFT.  BOUT NOT LESS THEN A MINUTE, I HEARD THE, I HEARD THE LP SAYING THIS TALL GUY WITH THE BLACK SWEET SUIT LEFT THE BUILDING, HE RAN FROM MY LEFT AND DENNIS THE STORE SUPERVISOR I KNOW BECAUSE, WHEN, I ALWAYS GO IN THERE, SO I KNOW THE NAMES, HE RAN FROM MY RIGHT, SO BOTH OF THEM RAN OUT THE DOOR, SO I WAS LIKE AMU HAS ON A BLACK SWEET SUIT, SO I CALLED, NO ANSWER, CALLED AGAIN NO ANSWER, I SAID LET GO AND MAKE SURE HE'S ALRIGHT, AS I WAS GOING OUT THE DOOR TOWARDS THE CAR, I SEE DENNIS THE STORE SUPERVISOR COMING BACK, CALLING THE POLICE SAYING HE'S IN A GREY VOLVO LEAVING THE SCENE, I HEARD THE TAG NUMBERS, THE TAG NUMBERS WAS JUST MIND BUT ONE TAG NUMBER OFF.

(A)    UM LET ME ASK YOU THIS, DID YOU EVER, DID REACH AMU AND ASKED HIM TO LEAVE BEFORE ANY TROUBLE AROUSED

(MA)   YES BECAUSE I CALLED HIM, THAT'S WHAT I WAS GETTING TO, I CALLED HIM BACK AND HE ANSWERED, I WAS LIKE WHAT IS GOING ON, HE WAS LIKE TWO GUYS HAD RAN BEHIND HIM, NOT KNOWING, HE DIDN'T KNOW WHO THERE WAS BECAUSE ALL HIM IS WHAT YOU GOT IN YOUR BAG, SO HE, HE PANIC, SO WAS LIKE THEY ARE CALLING THE POLICE, THEY SAID WE HAD A GREY VOLVO, WE HAD A GREY BMW, OUR TAG NUMBERS THEY SAID IT WRONG,

(A)    OKAY

(MA)  IT WAS OFF

(A)    OKAY, UM YOU KNOW WHAT I'M A BIT CONFUSED MS. ALLSTON, YOU SAID THAT DENNIS IS THE STORE MANAGER, (INAUDIBLE)

(MA)  HE'S THE FLOOR MANAGER

(A)    FLOOR MANAGER

(MA)  I FOUND AFTER

(A)    BUT DID DENNIS KNOW THAT YOU HAD BROUGHT ITEMS IN FOR EXCHANGE

(MA)  HE KNEW, WELL WHEN HE WAS UP THERE HE IS THE ONE THAT APPROVED IT, THAT'S WHEN I WAS TRYING TO TELL HIM THAT, BECAUSE HE JUST RAN OUT WITH THE LP AND I WHEN

(A)    DO YOU KNOW IF DENNIS KNEW WHAT CERTAINTY THAT YOU HAD BROUGHT THE BATTERIES IN THE STORE

(MA)  HE KNEW THAT WE BROUGHT THE ITEMS IN THE STORE, THE YOUNG LADY WAS RIGHT THERE WITH US WHEN I'M TELLING HER

(A)    OKAY THE ITEMS WERE WHAT, THE SWEAT SUITS?

(MA)  IT WAS SWEAT SUITS AND SWEAT SHIRT THAT WASN'T ON THE RECEIPT AND THE BATTERIES, SHE WAS RIGHT THERE AND SHE SAID TO ME, HERE'S A WAL-MART BAG

(HE)   WHAT SHE'S ASKING YOU DID DENNIS KNOW ALL ITEMS THAT WAS IN THE BAG

(MA)  NO HE DIDN'T, HE DIDN'T

(A)    NOTHING FURTHER

(MA)  HE DIDN'T

(A)    DR. PRICE, I'M GOING TO INTRODUCE AH AND GET TO YOU A COPY OF A LETTER FROM MARK LECOWICZ WHO WAS MR. ALLSTON'S ATTORNEY IN MARYLAND IN THE CRIMINAL CASE AND TO SUM UP WHAT MR. LACOWICZ SAYS IS THAT ONE OF THE OFFICERS, OTHER

THAN OFFICER HELLER, WAS PRESENT AT THE COURT AND TOLD MR. LACOWITZ THAT HE DOESN'T TAKE A CASE FROM MR. GIBSON BECAUSE THERE UNRELIABLE. UM HE ALSO, MR. LECOWICZ ASKED THE PROSECUTOR WHETHER THE STATE HAD ANY EVIDENCE THAT WOULD SHOW THE BATTERIES CAME FROM WAL-MART AND THE PROSECUTOR HAD NOT SUCH EVIDENCE. I ALSO WANT TO BE CLEAR CAUSE HE CLEARS WHAT THE EXACT STATUS OF THE CASE WAS. THE CASE WAS NOLLED IF MR. ALLSTON PERFORMS 10 HOURS OF COMMUNITY SERVICE, BUT HE WAS NOT REQUIRED TO AND IN FACT DID NOT MAKE ANY ADMISSION REGARDING HIS INVOLVEMENT IN ANY OF THE CRIMES HERE.  UM AND I (INAUDIBLE)

(HE)  WHAT (INAUDIBLE) DONE COMMUNITY SERVICE

(A)  THIS WOULD MAKE THE CASE DISAPPEAR, GET IT OFF YOUR BACK

(C)  IF I MAY, IF I MAY INTERJECT, UM I BELIEVE THAT IT WAS MORE SO AH A GOOD FAITH AS TO OPPOSED TO ANYTHING ELSE BECAUSE WHEN MY ATTORNEY FIRST MADE MENTION OF AH TEN HOURS TO ME, AH I INITIALLY SAID NO, BECAUSE I INFORM, I I I, IT WAS NO WAY, I DID, IT WAS NO WAY THAT I WAS ADMITTING TO ANYTHING BECAUSE I WAS NOT GUILTY OF ANYTHING, I TOLD HIM THAT I DID NOT WANT, I DID NOT WANT TO TAKE THE COMMUNITY SERVICE BECAUSE I HAD INTENDED ON FILING AGAINST A SUIT AGAINST THESE PEOPLE AS WELL AND I DIDN'T WANT ANYTHING TO REFLECT IN ANY WAY FOR PAROLE ISSUES AS WELL AS ANY OTHER ISSUE THAT MAY ARISE, THAT I HAD ADMITTED IN ANY KIND OF WAY ANYTHING RELATED TO THIS CASE BECAUSE I I I FEEL LIKE I WAS TOTALLY WRONGED IN THIS MATTER AND I FELT LIKE IT COULD HAVE BEEN RESOLVED SIMPLY BY THE GENTLEMAN SAYING LOOK I MADE A MISTAKE. THAT I FELT, I I HONESTLY FELT THAT WAY, BUT AND AND MY ATTORNEY AT THAT POINT LOOK MY JOB IS JUST TO MAKE THIS GO AWAY, HE SAID IF THE PROSECUTOR SAID HE'LL MAKE IT GO AWAY WITH YOU JUST DOING TEN HOURS COMMUNITY SERVICE THEN THAT'S WHAT YOU SHOULD DO AND MS. COOK, AT HER PERSUASION SAID LOOK JUST GO AHEAD DO THE COMMUNITY SERVICE AND YOU KNOW AND IT WILL BE DONE WITH, SO AT HE POINT AGREED.  NO WAY DID I DID I MAKE ANY DEALS, AGREEMENTS ANYTHING

(A)  WELL YOU DID AGREE

(HE)  BUT YOU DID, BUT YOU DID

(C)  I MEAN YEAH, I MEAN YEAH, YEAH,

(A)   BUT YOU DIDN'T ADMIT

(C)   BUT I DIDN'T ADMIT ANY GUILT THOUGH

(A)   THERE WAS SOMETHING I WANT TO ALSO ADDRESS IN THE POLICE REPORT WHICH WE'LL GET, AND I I HOPE YOU CAN MAKE A COPY OF IT AND THAT IS THAT UM OFFICER HELLER STATED THAT HE SMELLED A STRONG ODOR OF ALCOHOLIC BEVERAGES COMING FROM THE MALE'S BREATH, BUT WHEN YOU LOOK AT PAGE ONE OF THE INCIDENT REPORT UNDER IT ALCOHOL DRUG USAGE IT HAS N/A WHICH I ASSUMING IT WOULD MEAN NOT APPLICABLE

(HE)  UHM UHM

(A)   SO THAT IS IS A CONTRADICTION, ADDITIONALLY

(HE)  (INAUDIBLE) I MEAN THAT THAT (INAUDIBLE) HERE NOR THERE CONCERNING (INAUDIBLE) CURRENT CHARGES (INAUDIBLE)

(A)   OKAY, LET ME ALSO INTRODUCE A LETTER FROM THE PASTOR, MINISTER JOSE QUESTA ON BEHALF OF THE MR. ALLSTON AND HE TELLS YOU ABOUT MR. ALLSTON VOLUNTEERING AND (INAUDIBLE)

(HE)  INAUDIBLE)

(A)   HAND UP THIS COPY, ABOUT HIM DOING VOLUNTEERING SERVICE FOR THE AH THE CHURCH AND HIM BEING AN ASSET TO THEIR CHURCH.  AND THIS IS A LETTER FROM HIS MOTHER-LAW STATING THAT HE DID DO HVAC WORK AT HIS HOME ON FEBRUARY 20, 2006.

(HE)  INAUDIBLE

(A)   ALRIGHT AND THEN WE HAVE A LETTER FROM A WOMAN BY THE NAME OF

(HE)  THAT HAS NOTHING TO DO WITH HIM

(A)   WELL WHAT IT SHOWS IS THIS OFFICER'S BIAS TOWARDS THIS FAMILY

(HE)  HAS NOTHING TO DO WITH HIM

(A)   THERE'S A LETTER FROM MS. ALLSTON AS WELL, I KNOW YOU HEARD HER TESTIMONY BUT SHE'S WRITTEN A LETTER AS.

(C)     UM I DON'T KNOW, I MEAN I DON'T, IT MAY NOT BE RELEVANT AT ALL BUT I DO (INAUDIBLE) RECORD UM, THE FACT THAT, UM, I APOLOGIZE TO MY ATTORNEY (INAUDIBLE)

(A)     (INAUDIBLE)

(C)     OKAY

(HE)    I GOING TO GO OVER THE SALIENT FACTOR SCORES NOW, ARE YOU FAMILIAR WITH THE SALIENT FACTOR SCORE

(C)     YES, YES (INAUDIBLE)

(HE)    AS YOU KNOW THEN IT'S A TOOL THAT THE COMMISSION USE USES TO DETERMINE AN OFFENDER RISK OF RE-OFFENDING. AND IT'S BASED ON YOUR PRIOR CRIMINAL RECORD, (INAUDIBLE) NUMBER PRIOR CONVICTION YOU'VE HAD, HOW MANY TIMES YOU HAVE BEEN LOCKED UP, (INAUDIBLE) AT A TIME. YOUR AGE AT THE TIME OF THE CURRENT VIOLATION, WHETHER OR NOT YOU HAVE BEEN IN THE COMMUNITY FOR THREE YEARS OR LESS, YOUR PAROLE STATUS, IN YOUR CASE SUPERVISED RELEASE, YOUR PAROLE STATUS AND WHETHER OR NOT YOU WERE AT LEAST 41 YEARS OLD AT THE TIME OF YOUR CURRENT VIOLATION. (INAUDIBLE) SCORE FROM 1-10 WITH 10 BEING THE MOST FAVORABLE, 1 BEING THE LEAST FAVORABLE. THE RECORD INDICATES THAT YOU HAD 4 PRIOR CONVICTIONS, SOUND ABOUT RIGHT ?

(C)     3 CONVICTIONS

(HE)    IN 88, SEPTEMBER 88, CRIMINAL POSSESSION OF STOLEN PROPERTY, AND NOVEMBER OF 88, SELL DRUGS, SEPTEMBER 89, DISTRIBUTION OF COCAINE AND NOVEMBER 1991, DISTRIBUTION OF COCAINE

(C)     YEAH THAT'S CORRECT, THAT'S CORRECT

(HE)    THOSE FOUR CONVICTIONS 0 POINTS FOR ITEM A, ITEM B OUR RECORD INDICATES THAT YOU HAVE FOUR COMMITMENTS FOR MORE THEN 30 DAYS AT A TIME, OF THOSE FOUR COMMITMENTS (INAUDIBLE) 0 POINTS. I SEE THAT YOU WERE 36 YEARS OLD AT THE TIME THE CURRENT VIOLATION WITH PRIOR COMMITMENTS SO THEREFORE (INAUDIBLE) TWO POINTS FOR ITEM C, ITEM B YOUR LAST RELEASE TO THE COMMUNITY 12/19/03 AND THE DATE OF THE CURRENT OFFENSE 1/3/05, LESS THEN 3 YEARS 0 POINTS. YOU WERE ON PAROLE, 0 POINTS YOU WERE NOT YET 41 YEARS OLD, 0 POINTS, SO YOUR SALIENT FACTOR SCORE IS 2

(C)    UM, AH

(A)    (INAUDIBLE)

(HE)    (INAUDIBLE)

(C)    UM

(HE)    QUESTION, YOU GOT A QUESTION

(C)    UM THE SECOND ITEM, THE ITEM THAT YOU WERE TALKING ABOUT THAT I WAS INCARCERATED FOR MORE THAN THIRTY DAYS

(HE)    UHM UHM

(C)    FOR HOW MANY

(HE)    FOUR TIMES

(C)    UM, ACTUALLY THE FIRST, THE FIRST THE FIRST TWO CHARGES IN 88 CONSTITUTED ONE, I PLED GUILTY

(HE)    (INAUDIBLE) THAT'S ABOUT, YEAH THAT'S THIS ONE

(C)    YEAH

(HE)    IT'S JUST ONE TIME

(C)    THAT'S WAS ONE TIME, CAUSE I WAS INCARCERATED FOR MORE THAN (INAUDIBLE) THEN THE OTHER TWO TIMES WAS FOR THESE LAST CONVICTION THAT I WAS INCARCERATED FOR MORE THAN THIRTY DAYS

(HE)    YOUR PROBATION WAS REVOKED ON 11/

(C)    OH YEAH, YEAH, OKAY YEAH

(HE)    (INAUDIBLE) 91

(C)    OKAY, I'M SORRY THAT'S INCLUDED AS WELL OKAY YOU'RE RIGHT

(HE)    (INAUDIBLE)

(C)    I APOLOGIZE, I APOLOGIZE

(HE)    NO PROBLEM, OKAY WE HAVE A SALIENT FACTOR OF SCORE OF 2

(C)    OKAY

(HE)    ALRIGHT, (INAUDIBLE) YOUR VIOLATIONS, AH IF YOU'VE FOUND TO
HAVE VIOLATED (INAUDIBLE) ASSAULT WITH A DEADLY WEAPON,
(INAUDIBLE) CATEGORY 5 (INAUDIBLE) INVOLVED WITH A
DANGEROUS WEAPON. IF YOU'VE FOUND TO NOT HAVE VIOLATED
(INAUDIBLE) BUT VIOLATED (INAUDIBLE) OR USE OF DRUGS TO A
CATEGORY 1 VIOLATIONS. CATEGORY 5 VIOLATIONS HAS THAT
PAROLE, RE-PAROLE GUIDELINE RANGE 60 TO 72 MONTH, IF YOU
HAVE NOT FOUND TO HAVE VIOLATED IN THAT MANNER, THEN
YOUR FACING 12 TO 16 MONTHS, YOU HAVE ANY QUESTIONS.

(C)    UHM

(HE)    (INAUDIBLE) FOR THE 20TH WOULD BE 4, WOULD BE 4 MONTHS

(C)    THAT'S CORRECT SIR

(HE)    OKAY, YOU HAVE A FINAL COMMENT

(A)    AH YES DR. PRICE, REGARDING THE CHARGE OF ADW I REQUEST
THAT YOU MAKE A NO FINDING ON THAT CHARGE BASED ON THE
COMPLAINANT TESTIMONY UNDER OATH THAT MR. ALLSTON DID
NOT POINT THE KNIFE AT HIM AND THAT THE KNIFE WAS DOWN AT
MR. ALLSTON'S SIDE AND THAT ALL MR. ALLSTON SAID WAS WHAT
WHAT AND THAT HE WAS ANGRY, UM THAT THERE WAS NEVER
ANY MENTION MADE OF THREATS BY MR. ALLSTON TO USE THAT
KNIFE. (INAUDIBLE) MR. ALLSTON TOLD YOU THAT WHAT
HAPPENED WAS HE'S OUT IN THE PARKING LOT AND IT'S DARK AND
HE'S HEARS POUNDING FOOTSTEPS AND HEARS SOMEBODY SAYING
WHAT YOU GOT IN THAT BAG AND HE BECOMES FRIGHTENED AND
TAKE THE KNIFE WHICH HE'D BEEN USING EARLIER THAT DAY AND
WHICH HE USES FOR HIS JOB, UM AND HELD IT AT HIS SIDE,
BELIEVING THAT HE WAS IN IMMINENT DANGER, BELIEVING THAT
HE WAS ABOUT TO BE ROBBED AND SPECIFICALLY HE WAS
THINKING OF THE INCIDENT IN UM (INAUDIBLE) NORTHWEST
WHERE THE NEW YORK TIMES JOURNALIST WAS ROBBED AND
KILLED. BUT, AND THEN THERE'S SOMETHING ELSE THAT I THINK
BELIES THE UM HIS TESTIMONY THAT THE KNIFE WAS PULLED ON
HIM RIGHT IN FRONT OF THE STORE BY MR. ALLSTON. HE SAID
THAT IT HAPPENED RIGHT IN FRONT OF STORE, THAT IT WAS TWO
OR THREE STEPS IN FRONT OF THE STORE, BUT WHEN THE
QUESTION WAS ASKED OF HIM, UM WHAT TO DESCRIBE THE KNIFE,
ALL MR. GIBSON COULD SAY WAS THAT IT WAS A POCKET KNIFE,
HE COULDN'T SEE BECAUSE IT WAS DARK. BUT WE ALL KNOW

THAT THE FRONT OF THE WAL-MART STORE IS NOT DARK. IT'S WELL LIT, SO IT'S OUR POSITION THAT MR. GIBSON IS NOT BEING TRUTHFUL WHEN HE SAYS THAT IT HAPPENED RIGHT IN FRONT OF THE STORE AS OPPOSED TO OUT IN THE PARKING LOT. WHAT WE DO KNOW THAT HE'S CHASED HIM DOWN IN THE PARKING LOT THAT'S AGAINST THEIR POLICY, SO HE WOULD BE ADMITTING TO DOING SOMETHING TO VIOLATED WAL-MART'S POLICY. NOW MOVING ON TO THE ISSUE OF THE STEALING, UM THE THEFT, IT STATES THAT HE DOESN'T KNOW HOW FAR AWAY HE WAS BUT HE KNEW THEY WERE BATTERIES, THAT ELECTRONICS ARE BATTERIES. WHAT HE SAYS IN THE 911 CALL IS THAT HE HAS STOLEN ELECTRONICS IN HIS VEHICLE, BY THE TIME THE POLICE COME AND INTERVIEW MR. GIBSON, THE STORY HAS GROWN TO HE ENTERED THE ELECTRONICS DEPARTMENT AND REMOVED BATTERIES AND AN UNKNOWN ELECTRONIC ITEM FROM DISPLAY. (INAUDIBLE) TESTIFIED HERE THAT ALL MR. ALLSTON TOOK WERE BATTERIES NEVER MENTIONED ANY ELECTRONICS ITEM. THIS IS ON THE STATEMENT OF PROBABLE CAUSE THEN WHEN ONE GETS THE INCIDENT REPORT, ONCE AGAIN HE SAYS BATTERIES AND AN ELECTRONIC ITEM, BUT HIS FIRST OPPORTUNITY TO SAY SOMETHING RIGHT AFTER THE INCIDENT OCCURS WHEN HE'S STILL UNDER THE INFLUENCE OF THIS STARTLING EVENT HE SAYS, BATTERIES

(C)    INAUDIBLE)

(A)    ELECTRONIC ITEM, HE DOESN'T SAY BATTERIES, HE DOESN'T SAY BATTERIES UNTIL THE CAR GET'S SEARCHED. THEN IT BECOMES BATTERIES. NOW HE ALSO AGREES THAT HE CAN'T SAY THAT THESE BATTERIES THERE WERE NEVER IDENTIFIED AS COMING FROM WAL-MART. HE ADMITTED THAT HE SOMETIMES, HE DIDN'T KNOW WHAT HE WEARING THAT NIGHT BUT HE SAYS THE DOES WEAR HOODIES (INAUDIBLE) CONSISTENT WITH MR. ALLSTON SAYING THAT THE MAN BEHIND HIM WAS WEARING A HOODIE AND THAT'S IN PART WHAT FRIGHTENED HIM.

(HE)   (INAUDIBLE)

(A)    AND WE ASKED THAT YOU TAKE INTO CONSIDERATION WHAT MR. LECOWICZ LEARNED FROM APPEARING IN THE COURTHOUSE AND TALKING WITH ONE OF THE OTHER OFFICERS AND IN SPEAKING WITH THE AH U.S., THE STATE'S ATTORNEY. WHAT'S IN THE LETTER IS THAT THE ARRESTING OFFICER FOUND THAT MR. GIBSON COULD NOT IDENTIFY UM THE ITEMS AS DEFINITELY HAVING COME FROM WAL-MART

(HE)  OKAY WHAT (INAUDIBLE)

(A)  WELL WHAT HAD EXACTLY HAD BEEN STOLEN, I MEAN IT'S NEVER
IDENTIFY WHAT THIS UNKNOWN ELECTRONIC ITEM IS AND WE
HEARD FROM MR. GIBSON, HE WAS ABOUT 20 FEET AWAY, UM SO
WE ASK THE COURT TO MAKE A NO FINDING ON THE THEFT. WHAT I
WOULD ASK YOU TO CONSIDER IN TERMS OF REINSTATEMENT OF
MR. ALLSTON IS TO LOOK AT HISTORY DURING THE PAST ALMOST
THREE YEARS AT THE PREVIOUS HEARING WE HEARD FROM THE
CSO WHO, OR THE FEDERAL PAROLE OFFICER WHO STATED THAT
SHE INTERVIEWED MR. ALLSTON ABOUT WHAT HAPPENED AND HE
TOLD HER WHAT HE TOLD YOU.

(HE)  NAH - HE TOLD HER, HERS A LITTLE BIT DIFFERENT

(A)  OKAY WHAT WAS THE DIFFERENCES?

(HE)  OKAY FOR ONE IS THAT HE SAID THERE WERE SOMEBODY ELSE
NEXT AND NOT HIM

(C)  UHM I SAID WHAT

(HE)  THAT YOU WERE NOT THE PERSON DOING THE STEALING, THERE
WERE SOME OTHER PERSON

(C)  I NEVER SAID THAT SIR

(HE)  AH THAT'S WHAT SHE SAID

(C)  OKAY

(HE)  OKAY

(C)  YEAH, I'M RIGHT, I'M SORRY, I APOLOGIZE

(HE)  AH ACCORDING, UM HE WAS NOT THE INDIVIDUAL WHO WAS
INVOLVED THE CRIME OF QUESTION THAT IT WAS ANOTHER
PERSON STANDING CLOSE TO HIM

(C)  I, I, I NEVER, I DON'T KNOW WHERE

(HE)  THIS IS WHAT SHE SAID ACCORDING TO MR. HOWARD, OKAY

(A)  WELL LET ME, I HAVE A COPY

(HE)  BUT THE BEST THING TO DO

(A)    I HAVE A COPY

(HE)    THE BEST THING FOR HIM (INAUDIBLE) NO CONCERN, IT REALLY
ISN'T

(A)    WELL I HAVE A COPY OF THE TRANSCRIPT OF THE TAPE AND I'LL
TURN IT TO YOU, I'LL PROVIDE IT TO YOU AND THERE'S NO
MENTION OF THAT, WHAT THE CSO SAYS IS THAT SHE DOES
BELIEVE THAT HE WAS NOT INVOLVED IN THE THEFT AND DID NOT
COMMIT THESE CRIMES AND MR. SKOVORK RECOMMENDED
RELEASE AFTER HEARING FROM THE CSO AND HEARING ABOUT MR.
UM

(HE)    AH I HAVE (INAUDIBLE)

(A)    ALLSTON'S BEHAVIOR IN THE COMMUNITY

(HE)    I HAVE (INAUDIBLE)

(A)    THAT'S HE'S

(HE)    (INAUDIBLE)

(A)    BEEN EMPLOYED SUCCESSFULLY, I WOULD JUST LIKE TO SAY THIS
ONE ITEM IN CLOSING DR. PRICE AND THAT IS THAT MR. ALLSTON
EXTRAORDINARILY WELL, GIVEN THAT HE IS EX AN EX-ADDICT,
ADDICTS ARE KNOWN TO USE POOR JUDGMENT, TO NOT AH BE
RESPONSIBLE AND WHAT WE HAVE HERE IS A MAN WHO UP INTO
THE TIME OF HIS ARREST WAS BEHAVING RESPONSIBLY IN THE
COMMUNITY, HE HAD THREE DIRTY URINES THAT WAS MINOR
RELAPSE, BUT WHAT HE DID WAS HE CHECK, HE GOT INTO A
TREATMENT PROGRAM AND HE REMAINED IN ON HIS OWN AND
THAT'S, WE ASKED THAT YOU CONSIDER ALL OF THIS BEHAVIOR,
CONSIDER THAT THE EVIDENCE IS INSUFFICIENT TO MAKE A
FINDING OF AH, ON THESE CHARGES AND (INAUDIBLE) REINSTATE
BACK TO SUPERVISION WITH (ONE MINUTE PLEASE) IS THERE
ANYTHING ELSE YOU WOULD LIKE TO SAY

(C)    (INAUDIBLE) I DON'T, I JUST WOULD LIKE TO ADD THAT, THIS IS IN
REGARDS TO THE INITIAL THEFT SITUATION UM, AND YOU MAY
NOT EVEN FIND IT RELEVANT, HOWEVER I WOULD LIKE TO
MENTIONED IT. THE FACT THAT I AM LIKE GAINFULLY EMPLOYED,
UM AND I REALLY HAVE, I MEAN YOU KNOW, PEOPLE DO THINGS
WHATEVER REASON, HOWEVER AT THAT PARTICULAR TIME YOU
KNOW I I I, WE HAVE, I JUST RECEIVED INCOME TAXES RETURN, I

WAS (INAUDIBLE) THAT WEEK PRIOR I HAD JUST RECEIVED ON WEDNESDAY (INAUDIBLE) CLOSE TO A THOUSAND DOLLARS

(HE)   OKAY, BUT LET ME, LET CUT THROUGH THAT OKAY, BECAUSE AGAIN YOU KNOW THAT THE THAT THE MAIN THING THAT I'M CONCERNED WITH IS YOUR DRAWING THE WEAPON

(C)   OKAY SIR

(HE)   OKAY

(C)   YES SIR

(HE)   I MEAN LIKE, ACTUALLY YOU'VE HEARD CONFESSIONS ON HOW THEY (INAUDIBLE) WHEN SOMEBODY TRY TO ROBBED YOU, DOESN'T MATTER BECAUSE YOU NEED TO KEEP YOUR LIFE

(C)   YES SIR

(HE)   RATHER THAN YOUR PROPERTY

(C)   THAT'S CORRECT

(HE)   OKAY, YOU KNOW RATHER THAN DO THAT OKAY, YOU CHOSE TO DEFEND YOURSELF AND AGAIN I CAN'T HELP BUT WONDER WHAT WOULD HAVE HAPPENED HAD THOSE MEN CONTINUE CHARGING TOWARDS IT, SOMEBODY WOULD HAVE BEEN CUT.

(A)   DR, PRICE ONCE YOU MAKE THAT INFERENCE THAT HE WOULD HAVE BEEN CUT, BUT HERE'S ANOTHER THING LEGALLY MR. ALLSTON DEPENDING ON WHAT THEIR ACTIONS AS THEY APPROACHED HIM, IF THEY DIDN'T IDENTIFY THEMSELVES, IF THEY THREATENED HIM AND HE FELT AN IMMINENT DANGER OF SERIOUS BODY HARM OUT THERE ON A DARK PARKING LOT, HE WOULD HAVE BEEN ENTITLED TO USE DEADLY FORCE

(HE)   OKAY, AND HE AS YOU WELL KNOW, EVEN IF THEY HAD CONTINUE APPROACHING HIM AND HE HAD USED THAT KNIFE, AND, AND SHORT OF THEIR JUMPING HIM, OKAY, HE WOULD BE IN VIOLATION

(A)   OR

(HE)   THAT'S NO WEAPON

(A)   HE'S PERMITTED TO CARRY A WEAPON FOR PURPOSES OF HIS JOB

(HE)  IT'S NOT A WEAPON

(A)   WHICH IS WHAT HE WAS DOING

(HE)  BUT IT'S NOT A WEAPON, IT'S NOT A WEAPON

(A)   IT'S A POCKET KNIFE

(HE)  IT'S A TOOL, IT'S A TOOL

(C)   TOOL

(HE)  IT'S A TOOL

(C)   IT'S A TOOL, SIR

(A)    FIRST OF ALL IT'S A POCKET KNIFE

(HE)  OKAY WHETHER IT'S A POCKET KNIFE OR A BOX CUTTER OR WHATEVER

(C)   (INAUDIBLE)

(HE)  OKAY IT COULD INSTANTLY [KINDRED?]

(C)   YES SIR, BUT I, I, I WORK WITH HAMMERS, I WORK WITH NAILS, ANYTHING THAT I WORK WITH

(HE)  OKAY, BUT AGAIN YOU WEREN'T IN A WORK ENVIRONMENT

(C)   YES SIR

(A)   BUT DR. PRICE BY YOUR LOGIC, IF HE WERE IN A PARKING LOT AND BE SET UPON BY ROBBERS, HE WOULD SUPPOSED HAVE TO BE STANDING THERE, AND THAT'S CONTRARY TO THE LAW OF SELF-DEFENSE.  AND WHAT WE DO KNOW IS THAT HE NEVER EVER POINTED IT AT THEM

(C)   I THINK WHAT MORE IMPORTANT SIR IS

(A)   HE HELD IT AT HIS SIDE

(C)   I THINK WHAT'S MORE IMPORTANT SIR

(A)   NEVER MADE A THREAT

(C)     THAT ONCE I REALIZED, ONCE I REALIZED WHO THEY WERE AND
WHAT THEY WHAT WAS GOING ON I MADE AN ATTEMPT TO GO TO
MAKE SURE THAT EVERYTHING WAS RESOLVED

(A)     HE WAITED ON THE SCENE

(C)     BECAUSE I KNEW THAT I DIDN'T DO ANYTHING, I DIDN'T DO
ANYTHING WRONG, I I

(HE)    WITH THE STORE

(C)     EXCUSE ME SIR

(HE)    WITH THE STORE

(C)     WITH THE STORE

(HE)    YEAH

(C)     WITH THE STORE

(A)     OR IN THE PARKING LOT

(C)     OR WITH THE INDIVIDUALS, I DIDN'T ATTEMPT TO HARM ANYONE,
I'M NEVER WANTED TO HURT, HARM ANYONE, THAT WAS NOT MY
INTENT SIR

(HE)    OKAY

(C)     AND THAT'S WHY I WAITED FOR THE OFFICER TO COME AND AND
AND WANTED TO ADDRESS THE ISSUE BECAUSE I WAS NOT TRYING
TO HARM ANYONE AND I KNEW DIDN'T ANY WRONG IN THE STORE,
I DIDN'T STEAL ANYTHING, SO THAT'S THAT'S MY MOTIVATION FOR
STAYING, I COULD HAVE WELL LEFT, I HAD PLENTY OF TIME TO
LEAVE BUT I DIDN'T LEAVE BECAUSE I KNEW THAT I DIDN'T DO
ANYTHING WRONG, AND I DIDN'T AT POINT, I UNDERSTAND WHERE
YOUR CONCERNS AT THIS POINT, BUT I DIDN'T AT THAT POINT
EVEN CONSIDER IN ASSAULT, WHEN THEY CHARGE WITH ASSAULT,
I I COULDN'T, I COULDN'T UNDERSTAND WHERE THAT WAS COMING
FROM

(HE)    HAVE YOU ASKED YOUR ATTORNEY TO DEFINED THE ASSAULT
(INAUDIBLE)

(C)     I HAVE THE DEFINITION OF ASSAULT RIGHT HERE, SIR

(HE)   OKAY, OKAY,

(C)    I HAVE THE DEFINITION OF ASSAULT AND IT'S AH, IT SAYS AH AGGRAVATED ASSAULT MEANS A FELONIOUS ASSAULT THAT INVOLVED, A) A DANGEROUS WEAPON WITH INTENT WITH INTENT TO CAUSE BODILY INJURY, NO MERELY TO FRIGHTEN WITH THAT WEAPON, SEROUS BODILY INJURIES OR AN INTENT TO

(HE)   THAT'S AN AGGRAVATED,

(C)    COMMIT

(HE)   THAT'S AN AGGRAVATED ASSAULT

(C)    THAT'S WHAT, THAT'S WHAT I'M CHARGED WITH, ASSAULT ONE SIR

(HE)   OKAY, WHAT ABOUT SIMPLE ASSAULT

(C)    I HAVE THAT'S AS WELLS SIR, LET ME GO TO THAT TO

(HE)   UHM UHM

(C)    LET ME GO TO, LET ME GO TO, I HAVE THAT AS WELL SIR, LET ME, JUST GIVE ME A SECOND SIR  PLEASE, AH THE SIMPLE ASSAULT, SIMPLE ASSAULT AH, CON CONSIST OF WHOEVER LAW, UNLAWFULLY ASSAULT OR THREATENS ANOTHER IN THE A IMMERSING MANNER SHALL BE FINE NOT MORE THEN A THOUSAND DOLLARS OR BE IMPRISONED NOT MORE THEN A 180 DAYS OR BOTH, ANY PERSON WHOM OR ON MORE THAN ONE OCCASION ENGAGES IN THE CONDUCT WITH THE INTENT AGAIN TO CAUSE EMOTIONAL DISTRESS TO ANOTHER PERSON OR PLACE ANOTHER IN REASONABLE FEAR OF DEATH OR BODILY INJURIES WILL WILLFULLY BY WILLFULLY, MALICIOUSLY AND REPEATEDLY FOLLOWING OR HARASSING THAT PERSON OR WHO WITH A LEGALLY PERSON WILLFULLY MALICIOUSLY AND REPEATEDLY FOLLOW OR HARASSES ANOTHER PERSON IS GUILTY OF THE CRIME OF STALKING AND ASSAULT

(A)    NO GO DOWN THE EXCEPTIONS

(C)    IT SAYS FOR THE PURPOSE, DOWN HERE IT SAYS FOR THE PURPOSE OF THE TERM HARASSING MEANS ENGAGING IN A COURSE

(A)    WELL

(HE)   (INAUDIBLE) LOOKING AT STALKING (INAUDIBLE)

(C)    NO THIS IS, THIS IS AN ASSAULT

(A)    THIS ASSAULT

(C)    THIS IS ASSAULT SIR

(HE)   THIS IS ASSAULT, THREATENING (INAUDIBLE)

(A)    BUT THE POINT BEING IS THERE IS A DEFENSE TO ASSAULT

(C)    ASSAULT, (INAUDIBLE) STALKING, EVERYTHING IS INCLUDED WITH
       THAT SIR

(A)    DR. PRICE IS THAT IS IF YOU FEAR YOU ARE IMMINENT DANGER OF
       BODILY YOU ARE ENTITLED TO DEFEND YOURSELF.  AND WHAT MR.
       PRICE, AND WHAT MR. ALLSTON HAD ON HIM WAS NOT A
       DANGEROUS WEAPON

(C)    RIGHT

(A)    WAS A POCKET KNIFE AND HE NEVER EVER POINTED AT THE MEN

(C)    AND IT ALSO ALSO, HERE IT TALKS ABOUT THE DANGEROUS
       WEAPON, IT SAY DANGEROUS WEAPON THE MEANING INCLUDES
       ANY INSTRUMENT THAT IS NOT ORDINARILY USED AS A WEAPON
       RIGHT, WHICH (INAUDIBLE) MY KNIFE, BUT BUT IF SUCH AN
       INSTRUMENT IS INVOLVED IN THE OFFENSE WITH THE INTENT, IT
       STILL WITH THE INTENT TO HURTS SOMEBODY, AND I NEVER HAD
       THE INTENT TO HURT ANYONE SIR

(HE)   UHM UHM

(C)    AND THAT'S THAT'S THE DEFINITION OF THE DANGEROUS WEAPON,
       I NEVER HAD THE INTENT TO HURT ANYONE, AND THAT'S EXACTLY
       CAME BACK AND WAITED FOR THE POLICE BECAUSE I KNEW DIDN'T
       ANYTHING WRONG SIR

(HE)   ALRIGHT

(A)    I HOPE MY ARGUMENT IS CLEAR THAT HE IS ENTITLED TO DEFEND
       HIMSELF BUT THAT HE NEVER EVER RAISE THAT KNIFE, HELD IT AT
       HIS SIDE AND ONCE HE REALIZED WHO THEY WERE, IT WAS PUT
       AWAY.

17

(HE)    WELL AND ONCE THEY REALIZED THAT HE HAD THE KNIFE THEY BACKED OFF, CORRECT

(A)    WELL HE DIDN'T KNOW WHO THEY WERE, HE BACK OFF THE HE PUT THE KNIFE AWAY, HE DIDN'T DRIVE OFF INTO THE NIGHT, HE DIDN'T' THREATEN THEM, WHEN HE'S OUT IN FRONT OF THE STORE HE DIDN'T PULL THE KNIFE AGAIN, HE NEVER UTTER ANY THREATS,

(HE)    OKAY, ALRIGHT

(A)    DR. PRICE, I LIKE TO SUBMIT COPIES OF THE POLICE REPORTS, THE 911 CALLS, (INAUDIBLE)

(C)    (INAUDIBLE)

(A)    SO WHAT I'M SUBMITTING TO YOU IS THE AH, STATEMENT OF PROBABLE CAUSE, WHICH IS TWO PAGES, AND I AM SUBMITTING THE INCIDENT REPORT WHICH IS ALSO TWO PAGES AND I AM SUBMITTING A COPY OF THE 911 CALL, WHICH IS AH 1, 2, WHICH IS

(C)    WHAT ABOUT HE PICTURES (INAUDIBLE)

(A)    4 PAGES PLUS THE COVER SHEET, A TRANSCRIPT OF THE 911 CALL, AND

(HE)    I HAVE (INAUDIBLE)

(A)    OH OKAY, YOU HAVE THAT ONE

(HE)    THIS IS A SEPARATE COPY ALSO,

(A)    OH THAT'S OKAY IF HE HAS IT, (INAUDIBLE) IF HE HAS THAT SAME ONE,

(C)    THIS ONE ALRIGHT SIR, ALL WHAT AM I MISSING,

(A)    I DON'T KNOW ABOUT THOSE

(HE)    HELLO

(C)    THIS ONE(INAUDIBLE)

(A)    OKAY, WE'LL SUBMIT THE AH THE MAP THAT THE SECURITY OFFICER MARKED SHOWING HIS POSITION AND WHERE THE DISPLAY WAS

(C)     (INAUDIBLE)

(A)     AND THE (INAUDIBLE)

TAPE ENDED

**EXHIBIT B3**
**TRANSCRIPT OF REVOCATION HEARING**
**DECEMBER 12, 2007**

TRANSCRIPTION—12/20/2006 REVOCATION HEARING
AMU ALSTON - FINDINGS
1st SIDE


(HE)  HEARING OFFICER
(C)   CLIENT
(A)   ATTORNEY


(A)   AND THEN THERE'S THE DIAGRAM OF THE PARKING LOT

(A)   I WILL ALSO SUBMIT THE TRANSCRIPT FROM THE ORIGINAL HEARING
      AND I'VE MARKED WHERE THE PAGES ARE CONCERNING THE TESTIMONY
      OF THE CSO.  THERE IS A TRANSCRIPT OF THE ORIGINAL HEARING

(HE)  BACK ON THE RECORD

(HE)  I FIND LOOKING AT EVERYTHING AVAILABLE AH AH UM, MR. ALLSTON
      AND MS. RODRIQUES. AH AND  WHAT I HAVE
      I'VE DONE IS AH, I'VE ADDED A DIFFERENT CHARGE, A
      SEPARATE CHARGE THAT'S CHARGE OF SIMPLE ASSAULT.
      AND UM, MY ONLY CONCERN IS THIS, WHEN YOU ARE
      DEFENDING YOURSELF, WHAT YOU TRY TO DO IS DEFEND
      WITH THE SAME AMOUNT OF INTENSITY OR SAME LEVEL AS
      THE THREAT TO YOU, PRESENT OKAY,  UM THOSE GUYS
      HAD NOT WEAPONS

(C)   IT WAS TWO OF THEM THOUGH

(HE)  THOSE GUYS HAD NOT WEAPON, YOU PULLED A WEAPON
      THAT'S BEYOND WHAT WERE YOU WERE CONFRONT WITH

(C)   (INAUDIBLE)

(HE)  LET ME LET ME SAY SOMETHING, ALRIGHT UM AND AS
      SUCH YOU HAVE COMMITTED ON ASSAULT.  (INAUDIBLE)
      YOU HAVE COMMITTED AN ASSAULT AGAINST A LAW
      ENFORCEMENT OFFICER IN THAT MR. GIBSON IS "LAW" LAW
      RELATIVE TO THE JOB, THAT HE IS ESSENTIALLY A
      SECURITY OFFICER OKAY WHICH PUSHES IT UP TO I THINK
      YOU WANT TO GET  TO UUH C OR B I BELIEVE AH TO FROM A
      CATEGORY 2 TO A CATEGORY 3. HAD YOU (INAUDIBLE) AND
      DROPPED IT TOWARD THEM WITHOUT ANY DOUBT IN MY
      MIND IT WOULD BE ADW BUT THAT'S NOT WHAT

1

OCCURRED, UH OKAY UUH THAT'S WHY I'M ADDING THE SIMPLE ASSAULT, YOU FOLLOW ME SO FAR

(C)    I UNDERSTAND

(HE)   I I UNDERSTAND YOU DON'T AGREE WITH ME BUT DO YOU UNDERSTAND WHAT I'M SAYING

(C)    I UNDERSTAND

(HE)   OKAY, SO WITH CATEGORY, CHARGE 2A, HA ASSAULT WITH A DEADLY WEAPON, KNIFE, I'M MAKING A NO-FINDING BECAUSE THERE, THERE IS INSUFFICIENT EVIDENCE TO MAKE A FINDING OF WITH THIS CHARGE, 2 B STILL, I'M MAKING A NO FINDING.  THERE IS INSUFFICIENT EVEN TO MAKE A FINDING.  CHARGE 2C – SIMPLE ASSAULT, I DO MAKE A FINDING OKAY IN THAT YOU BY YOUR ACKNOWLEDGEMENT THAT YOU PULLED A WEAPON, OKAY THAT MAKE IT A SIMPLE ASSAULT, AND AGAIN BECAUSE IT'S UHH (INAUDIBLE) YOU PULLED A WEAPON,

(C)    OKAY

(H)    AND I UNDERSTAND THAT YOU THOUGHT YOU WERE DEFENDING YOURSELF BUT AGAIN THE LEVEL OF DEFENSE EXCEEDED THE THREAT THAT YOU WERE CONFRONTED WITH.

(C)    WHAT WOULD BE EQUAL WHAT WOULD HAVE BEEN EQUAL FORCE, IF IT WAS TWO PERSONS AGAINST ME, WHAT WOULD HAVE BEEN EQUAL, I DON'T UNDERSTAND IT, THAT'S WHAT I SAW

(HE)   JUST GEARING UP TO FIGHT IF YOU HAVE TWO

(C)    FIGHT TWO PEOPLE THAT WOULD HAVE BEEN EQUAL?

(HE)   THAT'S THE THREAT THAT IS CONFRONTING YOU, I MEAN THAT'S NO EVIDENT (INAUDIBLE) EQUAL

(A)    WELL, DR. PRICE WHAT IF, WHAT, THE LAW OF SELF-DEFENSE REQUIRES IS THAT YOU LOOK AT IT FROM THE PERSPECTIVE OF THE PERSON WHOSE UNDERGOING THE EVENT NOT YOU KNOW ARMCHAIR QUARTERBACKING

(HE)   (INAUDIBLE) MS. RODRIQUES

(A)    AND AT THE TIME

(HE)   MS. RODRIQUES

(A)    HE'S IN A DARK PARKING LOT, I JUST WANT TO MAKE MY RECORD,

(HE)   (INAUDIBLE)

(A)    HE HEARS TWO (INAUDIBLE) FEET, SETS OF FEET POUNDING BEHIND HIM.
       HE HEARS GIVE ME THAT BAG, WHAT YOU GOT IN THAT BAG, AND HE
       TAKES A KNIFE, HE DOESN'T POINT IT AT THEM BUT HE IS ENTITLED TO
       USE THE AMOUNT OF FORCE THAT HE FEELS IN HIS MIND THAT THE
       THREAT THAT IS POSED TO HIM

(HE)   (INAUDIBLE) I THINK

(A)    AND AT THAT MOMENT HE TOLD THAT

(HE)   I THINK IT'S MORE THAN THAT

(A)    HE TOLD YOU HE IS THINKING OF THE NEW YOUR TIMES JOURNALIST

(HE)   BUT AGAIN I'M NOT AN ATTORNEY, AND I DON'T PLAN TO BE, BUT AGAIN
       MY UNDERSTANDING IS THE AMOUNT OF FORCE COMMENSURATE WITH
       THE THREAT

(A)    WELL

(HE)   OKAY, AND TO WHERE IN THIS TESTIMONY HAS HE SAID ANYONE
       APPROACHED HIM WITH A WEAPON, BUT

(A)    THAT DON'T HAVE TO HAVE A WEAPON DR. PRICE LEGALLY.  WHAT WHAT
       THE WAY THE LAW, LAW OF SELF-DEFENSE (INAUDIBLE), REQUIRES IS
       THAT SURE THE AMOUNT OF FORCE HAS TO BE EQUAL, BUT THERE ALSO
       IS AN EXCEPTION FOR WHEN THE FORCE IS GREATER AND THAT IS YOU
       HAVE TO LOOK AT IT FROM THE PERSPECTIVE OF THE PERSON WHO IS
       UNDERGOING THE ASSAULT AND WHAT THEIR FEELINGS ARE AND IF
       THERE REASONABLE AND IT WOULD BE REASONABLE UNDER THESE
       CIRCUMSTANCES WHERE YOU HAVE MR. ALLSTON IS WHOSE S IN A DARK
       PARKING LOT.  HE HEARS POUNDING BEHIND HIM.  HE HEARS WHAT HAVE
       YOU GOT IN THAT BAG.  AND HE'S THINKING OF THE NEW YORK TIMES
       REPORTER WHO WAS KILLED DURING A ROBBERY.  AND SO IT WAS
       REASONABLE FOR HIM TO HOLD THE KNIFE AT HIS SIDE.  AND THAT IS
       ALL HE DID.  NOTHING MORE THAN THAT.  BY THE COMMISSION'S LOGIC
       IT WOULD MEAN THAT HE WOULD HAVE TO TURN AROUND SEE WHO
       THEY WERE AND WAIT TO SEE WHAT WOULD HAPPEN WHICH IS SIMPLY
       NOT WHAT THE LAW DEMANDS.  BECAUSE PEOPLE CAN MOVE IN AN
       INSTANT, THEY COULD HAVE BEEN ON HIM, AND THEY COULD HAVE
       KILLED HIM

(HE)   (INAUDIBLE)

(C)    YOU STILL STRESS EQUAL FORCE SIR AND I DON'T SEE HOW YOU CAN SAY EVEN THOUGH I WASN'T EVEN TRYING TO EXPRESS EQUAL FORCE OR APPLY EQUAL FORCE. BUT WHAT I'M SAYING IS THAT SIR THAT IF YOU AT LEAST GIVE ME THE BENEFIT OF THE DOUBT TO SAY THAT I COULD HAVE APPLIED EQUAL FORCE IT WOULD BE NO WAY THAT I COULD APPLY EQUAL FORCE IF THERE ARE TWO INDIVIDUALS COMING AT, CONFRONTING ME WITH ME BY MYSELF WITH BAGS IN ONE HAND SO NOW I'M NOT ONLY JUST BY MYSELF BUT I ONLY HAVE ONE HAND – HOW COULD I IN FACT IMPLY, APPLY EQUAL FORCE THAT YOU ARE IN FACT GIVING ME AT THIS POINT EVEN THOUGH LIKE I SAID I WAS NOT EVEN TRYING TO IMPLEMENT THAT. HOW COULD I EVEN DO THAT UNLESS THERE WAS ANOTHER PERSON WITH ME AND WE BOTH DEFENDED. WE BOTH TOOK TO DEFEND OURSELVES AGAINST THESE TWO INDIVIDUALS. THAT'S THE ONLY OTHER WAY THAT I COULD APPLY EQUAL FORCE. WHICH YOU ARE ALLOWED AT THIS POINT, SIR.

(A)    THE OTHER THING

(C)    ASIDE FOR

(A)    THE OTHER THING DR. PRICE, I WOULD LIKE TO RAISE IS YOUR SUPPLEMENTING THE WARRANT WITHOUT PRIOR NOTICE. UM YOU KNOW THAT'S THE WHOLE PURPOSE OF OF GETTING A WARRANT GETTING CHARGES.

(HE)   UM, WELL

(A)    YOU CAN'T SUPPLEMENT THE WARRANT AT THE END OF THE HEARING.

(HE)   WELL, WELL YOU SEE I LOOK AT SIMPLE ASSAULT IS AS BEING A LESS INCLUSIVE CHARGE THAT HE'S CONFRONTED WITH

(A)    WELL THEN THE COMMISSION NEEDS TO CHARGE IT.  FOR EXAMPLE THEY CHARGE PWID AND THEY CHARGE POSSESSION AND HERE THE COMMISSION CHOSE NOT TO DO THAT.  THEY CHOSE ONLY TO CHARGE ADW-KNIFE.  AND THAT'S IF THEY WANT TO MAKE A FINDING OF SIMPLE ASSAULT. THEY HAVE TO COME BACK AROUND WITH SUPPLEMENTAL WARRANT

(HE)   OKAY, WELL YOU YOU KNOW THAT YOU AND YOUR CLIENT HAS THE RIGHT TO APPEAL AND (INAUDIBLE) I WON'T TAKE IF PERSONALLY, OKAY.  THAT SAID, AH UM THAT'S THIS HOW I SEE IT OKAY?

(HE)   OFF THE RECORD



(HE)   BACK ON THE RECORD, OKAY MY RECOMMENDATION IS THAT UM MR. ALLSTON WAS ON PAROLE, NON OF THE TIME SPENT ON PAROLE SHALL BE CREDITED. PAROLE EFFECTIVE NO I'M SORRY WE WON'T DO THAT. YOU SHALL PAROLE DATE OF 12/20/07 AFTER A SERVICE OF 16 MONTH HE IS SCHEDULED, YOU GUIDELINES CALLS FOR 24 TO 32 MONTHS AND WOULD I'LL TRY TO DO IS TO KNOCK OFF 8 MONTHS OF TIME, OKAY? YOU'LL ALSO HAVE SOME SPECIAL DRUG AFTERCARE CONDITIONS. THAT CONCLUDES TODAY'S HEARING I WISH YOU WELL, UM

(A)    THANKS YOU DR. PRICE, YOU WANT US TO GET (INAUDIBLE)

(HE)   GOING OFF THE RECORD.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

AHU A. AHLSTON

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _11001_
(EXCEPT IN U.S. PLAINTIFF CASES)

PRO SE PR

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

**DEFENDANTS**

USPC

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

Case: 1:07-cv-02354
Assigned To : Urbina, Ricardo M.
Assign. Date : 12/10/2007
Description: Habeas Corpus/2255

**II. BASIS OF JURISDICTION**

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
   Plaintiff

☐ 3 Federal Question
   (U.S. Government Not a Party)

☒ 2 U.S. Government
   Defendant

☐ 4 Diversity
   (Indicate Citizenship of Parties
   in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
    Administrative Agency is Involved)

**☐ D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other)  OR  ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
    defendant
☐ 871 IRS-Third Party 26
    USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
    Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
    Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
    Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
    Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
    Exchange
☐ 875 Customer Challenge 12 USC
    3410
☐ 900 Appeal of fee determination
    under equal access to Justice
☐ 950 Constitutionality of State
    Statutes
☐ 890 Other Statutory Actions (if not
    administrative agency review or
    Privacy Act

— 0 —

| ☑ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☑ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

**V. ORIGIN**

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 2244 - Habeas Corpus -

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS   ☐   ACTION UNDER F.R.C.P. 23   **DEMAND $**   Check YES only if demanded in complaint   **JURY DEMAND:** ☐ YES   ☑ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES   ☑ NO   If yes, please complete related case form.

**DATE** 12/10/07   **SIGNATURE OF ATTORNEY OF RECORD** NCO

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd